THE STATE, EX REL. GEORGE T. WERTS, GOVERNOR, v. MAURICE A. ROGERS AND ROBERT ADRAIN.

1. Whether the senate of the state be a continuous body or one to be organized into life annually, is a purely constitutional question, and therefore as such is to be decided by the courts.
2. In such case where there are two bodies, each claiming to be the true senate, an information in the nature of a *quo warranto* is the appropriate process whereby to test such respective claims.
3. Where a majority of the entire body of senators proceed to organize themselves into a senate, their methods and proceedings are not subject to judicial supervision.

On *quo warranto*.

This was an application for leave to file an information in the nature of a *quo warranto* against Robert Adrain and Maurice A. Rogers, to inquire by what warrant they and each of them claimed to have, use and enjoy the office of president of the senate of New Jersey.

Upon petition filed by George T. Werts, governor, an order to show cause was granted upon Robert Adrain and Maurice A. Rogers, and depositions were taken to be used on the return of the rule.

The rule came on for hearing at the February Term, 1894, before BEASLEY, CHIEF JUSTICE, and Justices DEPUE, VAN SYCKEL, DIXON, REED, GARRISON, LIPPINCOTT and ABBETT.

The facts, in so far as they appear to be pertinent to the inquiry, are as follows: A short time before three o'clock in the afternoon of January 9th, 1894, the nine Democratic hold-over senators assembled in the senate chamber At about three minutes before three o'clock Samuel C. Thompson, who was secretary of the session of 1893, called the senate to order, and Senator Daly offered a resolution, naming Robert Adrain as president *pro tempore.* This resolution was immediately adopted. Robert Adrain thereupon took the chair, and, after waiting until three o'clock or later, ordered a roll-call of the senate. The nine senators referred to alone answered to their names. There was then another wait of three or four minutes, ending in another roll-call. To this roll-call also only the nine senators referred to answered. Thereupon Senator Daly moved a recess of five minutes, which motion was adopted. At about fifteen minutes past three o'clock the senate came to order again.

At this time the four hold-over Republican senators, accompanied by the seven Republican senators-elect, entered the chamber and took their seats on the floor. Immediately after the Republican senators had taken their seats, Robert Adrain, as presiding officer, ordered another roll-call. The names of the hold-over senators, both Republican and Democratic, were called. At the conclusion of the call the secretary announced, in a loud tone of voice: "Mr. President, there are thirteen senators present and have answered to their names." The secretary testified that he believed the whole thirteen did answer to their names. He did not, however, swear positively that they did, and the evidence given by other witnesses makes it very clear that they did not. However, no objection was made by anybody to the announcement of the result of the roll-call by the secretary as above mentioned, and the president thereupon declared that there was a quorum present. No objection appears to have been made by anybody to this declaration.

While this roll-call was proceeding, Senator Stokes, one of the hold-over Republican senators, arose and entered a pro-

test against the organization of the senate on account of its having been effected in the absence of the Republican senators. Senator Adrain ruled him out of order, on the ground that a roll-call was in progress. At the conclusion of the roll-call, Senator Adrain recognized Senator Stokes, and the latter said he arose to a question of the highest privilege, and asked Senator Adrain, as presiding officer, if the usual custom would be followed and senators admitted on their credentials. Senator Adrain replied that he was only one of the body and could not give the desired information. Senator Skirm, another of the Republican hold-over senators, then arose and announced to Senator Stokes, without addressing the chair, that he had the credentials and affidavits of the seven newly-elected Republican senators.

At that point Senator Adrain stated that Senator Daly had a resolution which he thought would cover the matter and give the information desired. Thereupon Senator Daly, one of the Democratic hold-over senators, offered the following resolution : *"Resolved,* That all certificates of election or other credentials of those claiming seats in this senate by virtue of the election held on the 7th day of November, 1893, together with all protests, petitions and other communications or papers presented to this senate concerning its membership, be in the first instance referred to a special committee of three to be appointed by the president, which committee shall report upon the validity of such credentials and shall make such report concerning such protests, petitions, communications or papers as shall be necessary." After the resolution was offered, Senator-elect Voorhees, one of the newly-elected Republican senators, arose in his seat and attempted to address the chair, stating that he claimed his rights on the floor of the senate as senator-elect from the county of Union. Senator Adrain refused to recognize him and ordered him to take his seat. Senator Voorhees declined to be seated, and Senator Adrain thereupon directed the sergeant-at-arms to seat him. Senator Voorhees still refused to be seated, and after some further protest invited the Republican senators and senators-elect to

withdraw to one of the lobbies of the senate chamber, and they all immediately did so.

No notice was taken of the withdrawal of the Republican senators by the nine Democratic senators. Soon after such withdrawal the resolution last offered by Senator Daly was adopted and a committee on credentials appointed. Immediately after such appointment Senator Daly arose and presented the credentials of Christopher S. Staates, a Democratic senator-elect from the county of Warren. These credentials were referred to the said committee, who immediately reported favorably upon them, and Senator Staates was thereupon admitted, sworn in and took his seat.

Next, a resolution was passed as follows: *"Resolved,* That no one shall be admitted to membership of this senate except on motion made for his admission and its adoption by a majority of the qualified and admitted senators." Senator Daly then offered a resolution " that the officers of the session of 1893 be and the same are hereby appointed officers of this session, to hold until further orders shall be made concerning their positions by the vote of a majority of the qualified and admitted members of the senate."

After the passage of this resolution Senator Daly offered the following: *"Resolved,* That the president *pro tempore* of this senate shall hold said office of president until his successor shall be elected by the votes of a majority of the qualified and admitted members of the senate." This resolution was also adopted. · A number of the old officers thereupon took the oath of office. The president, however, does not seem to have done so. This body, thus organized, continued in session some time after the passage of these resolutions and transacted or attempted to transact considerable business. Among other things it appointed a committee to wait upon the governor and inform him that the senate had organized. It also directed the secretary of the senate to inform the house of assembly that the senate had organized. It also passed a resolution adopting the rules of the senate of 1893

for its guidance, and received and referred to committees,. when appointed, three or four legislative bills.

Ever since said organization, or attempted organization, this body has met as a senate at intervals of not more than three days each. Its presiding officer has always been Robert Adrain. It recognizes him as president of the senate and he claims to be such, we are informed, not only by virtue of his election as temporary president and his after-election as president until his successor should be elected, but also by virtue of his election as president at the beginning of the session of 1893. He has done no act as president, however, so far as the testimony discloses, except to preside over the deliberations of this body.

Upon the withdrawal of the Republican senators and senators-elect as aforesaid, they proceeded at once to organize a senate in the lobby of the senate chamber, to which they had withdrawn as above mentioned. Before proceeding with their organization, Senator Stokes stepped into the door opening from the lobby upon the floor of the senate chamber and announced to the Democratic senators there remaining that the senate was about to proceed to organize, and requested them to participate in such organization. No notice was taken of this announcement, and the Republican senators proceeded to organize alone. Senator Stokes assumed the chairmanship of the meeting and Wilbur A. Mott assumed the position of temporary secretary. The credentials of the newly-elected Republican senators were produced and inspected and handed to the secretary *pro tempore*. These senators had taken the oath of office before appearing in the senate chamber, and their respective oaths were produced with their credentials and handed to the secretary *pro tempore*.

The secretary thereupon called a roll of the senators, including those newly elected. The eleven Republican senators all answered to their names. Thereupon Senator Skirm moved that they go into an election of a president. Maurice A. Rogers was nominated, and upon a roll-call he received:

eleven votes.   A secretary and the usual number of officers
of the senate were next elected by the same vote.

After the officers were elected they were all sworn in, in-
cluding Maurice A. Rogers.   Mr. Rogers thereupon took his
seat as president of the senate.   A committee was then
appointed to wait upon the governor and inform him that the
senate was organized.   A message was also received from the
house of assembly to the effect that the assembly was duly
organized and had proceeded to business.

The body thus organized has also been in session at inter-
vals of not more than three days each ever since its organiza-
tion.   Senator Rogers regularly presides over it and is recog-
nized by it as president of the senate.   It has passed bills
and Senator Rogers has authenticated them as president of
the senate.   It has also been recognized regularly and continu-
ously by the house of assembly as the true senate, and has
met in joint assembly with the house, and such assembly has
elected or attempted to elect a state treasurer and comptroller.

For the relator, *Richard V. Lindabury, Frederic W. Stevens*
and *John P. Stockton, Attorney-General.*

For Robert Adrain, *Allan L. McDermott.*

For Maurice A. Rogers, *Cortlandt Parker, Thomas N.*
*McCarter, Samuel H. Grey, John W. Griggs, Gilbert Collins,*
*Richard Wayne Parker* and *William M. Lanning.*

For the relator, *Richard V. Lindabury.*

I. By our statute an information, with the leave of this
court, lies at the suit of the attorney-general upon the relation
of *any* person desiring to sue or prosecute the same against
*any* person or persons who shall usurp, intrude into or un-
lawfully hold or execute *any* office or franchise within this
state.

How much this statute enlarges the common law remedy

by information, there is not now either time or necessity to point out. Words conferring jurisdiction could not well be broader than those here found, and it has been authoritatively determined, in this court at least, that under this act any intruder into any office of a public character in this state, may be judicially ousted by a proceeding in this court. *State* v. *Utter*, 2 *Gr.* 84; *Bownes* v. *Meehan*, 16 *Vroom* 190.

Is, then, the office of president of the senate a public office within the meaning of this act as interpreted by the courts?

The office is recognized in the constitution in four places. In article 4, section 6, paragraph 7, it is provided that "The president of the senate and the speaker of the house of assembly shall, in virtue of their offices, receive an additional compensation, equal to one-third of their per diem allowance as members."

In article 5, paragraph 12, it is provided that, "In case of the death, resignation or removal from office of the governor, the powers, duties and emoluments of the office shall devolve upon the president of the senate, and in case of his death, resignation or removal, then upon the speaker of the house of assembly for the time being, until another governor shall be elected and qualified."

Paragraphs 13 and 14 of the same article are as follows:

"13. In case of the impeachment of the governor, his absence from the state or inability to discharge the duties of his office, the powers, duties and emoluments of the office shall devolve upon the president of the senate; and in case of his death, resignation or removal, then upon the speaker of the house of assembly for the time being, until the governor, absent or impeached, shall return or be acquitted, or until the disqualification or inability shall cease, or until a new governor be elected and qualified.

"14. In case of a vacancy in the office of governor from any other cause than those herein enumerated, or in case of the death of the governor-elect before he is qualified into office, the powers, duties and emoluments of the office shall devolve upon the president of the senate or speaker of the

house of assembly, as above provided for, until a new governor be elected and qualified."

On February 14th, 1845, the legislature passed the following act: "Sec. 1. The powers, privileges, duties and remunerations, granted to or imposed upon the vice president of council by law, at and immediately before the time when the present constitution of the state took effect, shall hereafter be exercised, enjoyed and performed by the president of the senate, so far as the same are not inconsistent with the present constitution; and all such powers or duties heretofore exercised or performed by the president of the senate, are hereby ratified and confirmed, and shall' have the same force and effect as if exercised or performed after the passage of this act." *Rev., p.* 748.

Since the adoption of the constitution, the president of the senate has been made *ex officio* one of "the trustees for the support of public schools." *Rev., p.* 1081, § 65. He has also by the same act been made a member of the "state board of education." *Rev., p.* 1071, § 1.

It seems to me there can be no doubt that an office of this character, with these duties, is a public, substantive one. It is true that it is filled by the senate alone, and that the incumbent is not commissioned by the governor; but it is also true that the incumbent is, and always has been, elected for a year, that the office is upheld by both the constitution and the law, and that its duties extend far beyond the mere service of the senate, and in such extension touch the public welfare at vital points. *Bownes* v. *Meehan,* 16 *Vroom* 189; *State* v. *Utter,* 2 *Gr.* 84.

II. But an information will not lie against a mere claimant to an office. User must be shown in every case, and I submit it is shown in this case.

Maurice A. Rogers has presided over his senate and has attested legislative bills as president of the senate. In so doing he has executed the office in two of its important functions, and, I submit, is clearly guilty of a user of that office unless he has a title thereto. Besides, he has taken the official oath

to " perform all the duties of the office of president of the senate" according to the constitution, and that, by all the cases, is a sufficient user to support an information. *King* v. *Harwood*, 2 *East* 177; *King* v. *Tate*, 4 *Id.* 337; *People* v. *Callahan*, 83 *Ill.* 128.

Robert Adrain has not taken the oath of office as president of the senate, but he has constantly presided over his senate since its organization, as the president of the senate. I submit that this is a sufficient user on his part. Whether it is or not, however, need not be considered, because an information can properly be filed against him under the first section of our *Quo Warranto* act as a mere claimant to an office into which another has intruded.

Neither of these defendants, however, disclaims title to the presidency of the senate nor denies that he is executing the functions of that office. On the contrary, both of them appear and set up title to the same. The question of user, therefore, can scarcely need consideration.

III. Here the argument as to jurisdiction would end in an ordinary case. But we are reminded in this case that the titles to office set up by these gentlemen rest upon the action of a co-ordinate department of the government; that they cannot be inquired into and determined without inquiring into and determining the *status* of this department—and we are told that no court has the power to do this; that within its own domain the senate is supreme and that no inquiry as to its organization or membership can be made in any other forum than its own.

I admit that the court cannot inquire into and determine the titles of these gentlemen without inquiring into and determining the *status* of the respective senates which elected them, but I deny that the court is without the power to do this for any of the reasons stated or for any other reason. To admit this proposition would be to elevate the legislature above the people, to nullify the provisions of the constitution which limit and control its powers, and to rob this court of its prerogative to pass upon all judicial questions that arise in

the state and are not committed by the constitution to other tribunals.

If this proposition were sound it would prevent the court from passing upon the constitutionality of the laws of any usurping legislature that might choose to assemble. A band of outlaws might come together in Trenton, and, by dividing themselves into two bodies and calling one the senate and the other the house of assembly, they might pass laws and this court would be bound to enforce them ; or, as happened in Maine a few years ago, we might have two senates and two houses of assembly, both claiming to have been elected and both passing laws, and this court would be powerless to decide which laws the people must obey.

Such consequences as these must demonstrate the absurdity of this proposition.

Nothing can be more obvious, I submit, than that power must exist in the judicial department of any constitutional government to pass in some way or other upon the constitutional existence of any body setting itself up as the law-making power. When two such bodies exist, who is so blind as not to see that the courts must of necessity decide between them ? If the courts may do this at all, why may they not do it as well in one form of action as another—as well when the title to office of a high public officer is challenged as when the validity of a law is put in question ?

Suppose the governor should die to-morrow and both of the defendants in this case should claim the succession—would the court then be unable to decide which was entitled to it ? It could no more do so then than now, without looking into the organization of the respective senates which elected them. If it could do so then, why cannot it do so now ?

Or, suppose the gentleman elected to the office of state treasurer in February last should assume the duties of that office, and an information should be filed against him on the ground that the body sitting as a senate in the joint meeting which elected him was not the constitutional senate of New Jersey—could not the court in such action try that question ?

If so, why cannot it try the same question in a *quo warranto* proceeding against a person whom the same body has elected to the still more important public office of president of the senate of New Jersey?   See *Attorney-General* v. *Barstow*, 4 *Wis.* 567 ; *Thacher* v. *Boyd*, 143 *U. S.* 135 ; *State* v. *Buckley*, 23 *Atl. Rep.* 186 ; *Prince* v. *Skillin*, 71 *Me.* 367 ; *In re Gunn*, 32 *Pac. Rep.* 470 ; *Burnham* v. *Morrissey*, 14 *Gray* 238.

IV. But it has been argued that, as the constitution makes the senate the judge of the election, qualifications and returns of its members, and as the title of the defendants respectively depends, not so much upon the action of their respective senates as upon the qualifications of the members of those senates to act, the court cannot try such titles without passing upon the very questions exclusively committed to the judgment of that tribunal.

I admit that the court cannot inquire into the qualifications, election or returns of members of the senate, but I deny that it is necessary for it to do so in order to determine this controversy.

Suppose that two houses of assembly should convene in this state ; that one should be composed of thirty certified members and thirty-one members without certificates ; that the other should be composed of thirty-one certified members and thirty members without certificates ; that each should immediately organize itself into a court and pass upon the qualifications, election and returns of all its members, and admit them to seats.   It might be the court could not, upon *quo warranto* proceedings, oust the uncertified members from either house, but it certainly could, without difficulty, upon a proper case, determine which was the true house by determining which was organized according to the constitution. Trying them by that standard, it would be found that the true house was that body which organized with a quorum of certified members, and the fact that the other body consisted of sixty members whose election, qualifications and returns had been regularly passed upon by their fellows, would go for nothing because of the fact that the body which passed

upon them was without jurisdiction as a court for want of a quorum. *In re Gunn,* 32 *Pac. Rep.* 470 ; *State* v. *Tomlinson,* 20 *Kans.* 692 ; *State* v. *Francis,* 26 *Id.* 724.

Suppose the court should find in this case that Robert Adrain was elected by less than a quorum of the senate, what question as to the election or qualifications of the senators so electing him would stand in the way of the court in declaring such election an utter nullity ?

Or suppose the court should find that the senate which elected Maurice A. Rogers was organized, not in conformity with the constitution, but contrary thereto ; that although it had sat as a court and passed upon the election of its members and admitted them to seats, its judgment was a nullity, because it was not the senate of New Jersey, but a mere body of volunteers, what question as to the election, qualifications or returns of the members of this body could then stand in the way of the court in declaring such election void ?

There cannot be two senates at the same time. If the true senate consists of the hold-over members and such others as they shall admit to seats in their body, then the court of the Rogers senators, consisting of less than a quorum of the hold-over senators, and none others who had been inducted into office, was without jurisdiction to admit anybody to seats in the senate of New Jersey. If, on the other hand, the senate, at the beginning of a session, consists of the hold-over members and the members-elect who are properly certified, then the organization of the Rogers senate, participated in by a quorum of the whole number, conformed to every constitutional requirement, and the election of Mr. Rogers by that body gave him title to the office which he claims.

The simple question to be considered, therefore, is this : Who constitute the senate at the beginning of a session ? Upon that question every other question in this case depends, and it is folly to claim that in solving it the court will be required to pass upon the election, qualifications or returns of any member of the senate.

V. I need scarcely argue that no question can arise in this ·

case as to the *de facto* existence of either of these bodies. As was pointed out by the judges in both the Maine and Kansas cases, there can neither be two *de facto* legislatures, nor a *de facto* and a *de jure* legislature at the same time. *McCra. El.*, § 596.

VI. There should be a remedy somewhere for such a case as this.

The only judicial remedy, other than that here sought, which I have heard suggested from any source, lies solely at the instance of private parties. Such a remedy is no remedy at all. The state is the sufferer from this usurpation. The public peril and confusion to which its peace and dignity are exposed are an infinitely greater injury than any individual can sustain. It will not do, therefore, to point out a remedy which the state itself cannot invoke.

It has, however, been suggested in some quarters that the question presented is political and not judicial, and that therefore no court can provide a remedy.

This position has been overruled so often that it calls for no discussion now. It was first taken, in effect, by Mr. Carpenter in the Barstow case, and was there overruled by all the judges. It was taken also in the Kansas case and was there overruled. It is likewise opposed to the decisions referred to in the Maine case, the Connecticut case and the Nebraska case, and to the opinion of every approved text-writer on the subject. See *McCra. El.*, § 347; *Cooley Const. Lim., p.* 786.

For Maurice A. Rogers, *Cortlandt Parker.*

I. The senate is no continuous body in the sense of one continuing from session to session.

The members all continue members " until the second Tuesday in January of each year, at which time of meeting the legislative year begins." Art. 4, § 1, ¶ 3. During the period between their adjournment *sine die* and the meeting of the new senate, the old subsists, but in a state of suspended animation. The governor, by calling a special meeting of the

legislature, can break this suspended condition. The same is true of the house of assembly. It continues to exist—in identically the same way. That is, the members remain members for the year, without power to convene except at the governor's call. When the time of meeting which begins the legislative year arrives, then the old members of the assembly go out and new members take their places. And this is true of one-third of the number of the senators. They go out and others take their places. The fact that all do not go out, does not make the senators who remain constitute a body. They cannot do so till they meet their new fellows. Then the old and the new make up the senate of that year.

Does the president of the senate one year remain and act as the president of the senate of the next? Not so. The case shows it. Robert Adrain did not assume to be president. A motion made him president *pro tempore* only. Did the secretary of the last senate hold over? Not so. The case says the senate was called to order by Samuel C. Thompson, the secretary of the last senate. Is there any other officer of the *last* senate that remained an officer of this, *virtute officii?* Not so. The case shows a resolution passed by this " Council of Ten," " that the officers of the senate for 1893 were thereby appointed officers of this session."

If the body continue, how comes it that the head and the tail—the president, the secretary and the sergeant-at-arms and all the smaller officers, all through which it manifested its life in action—had ceased long before to be its officers? Had the governor called the legislature together, would not the officers have all taken their places, subject, perhaps, to being changed? Such is the case with congress when called together in special session.

It is urged, and the argument made is upon this alleged analogy, that the senate of New Jersey is like the senate of the United States—both are made up by classes; that the United States senate is pronounced to be a continuous body, and that therefore this is the case with the New Jersey senate.

How is it proved that the United States senate is a con-

tinuous body in the sense asserted? ˙ Some members, debating
on some different subject, talked as if they meant so.   It would
seem that the topic was the continuance of the rules from
congress to congress.   Well, do the rules of our senate so
continue?   They might continue by law, without the body
being continuous.

Mr. Clay, quoted by the attorney-general, seems nearer
right.   "In the true contemplation of the constitution, the
senate and the house, too, were supposed to be in existence.
The senate and house were, in the contemplation of the con-
stitution, continuous bodies.".

Mr. Buchanan argued for the senate's being a permanent
body thus: "Its rules were permanent."   Not so with our
senate.   "Its secretary was permanent."   Not so with our
senate.   "The senate always had a president."   Not so with
ours.

The arguments in our constitutional convention fall far
short of claiming that the senate would be a continuous body.
Those who favored its division into classes favored a long
term instead of a short one, thinking that thus the *character*
of the body would be more *stable.*   The long term would call
for better men.   The division into classes would bring in new
minds, and they would be influenced by the experience of the
hold-overs.   Do the words " continuous body " occur in any
of these arguments?

II. If the senate be a continuous body in any sense, its
members possess no power to sit upon the right of their
fellows in organization.

I have had the curiosity to look into the journals of the
United States senate to see how its sessions were organized.
I examined the journals from 1789 to 1849.

At the first session, in April, 1789, the members came
slowly in.   At last, April 6th, the journal shows the presence
of senators from eight states, three of them only represented
by one senator each.   The journal states their appearance by
name, proceeding, " being a quorum consisting of a majority
of the whole number of senators of the United States.   The

credentials of the aforesaid members were read and ordered to be filed. The senate proceeded to elect a president for the sole purpose of counting the votes for president." Hon. John Langdon was elected.

April 13th other senators are named as appearing, of whom the journal says that they "severally produced their credentials and took their seats in the senate."

No committee, no approval, no vote of admission.

In the second session of the same congress the journal gives the names of a quorum as appearing, and resolutions then inform the president and the house that they are ready to proceed to business.

In the third session new members appear, "produced their credentials and took their seats."

At a later day, P. Dickinson, from New Jersey, "produced his credentials and took his seat in place of Gov. Paterson."

The journals of 1791 to 1795 show the like. At first no statement was made that the oath was administered; afterwards there was. The act requiring the president of the senate to administer the official oath to the members was passed in 1789. The journal does not mention its administration till 1791.

But never is more said in any minutes than that the new man produced his credentials, which were read, and then, the oath being administered, he took his seat.

No vote admitting, no approval even; nothing but reading the credentials, through which the other members were simply informed of the right of their new associate.

The ordinary way with the journal is as follows:

First, it announces that, the day for session having arrived, the following senators appeared, giving the names of all, both old and new. Then the new are mentioned by name a second time, and then the journal says, "who severally produced their credentials and took their seats in the senate."

Such was the entry in 1789. After this "the senate elected a president *pro tem.*, to whom, by motion, Mr. Read administered the oath required by law."

Then a resolution is stated that a message be sent to the house and to the executive that a quorum was ready to attend to business.   In 1801 the journal gives a list of all, and then names eight new members, who are stated to have severally produced their credentials and taken their seats.   Then came election *by all* of a president *pro tem.*, a legal officer by force of the statute, and that officer administered the oath to the new members.   They voted for him before they were sworn in.   Then came the resolution notifying that there was a quorum ready for business.

In 1803 to 1805 like entries occur.   In 1807, Vice President Clinton being in the chair, the statement is that the new members respectively took their seats and presented their credentials, which were read, and the oath prescribed by law was administered to them.

Hon. John Pope had left his credentials at home, but said he expected soon to get them, " whereupon he took his seat and the oath was administered to him as the law prescribes."

The oath was also administered to four others, whose credentials had been given to the senate at the last session.   All this being done, the notification that a quorum was in session was directed.

The same practice obtained year by year.   The record names all senators appearing, then states the new ones, and that they produced their credentials, generally adding that they were read, and then stating that they took their seats and were sworn in.   Often men were sworn in and took their seats without producing credentials, sometimes because left at home, oftener when presented before.   All this preceded the resolution for notifying the house and the executive that a quorum was in session.

In the twenty-third congress, 1833, the journal is noticeable.   A full list of members is given, then new ones named in it are mentioned and stated to have produced their credentials, been sworn in and to have taken their seats.

Then occurs this entry : " The president communicated an act of the general assembly of Rhode Island declaring void

the election of Asher Robbins, and a certificate by the governor of that state of the election of Elisha R. Potter." Then a motion was made to administer the oath to Mr. Robbins, whose credentials were received at the last session. Mr. Benton then moved to refer the matter to a committee to consider and report. Ayes and nays being called, that motion was lost. Then the motion to administer the oath was put and carried. The oath was administered and Mr. Robbins took his seat.

And then came the resolution of notification that a quorum was in session ready for business.

Throughout the long period examined, this is the only case in which action was formally taken upon the right of a member during the process of organization. In this case contest was made by the state and by an individual contestant himself bringing a certificate of election; and the vote of the court endorsed the law that not even the statute of the state represented declaring the election void, and the contesting credentials of a governor, authorized considering the members' credentials.

Now, when it is considered that there never has been any one legally-enacted form for the credentials of a member; that each state had its own; the improbability that such credentials should not sometimes differ, and that during sixty years they never were referred—never appeared to have been examined, but were simply read—or known or believed to exist, and that the rights of members-elect were never affirmed by a vote of their fellows except in this one case of contest, and never were denied, and that they took their seats, several times voting before their credentials were even read, what becomes of the idea that the senate of the United States, taken as the pattern of that of the State of New Jersey, justifies the assumption, whether it be a continuing body or not, that the hold-over members in our senate had the right to sit in judgment upon the credentials of their newly-elected fellows, and if they pleased, deny them the seats to which they were certified to have been elected by the people?

And, in fact, the law of the United States passed in 1789 impliedly forbids the unorganized senate to prevent the member-elect from taking his seat. *U. S. Rev. Stat., p. 5, ch. III.,* entitled "Organization of Meetings of Congress," enacts as follows : " The oath of office shall be administered by the president of the senate to each senator who shall hereafter be elected, previous to his taking his seat." Does not this imply that *he* shall determine the fact of election and compel him to swear him in ? It does not say when or where—the credentials declare who was elected. The individual is identified by their production. Custom makes him wait till fellow-members assemble. What else does ? But the fact that only the president of the senate can administer the oath, and must do it, puts the determination of the question of authenticity, in fact, upon him.

Even the practice of the house of lords in England demolishes the idea of a continuous body. There are periods there when no parliament exists. At every new parliament every peer renews his oath of office. New peers present their patents and take their seats. Peers by inheritance simply take their seats.

III.–IV. If any practice has obtained in the New Jersey senate of passing upon credentials of senators-elect, it has no warrant of law and is not obligatory. On the contrary, it is a breach of the constitution.

The constitution and the statutes rule, and under these the method of organization pursued by the eleven senators who elected the respondent president is legal and proper.

The whole argument on these two propositions has seemed to me condensed in a few words. Constitutions overrule statutes. Much more do they overrule customs. Customs, in this country, are laws for nothing. They may be conformed to by consent and may be proper. If so, they may deserve and gain respect, and in time, even obedience. But they have no obligatory force. Constitutions and laws have.

What says the constitution ?

" Members of the legislature shall, before they enter on the

duties of their respective offices, take and subscribe the following oath or affirmation." Then comes the oath comprising allegiance to the Union, to the state, and faithful discharge of his official duty, and the section proceeds :

"And members-elect of the senate or general assembly are hereby empowered to administer to each other the said oath or affirmation." Art. 4, § 8, ¶ 1.

Now, taking this oath or producing it in an assembly of a quorum is the initial act of organization of the body. It does not complete organization. Something more is necessary before the body is "ready for business." That, the quorum must do. They must elect a president and a secretary. This done, they *are* ready for business. They notify the governor and the house of assembly. Communications of like readiness, in reply, come from the house, and then the legislature can act.

I may remark here that the framers of the New Jersey constitution were very wise men. They foresaw the possibility of just what has happened and still exists, the refusal of partisans in power' to swear in members of the party opposed to them, " members-elect," and so they gave these persons the right to administer the official oath to each other. They did this with the constitution and laws of the United States before their eyes. They did not confer upon the president of the senate, *as such*, this right of administering the official oath, nor upon the hold-over members. If they used the phrase "*members-elect*" in the exact sense, they confined the power of administering the oath to them. They recognized them as " members-elect" upon their certificates giving them the power of performing *this* act of organization.

Perhaps experience had proved the wisdom of this rule of the constitution. It is taken substantially from the constitution of 1776—our first constitution. That instrument says (article 23) : "And any person or persons who shall be elected as aforesaid, is hereby empowered to administer to the said members the said oath or affirmation." This phraseology, if adopted by the convention of 1844, would have more clearly

included hold-over members as authorized to swear in new. But it had no such operation then, because there were no old members. All were elected yearly. To give this power to old members under the language of our present constitution, compels construing the phrase "members-elect" to mean members elected, whenever the election happened. It is not necessary, in this case, to deny such power to the hold-over members. But they have no more power in this respect than those who are strictly "members-elect" in ordinary parlance —men who have not taken their seats.

We return, then, to this provision of the constitution and ask if a practice has obtained in our senate of passing upon credentials of members-elect, giving hold-over members the right to sit and admit members-elect, and, as argued, the right to refuse or delay, is it not a breach of the constitution? If a man comes, bearing a certificate that he is a member-elect, and an official oath is taken, or has been taken, by him, administered by a fellow member-elect, is not that man a senator, entitled to take his seat, and without legal right on the part of any other man to say him nay?

And more, is it not true that a practice or custom by which hold-over members regard only themselves as the senate is forbidden by the constitution?

That this is so, and that no rights exist through the hold-overs forming a "continuous body," appears from the fact that this provision of the constitution applies to both houses. The house of assembly being elected annually, no such question can there arise. There is nobody but the members-elect who can act in the organization. Yet the provision is emphatic and clear. "Members-elect of the senate or general assembly are hereby empowered to administer to each other." So the practice in the house, necessary because there are no members but members-elect, is to be the practice in the senate. Is not this clearly so?

But does the constitution stop here?

We read, in article 10, schedule, the following: "It is hereby declared and ordained that the common law and

statute laws now in force, not repugnant to this constitution, shall remain in force until they expire by their own limitation or be altered or repealed by the legislature."

Now, at this time—1844—there subsisted a statute passed in 1839, entitled "An act to regulate elections." It regulated the whole subject of elections. By its seventy-eighth section it directs the county clerk to certify the result under the county seal, and deliver the certificate to each member, and by section 94 it provides that " *in the organization* of each house, the certified copies of the statements of determination made under the direction of the seventy-eighth section *shall* be deemed and *taken* to be *prima facie* evidence of the right of the persons therein mentioned to seats in the houses respectively, to which they will have been so determined to be elected." *Pamph. L., p.* 229.

This act then becomes, by the constitution, a temporary part of it. It is not repugnant to it. It had not expired by its own limitation. It was not altered or repealed by the legislature September 2d, 1844, when the constitution went into force. It remained upon the statute-book untouched for several years. In 1844 an act was passed adding to the section, but renewing this part of it. During this period the senate convened several times. The enactment had the force of all statutes, and, beside, the force of the constitutional adoption and confirmation.

Does it not, in combination with the section empowering members-elect to administer the oath of office to each other, settle the question that the late practice of the senate, if it be as described and contended for, is contrary to the constitution, abolishing all argument based on the theory, whether true or false, that the senate is a continuing body? For the two provisions, taken together, say: "There shall be no question when senators, hold-over and elect, convene for organization, as to the credentials held by those who attend. In organization, these credentials *shall* be deemed and taken to be *prima facie* evidence of the right to seats of those who bring them. There is no right, then, to go behind them, and those who

bring them are hereby authorized, that is, directed, to administer the oath of office to each other."

This act of 1839 was followed in 1846 by "An act to regulate elections," approved April 17th, 1846, the ninety-sixth section of which re-enacts section 94 of the act of 1839, with an addition. *Pamph. L., p.* 222. It is printed also in the Revision of 1847. It reads as follows : " 96. ' *And be it enacted,* That the senate and general assembly shall convene and hold their sessions in the state-house at Trenton ; and in the organization of each house, the certified copies of the statements of determination, made under the direction of the seventy-ninth section of this act, shall be deemed and taken to be *prima facie* evidence of the persons therein mentioned to seats in the houses respectively, to which they shall have been so determined to be elected."

" *So* determined to be elected." Every word is important. The election, the right of the member was *determined* by the canvassing board, officer or officers. The certificate of it is a judgment of record, estopping all denial, save that afterwards when there is a " house," it shall be the judge of the elections, returns and qualifications of its own *members.*

The section remains the law. It was re-enacted in the last (1876) Revision in the same words. *Rev., p.* 353, § 85. .

How any such practice has sprung up as that alleged to exist in the senate, in the face of these enactments, the constitution and the statutes regulating elections, is difficult to comprehend. It did not begin its sessions thus. The senate journals for 1845, 1846 and 1847, and the evidence of Mr. Daniel Dodd, the first secretary of the New Jersey senate, show this, and show also that the practice then begun was according to the constitutional and statutory requirements.

In 1849 the new practice seems *half* begun. The hold-overs are stated to have appeared *in their seats.* The secretary of the last senate called to order. Then one of the hold-overs, on motion, was made president *pro tempore.* Then one of the hold-overs presented the credentials of a member-elect, which were read and approved, " and the oath prescribed

by law having been administered to him by the president *pro
tempore*, he took his seat in the senate." (So with others
newly elected.) Then the journal proceeds, the newly-elected
members of the senate having been all sworn or affirmed, the
senate proceeded to the choice of a president for the present
session.

This is the first time when anyone as president *pro tempore*
administered the oath of office. It would seem probable that
some one got hold of a journal of the United States senate,
and did not notice the difference between its president *pro
tempore*, an officer directed to be created by statute, and one
who was a mere chairman of an unauthorized meeting taking
the place of president over such members as appeared in their
seats to facilitate an orderly organization. And so the use of
the word "approved," an entirely incorrect word to express
the only fact, to wit, that the credentials as read appeared to
come from the right source—a word not found in the early
minutes of the United States senate—was a mistake. There
was no more right to approve than there is in a judge to
approve the record of a judgment put in evidence by its pro-
duction before him. Yet it *could* mean nothing more than
that it was in form.

Yet what right had a president *pro tempore*, as such, to
administer the official oath ? He did not have it by the con-
stitution, as such, I say. I will not here argue, for it is
unnecessary, that he was not a member-elect, and therefore
could not swear members-elect in. That would perhaps be
giving too narrow a meaning to the phrase "member-elect."
And yet the statutes are curiously drawn on this subject.

The act relative to oaths and affidavits (*Rev., p.* 740),
passed in 1857, allows (section 1) all necessary or proper oaths
to be taken before a number of officers, but provides that it
shall not apply to official oaths required by any officers of this
state. Section 4 authorizes the president of the senate to
administer oaths in any matter or case under examination,
but it does not mention the official oaths of members.

The act prescribing oaths of public officers (*Rev., p.* 901)

begins with prescribing the oath of allegiance, and, by section 9, empowers any member of the senate or general assembly to administer the oath of *allegiance* to his fellow-members of the same house. But there is no authority given to administer the official oath. So there is more doubt as to the right of the president of the senate or *pro tempore*, as such, to administer oaths of office to members-elect than there is of their right to do this to each other.

I do not see where either gets his right, except that any member elected comes within the description "member-elect."

The result of all this is that the method of organization adopted by the hold-over senators had not the warrant of the constitution of New Jersey or of its statutes, and was besides dissimilar to that with which the New Jersey senate began, and to that which the United States senate has practiced from 1789 to 1849, if not to the present day.

And a rightful inference is that for this reason there was no lawful claim on the four hold-over senators or the seven senators-elect to remain with the nine hold-overs who convened and still convene as the senate of New Jersey, and that this convention of the nine or the ten is not only no senate, but it is yet acting contrary to their duty in refusing to join the majority.

This is so, even if in any unsubstantial particular the proceedings of the eleven who elected the respondent, Rogers, were irregular. Mere irregularity never vitiates, especially when it occurs on the part of those who, by law, have no responsibility for their conduct to any court. *A fortiori* is it the duty of the Adrain and Daly party to give up their daily and laborious occupation of adjourning and enter the room where the *eleven* meet, because the organization by the eleven was and is in strict obedience to the constitution and the laws.

What were the proceedings of the eleven in their organization of the senate?

They met at Trenton, in the state-house. Obstructed by a mob, some of whom were armed, they at last struggled suc-

cessfully into the senate chamber. There they found ten fellow-senators, and, after a few minutes, they went into an adjoining room, inviting them to follow, and proclaiming that they were about to organize the senate. They had their credentials as senators-elect with them, and offered to show them. They produced their official oaths, taken, as the constitution required, before each other. One of the number acted as chairman, under the title of president *pro tempore*. The certificates were produced, and to make assurance doubly sure, they appear upon the journals, as do also the official oaths of each new man, in full. They then proceeded to elect a president of the senate. The roll of the whole senate was called, and a majority elected the respondent. They then elected a secretary. All this done, they appointed three of their number a committee to inform the executive, and likewise to inform the house of assembly, that there was a quorum, and that they were ready for business.

"They were not in the senate chamber"—no and yes. They were in a room adjoining, a usual appendage to the chamber, but with the door open. But no law requires them to be in the senate chamber. All it does require is that they should be in the state-house at Trenton, and they were there.

They were not there and then sworn in. But they had been. The evidence of it was there, along with their credentials. Both were offered, shown, recorded on the minutes. Everything was done that day. The law takes no further account as to time. The law does not require the ceremony of oath-taking to be public, or in the presence of an assembly of senators. The substance is there. The law provides no form except the oath, and that was observed. The oath of each man was administered to him by a fellow-member-elect. Each officiating member "determined" that the credentials produced certified the right of the other and then each took before another the official oath.

The constitution and the law was fully obeyed and by a quorum. Why is there not a senate of New Jersey?

What signifies the motive that led them to take this course?

They were the majority and they had the power. For the reason, the propriety, of their action they must answer to the people. It may have been cowardice or prudence; it may have been reasonable distrust or unreasonable misconception of the unlawful projects of an adversary. This court has nothing to do with their motives. They are not on trial. Nay, this court cannot put them on trial. To their own master, they stand or fall. That master is the people. They obeyed the will of the people as made known to them by the constitution and the law. They were the majority. They were the quorum. They had the legal power. They can give good reasons to satisfy good men that in their action they were not partisans, but patriots. But no judicial tribunal exists which can demand of them anything more than conformity to law, if there is any that in this matter can do that.

V. But the insistment is that the action of Messrs. Stokes, Skirm, Hoffman and Smith in leaving their fellows who had taken their seats as *the* senate in the chamber appropriated to that body, broke up a quorum which had existed, and that a senate had convened, wherefore the majority could create no other. In opposition to this, we say that the presence of these four gentlemen there at that time did not make up a senate.

What are the facts? They are best shown in the evidence of Mr. Senator Voorhees, to which we ask the attention of the court in view of its intelligence, its fullness and because he was the leader in the action taken.

They arrived too late for participation in the selection of a temporary chairman. Their presence was made known only as was that of a dozen others who were also in the room, and there before they arrived. They were not there presenting themselves to join in the deliberations of the meeting, nor were they supposed so to be. Their names may have been called, but they did not answer, and, on the evidence, they did not hear. While the chicanery of recalling the roll was going on, one senator was protesting against what had been done and against what was doing, asserting the rights of the members-elect, producing their credentials and their oaths of

office and demanding that their rights be respected. It was declared by the acting president, in answer to a question whether the members-elect would be permitted to take part in the organization, that they had no rights and that he would not respect them. Thereupon, convinced that there was no defence of the rights of the people of the state possible except through the course actually pursued, the majority of the senate, including the four hold-overs mentioned, withdrew into the adjoining room, a part of the senate chamber, and exercised their right of organizing the body—inviting the action of those they left, and calling their names from the list obtained from the secretary of state.

All the evidence supports this statement of the facts.

Now, who will pretend that a presence not to organize but to inquire, protest and, on failure to succeed in such protest, to withdraw from the assembly, was presence with the nine men whose preannounced scheme they were there to controvert—first to assure themselves still more of its existence, and then to controvert, by hostile organization? Rather say by an organization hostile to fraud and tyranny, but one strictly according to law, in which the nine men, as well as the twelve others, all entitled through credentials identical in execution, were invited to act?

VI. But even if this action by the four members was secession on their part, still their union with those whose rights to be and act as members the nine denied, transferred the locality of the senate. It created a quorum of that body, and its proceedings then and from thenceforth made a senate *de facto* and *de jure* acting from and after that moment lawfully. It is the only body of the two that can be held to be the senate, and, even if irregular in its inception (though it was not, being according to correct form, and there being no senate rules which could be broken and no pretence existing that any rule was the basis of the practice of the nine), this court should decide and advise that it was the true senate, and that Rogers, its unanimously-elected president, was such.

Another view may be taken of this action by the eleven

members, leading on different grounds to the same result. They started for the senate chamber in full time to get there. They were physically obstructed. But for this they would have been there, not perhaps as early as the energy of the nine brought about, but by three o'clock P. M. They were half an hour late, and their ingress there was far from dignified. The nine had assembled. What of that? They were not a majority of twenty-one. They had chosen a chairman for themselves. What of it? They had passed or did pass a resolution claiming authority to determine upon the rights of certificated members-elect. None of their action was senatorial. None of it was legal. The eleven rescinded what had been done. They might have stayed there and physically fought out the difference between them. They did not. They simply went into a cloak-room and then carried out the rescission. They were senators, all of them, because certificated. They were the majority. Like conduct was confirmed in *State* v. *Foster*, 1 *Halst.* 207; *Kendall* v. *Camden*, 18 *Vroom* 67, endorsing this decision, confining it to action during the same day, and so approving it. This view, of course, takes it for granted that members-elect are members. But surely this is so. And see *Feurey* v. *Roe*, 6 *Id.* 123, where the majority of a board of chosen freeholders, part hold-overs, part members-elect, acted without notice to the minority.

Will this court minister to anarchy? Anarchy exists literally where the law-making power and the appointing power provided by the constitution are blocked. There are degrees of anarchy. Here it has reached to a certain extent. The fact that the majority of one party over the other is only one, and that the minority is wholly (save one) composed of hold-over members has given opportunity for collision, which, through the mistaken action of the governor, prevents the working of the machinery of the government.

This *quo warranto* procedure is intended, and can be valuable only to inform the governor. He has this matter in his power, and no one else has. The adhesion by the minority of ten to the majority will not, by itself, help. The majority

cannot be expected to join the recusant minority. They will not. They feel themselves in the right, and cannot give away the rights the people have given them. What, then, will the court do?

Suppose they declare that the true senate was that which has Mr. Adrain for its temporary head. What then? That assemblage of senators is not a quorum. They are powerless. Mr. Adrain is no officer. If he were, he would have taken the oath. He is simply the chairman of a minority. He is not a proper respondent to a writ of *quo warranto*. He does not claim that he uses or occupies the office of president of the senate. The writ of *quo warranto* cannot possibly be issued to him. Suppose the court decide or advise that the respondent, Maurice A. Rogers, was elected president of the senate by a body of men forming the majority of the senate, but irregularly, and that this election is void, and therefore order the writ to issue against him, what then? Why, then comes the writ, and a plea, and an issue, and then a trial—and if, at the end, the court has the same opinion, and renders judgment accordingly, of ouster against the respondent from the office of president of the senate which he holds. And then can the judgment be enforced? It does not affect his right to be a member of the senate, nor his right to vote as such. It does not affect the right of any other of the eleven who claim to be the quorum of the senate. Nor could a *quo warranto* be issued as to either one of these.

This being so, the majority, if judgment passes against him, can elect the respondent again, or some other man, and procedure like this may go on again. But the deadlock will still continue. The anarchy will increase.

The courts are, therefore, powerless. They can apply no remedy.

But if the court say: Here is a lack of the long-followed ceremony, but still everything substantial is here. These seven men were elected senators. They have their credentials. They have taken their oaths of office. They assemble at Trenton, in the state-house. Four others already elected

meet and vote with them, and together they make up a quorum of the senate. Mr. Rogers was unanimously elected by them president of the senate. The minority knew of the organization and election, and were invited to be present. They are, therefore, a senate *de facto*, and Mr. Rogers is president of the senate. If they so advise and decree, then the governor, who has submitted this matter by these proceedings to this honorable court, who has asked to be instructed by it, will (it must be so) gladly receive the judgment and act accordingly.

The court's refusal to direct the writ of *quo warranto* applied for, as against both these respondents, after a full hearing of all parties, will, even without an opinion, admonish the executive that the majority of the senate *is* the senate and that his duty is to recognize it and set the machinery of government in action again; for that is his unmistakable duty—to set the machinery of government in action again.

And, after all, what is the contest about? The minority could not lawfully refuse any of these seven members-elect their seats. The act to regulate elections forbids it beyond all question. Of what practical moment is it that they were not given the opportunity to break the law—that they were prevented so doing through the action of the majority?

VII. I have said almost nothing of the facts proven which justify, morally, the action of the majority. In my judgment it was their duty. It was the proclaimed intention of the minority, though it frustrated the will of the people, expressed with avalanche-like power, to defy that power and rob the majority of their lawful authority, and, by this chicanery, to prevent the enactment of any laws without their permission. This intention was to be carried out, so it was announced, by the action of the minority in organization, who were to adopt a new course of conduct, never pursued before— the reference of all credentials to a committee who would, in their own good time, report whether or not their bearers should be seated. It was announced that this committee would recommend the rejection of at least one, probably of

two or three, of the certificated seven. If one was kept out
there would be a tie. If two, a majority for the minority.
If three, a greater one. This was common talk throughout
the state, and the reputation of the alleged leaders in the
movement for audacity and party spirit convinced these mem-
bers-elect and their friends among the hold-overs that this
scheme was intended to be carried out. They were good
men—prudent and patriotic. They investigated. They came
to the senate chamber the day before and found it to be gar-
risoned. Their path to their seats was obstructed. There
was riot in the corridors, and numerous policemen, acting in
the interest of the minority, armed, were there to terrorize
them and their friends. They could not enter the senate
chamber except with force and arms. There they found cor-
roboration in the fact that seats which had borne their names
bore them no longer. There is further corroboration of a
scheme of action in the fact that the three resolutions drawn
to carry out this plan were upon chancery paper, typewritten
and numbered in the order in which they were moved, and
that beside the mover, aiding him apparently in his conduct,
was the clerk of that honorable court. Who doubts the
existence of this scheme? And if it existed, every considera-
tion called for its frustration. Had the majority not resisted
it by all lawful means they would have been poltroons. And
they simply held up the ægis of the law to put down this
wickedness.

Finally, and on the question, what should the court do as
a matter of common sense?

Here are two organized assemblies, each claiming to be the
senate. That body consists of twenty-one members. One
of these assemblies consists of ten men—a minority—not a
quorum. The other consists of eleven members, a number
which constitutes a quorum. All these twenty-one have
proper certificates of their election. The eleven have enough
rightful members to do all that they have done and to legis-
late authoritatively. Is not this body the senate *de jure?*
What does such a senate need? Enough members to make

a quorum? It has them. That they should be regularly elected? They are so, and most of them by tremendous majorities. That they should be lawfully sworn in? They are so. Who can doubt it, with the constitution in his hand? That the quorum should be organized? Yes, with president, secretary, sergeant-at-arms—all officers. That it should be accepted by the house of assembly? It is. That body will have nothing to do with the ten who, having seized the senate chamber, thence arrogate themselves to be the senate. Is it not true that here is a legislature of two houses, *de jure*, even if customary forms have not been observed in the organization? And was it not, then, the duty of the governor, by communicating with the quorum, to make the legislative power complete? Should not the court, even if not sure as to technical theoretical regularity, advise him to this when he asks it?

VIII. I have so far had nothing to say as to adjudications already made. There are but few; but these are corroborative of the line of argument pursued.

The case in Maine (70 *Me.*), that in Kansas and a late one in Nebraska are all which I have found exactly touching the points here litigated.

We have two or three which in principle are in unison.

In *Kearns* v. *Edwards,* reported in the *N. J. Law Journal,* February, 1894, at page 52, Mr. Justice Depue says: "The constitution provides, in the second paragraph of section 4, article 4, that each house shall be the judge of the elections, qualifications and returns of its own members. The constitution having conferred on the legislative department the power to judge, that is, judicially determine, it would not be competent for the legislature to confer that authority on the judicial department of the government."

He refers to *Ruh* v. *Frambach,* 18 *Vroom* 85, where the late Mr. Justice Parker said: "The certificate of election presented to the house is *prima facie* evidence of the rights of the person holding it. The person producing the certificate issued by authority of the officer or officers issued by

law to give the credentials is permitted in the first instance to take his seat in the body."

In the case of *Feurey* v. *Roe*, 6 *Vroom* 123, already mentioned, there seems to have been a dispute which led the majority to ignore the minority of a board of chosen freeholders and elect without notice to them. The case is not very fully reported, but it appears that in this majority were both some hold-overs and some members-elect, and the votes of those elected the officer whose right was in question. The election was sustained.

In the case of *Kendall* v. *Camden*, 18 *Vroom* 67, also already mentioned, it was held that action by a body, reversing prior action, electing an officer during the session, by electing another, was lawful, and the last man was held elected.

Applying this, the action of the eleven is sustainable as reversing what had occurred before.

The cases of *Billings* v. *Fielder*, 15 *Vroom* 381, and *Mason* v. *Parkerson*, 6 *Id.* 119, are also worthy of attention.

I refer likewise to the case *In re McNiell*, 111 *Pa. St.* 235, a well-considered case, arising upon language giving the legislative houses the right to judge as to qualifications, &c., similar to that in our constitution.

It is submitted that the votes which elected Maurice A. Rogers were lawful and lawfully delivered, and that he is president of the senate, and that this court should not issue a writ of *quo warranto* to him.

For Robert Adrain, *Allan L. McDermott.*

The legislative scheme of the constitution contemplates a continuous body, composed of three classes of senators, with their terms so arranged "that one class may be elected every year." There is nothing in the constitution preventing the election of a president for three years. Article 4, section 4, paragraph 3, provides that "each house shall choose its own officers." The senate being a continuous body, it may designate whom it chooses to act as president, during his term as

senator, subject to reconsideration. A class goes out each year, but the senate remains; that there may not be an interruption in the life of the senate—that there may always be two classes remaining—it is provided that the persons elected to fill vacancies shall be elected for the unexpired terms only. These two ever-existing classes form a senate. No one can become a member of the body except by its action.

The constitution provides that "each house" shall be the judges of the elections, returns and qualifications of its own members. The argument that the senate, which is to judge of its own membership, must be composed of one member from each county in the state is fallacious, because article 4, section 2, paragraph 1, provides that it shall be composed of such senators "elected by the legal voters of the counties," and it is the decision of this very question, of whether an applicant for membership was elected by the legal voters of the county he seeks to represent, that is committed to the senate. It may judge, first, of the elections of its members. No man is entitled to a seat in the senate unless he is elected to that body. No one can finally say that a senator has been elected except the senate itself.

Section 85 of the General Election law is invoked to give value to certified copies of election statements. This says only that a certified copy of the statements of the determination of a county board of canvassers shall be deemed and taken to be *prima facie* evidence of the right of a person mentioned therein to a seat in the legislature. But the statute does not say that the presenter of such a certificate shall be admitted to membership, and if it did, it would be clearly an unconstitutional substitution of the declaration of an election board for the judicial function reposed in the senate. The constitution does not say that the senate shall be the judge of the elections and returns of its members except where otherwise provided by statute. The legislature cannot give to a return any force subtractive from the power of the senate to examine it, approve of it, object to it or do whatever it will with the paper. A person must not only be elected; he

must be qualified. A foreigner would have no right to demand a seat in the senate merely because his ineligibility had not been discovered before he had obtained his certificate of election. The certificate is *prima facie* evidence that the person named therein received the highest number of votes cast at the election.

It is made legal evidence, and as it is the law that the qualified person who legally received the highest number of votes shall hold the office, the senate may receive the certificate as evidence. Section 25 of the Crimes act provides that a successful candidate, being convicted of bribery, he "shall be disqualified to hold any office to which he was elected at any such election." The constitution provides that "no person shall be a member of the senate who shall not have attained the age of thirty years," &c. If the candidate receiving the certificate is convicted of bribery between the election and the assembly of the legislature, or it is discovered within such time that he is under the age of thirty years, can he, in virtue of his certificate, become a senator "for a little while?" A person applying for admission must have certain qualifications. If he has them not, the constitutional proposition is plain and unequivocal. It is not that he may be expelled, but that without those qualifications "no person shall be a member of the senate." The attitude of Mr. Rogers is that, having obtained a certificate of election and taken an oath of office, he is a senator. If this is true, it would be equally so if he did not possess a single constitutional qualification.

The framers of our state constitution designed the state senate as a continuous body, its prototype, in this particular, being the United States senate.

The federal constitution makes provision for a president of the senate *pro tempore,* but this is to meet such emergencies as may arise and to qualify the constitutional proposition that the vice president shall be president of the senate. The absence of the vice president and the president *pro tempore* will not disorganize the senate. At the first session of the second congress Senator Lee was elected president *pro tempore.* This

session adjourned on the 8th of May, 1792. The next session commenced November 5th, 1792. At the opening of this session both the vice president and Senator Lee were absent. The senate thereupon elected John Langdon president pro tempore. When the third congress met, December 2d, 1793, Senator Langdon, as president pro tempore, acting under the election of the senate of the second congress, presided and administered the oath to the vice president. Bent. Abr. 314, 380, 441. This proceeding was varied in the next congress. Although Senator Tazewell was elected president pro tempore at the close of the third congress, it is recorded that he was again elected upon the assembling of the senate of the fourth congress. Id. 524, 592. The absence of the vice president and the president pro tempore would not affect the senate of the United States. It is always an organized body, as is the senate of New Jersey. The organization of the state senate does not depend upon its having a president or a secretary. Its organic structure is found in its membership. The governor is authorized to call the senate together in special session. Would there not be a senate if its president had resigned his membership?

The framers of the state constitution intended to make the senate an ever-living body. On the 7th of June, 1844, the composition of the senate being under consideration by the constitutional convention, Mr. Vroom said : "The reason, the great object, of fixing the terms of senators at three years, is not only because they are connected with the executive, but, by this means, the senate will be a more permanent body than the house of assembly. If the senate is elected annually you will have a changing legislature, as we always have had." A motion to amend the term of senators from three to two years being considered the same day, Mr. Ogden advocated it, but said : "The reasons given in favor of the permanency of the senate are strong." "Newark Daily Advertiser," June 8th and 10th, 1844.

In the first senate under the constitution of 1844 a special committee reported a mode of classifying the senators. It

was that the senators be divided into three classes, and the term of each class decided by lot, " and that the classes *shall vacate their seats in the senate* according to the order of numbers drawn for them, beginning with number one."

In this procedure the senate followed the words of the constitution, which directed that the first senate should be divided into three classes, and that " the seats of the senators of the first class shall be vacated at the expiration of the first year, of the second class at the expiration of the second year and of the third class at the expiration of the third year." Not only was the provision of our constitution suggested by the federal constitution, but the mode of determining the classes adopted by the first United States senate was adopted by the senate of New Jersey. See 1 *Bent. Abr.* 14, 15, and *Senate Journal*, 1845, *p.* 169.

It will be seen by a comparison of the following records that the resolutions used by the federal senate were taken as models in classifying our state senate in 1845 :

CONSTITUTION OF THE UNITED STATES.
(Art. 1, § 3.)

Immediately after they shall have assembled, in consequence of the first election, they shall be divided as nearly as may be into three classes. The seats of the senators of the first class shall be vacated at the expiration of the second year; of the second class at the expiration of the fourth year, and of the third class at the expiration of the sixth year, so that one-third may be chosen every second year.

The following steps were taken in pursuance of this provision by the first senate of the United States (see 1 *Bent. Abr.* 14, 16) :

STATE CONSTITUTION.
(Art. 4, § 2, ¶ 2.)

As soon as the senate shall meet after the first election to be held in pursuance of this constitution, they shall be divided as equally as may be into three classes. The seats of the senators of the first class shall be vacated at the expiration of the first year; of the second class at the expiration of the second year, and of the third class at the expiration of the third year, so that one class may be elected every year.

The following steps were taken in pursuance of this provision by the senate of 1845 (*Journal of Senate, p.* 169) :

Mr. Brown called up the following report:

"The committee appointed to consider and report a mode of carry-

*Resolved,* That the senators be divided into three classes:

The first to consist of Mr. Langdon, Mr. Johnson, Mr. Morris, Mr. Henry, Mr. Izard and Mr. Gunn.

The second of Mr. Wingate, Mr. Strong, Mr. Paterson, Mr. Bassett, Mr. Lee, Mr. Butler and Mr. Few.

And the third of Mr. Dalton, Mr. Ellsworth, Mr. Elmer, Mr. Maclay, Mr. Read, Mr. Carroll and Mr. Grayson.

That three papers of an equal size, numbered 1, 2 and 3, be, by the secretary, rolled up and put into a box, and drawn by Mr. Langdon, Mr. Wingate and Mr. Dalton, in behalf of the respective classes in which each of them are placed; and that the classes shall vacate their seats in the senate, according to the order of numbers drawn for them, beginning with No. 1.

And that when senators shall take their seats from states that have not yet appointed senators, they shall be placed by lot in the foregoing classes, but in such manner shall keep the classes as nearly equal as may be in numbers.

The senate proceeded to determine the classes agreeable to the resolve of yesterday, on the mode of carrying into effect the provision.

ing into effect the provision in the second clause of the second section of the fourth article of the constitution, beg leave to report, for that purpose, the following resolution:

"*Resolved,* That the senators be divided into three classes:

"One to consist of Mr. Ihrie, of Warren; Mr. Dodd, of Essex; Mr. Brown, of Somerset; Mr. Combs, of Monmouth; Mr. Smallwood, of Gloucester; Mr. Howell, of Camden; Mr. Shinn, of Salem.

"One to consist of Mr. Outwater, of Hudson; Mr. Johnes, of Morris; Mr. Paulison, of Bergen; Mr. Olden, of Mercer; Mr. Adams, of Atlantic; Mr. Moore, of Cumberland.

"A third to consist of Mr. Garrison, of Passaic; Mr. Wurts, of Hunterdon; Mr. Crowell, of Middlesex; Mr. Hulme, of Burlington; Mr. Hamilton, of Sussex; Mr. Willets, of Cape May.

"That three papers of equal size, numbered 1, 2 and 3, be, by the secretary, rolled up and put into a box, and drawn by Mr. Ihrie, Mr. Outwater and Mr. Garrison, in behalf of the respective classes in which each of them are placed; and that the classes shall vacate their seats in the senate, according to the order of the numbers drawn for them, beginning with No. 1. George H. Brown, A. Wurts, Wm. J. Shinn, Committee.

"January 16, 1845."

Which report was adopted and the resolution recommended therein was adopted.

Mr. Hulme moved the senate do now proceed to determine the classes according to the said resolution. Which motion was agreed to.

of the second clause of the third section of the first article of the constitution; and the numbers being drawn, the classes were determined as follows:

Lot No. 1, drawn by Mr. Dalton, contained Mr. Dalton, Mr. Ellsworth, Mr. Elmer, Mr. Macay, Mr. Read, Mr. Carroll and Mr. Grayson; whose seats shall accordingly be vacated in the senate at the expiration of the second year.

Lot No. 2, drawn by Mr. Wingate, contained Mr. Wingate, Mr. Strong, Mr. Paterson, Mr. Bassett, Mr. Lee, Mr. Butler and Mr. Few; whose seats shall, accordingly, be vacated in the senate at the expiration of the fourth year.

Lot No. 3, drawn by Mr. Langdon, contained Mr. Langdon, Mr. Johnson, Mr. Morris, Mr. Henry, Mr. Izard and Mr. Gunn; whose seats shall, accordingly, be vacated in the senate at the expiration of the sixth year.

And the members being drawn, the classes were determined as follows:

Lot No. 1, drawn by Mr. Ihrie, contained Mr. Ihrie, Mr. Dodd, Mr. Brown, Mr. Combs, Mr. Smallwood, Mr. Howell, Mr. Shinn; whose seats shall, accordingly, be vacated in the senate at the expiration of the first year.

Lot No. 2, drawn by Mr. Garrison, contained Mr. Garrison, Mr. Wurts, Mr. Crowell, Mr. Hulme, Mr. Hamilton, Mr. Willets; whose seats shall, accordingly, be vacated in the senate at the expiration of the second year.

Lot No. 3, drawn by Mr. Outwater, contained Mr. Outwater, Mr. Johnes, Mr. Paulison, Mr. Olden, Mr. Adams, Mr. Moore; whose seats shall, accordingly, be vacated in the senate at the expiration of the third year. The senate then adjourned.

The expression of the constitution is not that the terms of senators shall end agreeably to the division, but that their seats shall be vacated. Vacated in what, pray, if not in a continuous body? This provision is in the federal constitution "so that one-third' may be chosen every year." It is in the state constitution "so that one class may be elected every year." One class of what, if not of a continuous senate? Does the fact that the seats of *one* of three classes are vacated destroy the senate? Does it, for a second, vacate the seats of the other classes? The organization is composed of three classes. Does the retirement of one destroy the body? Does it take from it the right to order elections, to elect officers, to transact business, to judge of the elections, returns and qualifications of its own members? Is it so impotent that it cannot reject an unqualified applicant for admission? Are

not the two remaining classes the senate? To answer nega-
tively is to say that the senate may die although two-thirds
of its members exist. This cannot be. Those whose seats
are not vacated remain the senate; they are the organization;
they are the judges of the elections, returns and qualifications
of their membership. *Robertson* v. *Smith*, 109 *Ind.* 79.

The senators-elect claim that their certificates of election
are *prima facie* evidence of their rights to seats. Evidence
to whom? In what tribunal are they to present this evi-
dence? Not in this court, because it cannot pass upon their
titles. Where, indeed, but in the senate, which is the only
judge of the weight of that evidence? And when this *prima
facie* evidence is submitted its probative force is neither more
nor less than is accorded by the tribunal which is to pass
upon the evidence. In *Ruh* v. *Frambach*, 18 *Vroom* 87, this
court says: "The person producing the certificate issued by
authority of the officer or officers authorized by law is per-
mitted, in the first instance, to take his seat in the body."
"Permitted" by whom? The body empowered to permit
must have the power to refuse. The right to permit implies
the right to prohibit. The right to consider evidence implies
the power to adjudicate. If a certificate entitles a senator-
elect to take his seat it is conclusive evidence of his right to
become a member of that body. It is equal to an adjudica-
tion of that body upon his election, return and qualifications,
for such an adjudication does not conclude the body from
further inquiry.

Section 85 of the Election law was enacted in 1839 (*Harr.
L.*, 1834–43, *p.* 368), and was intended to apply to the con-
ditions as they were found under the constitution of 1776.
Then the legislature was composed of a legislative council
and general assembly. They were each chosen every year,
and they chose at their first meeting a governor for one year.
In consequence of these provisions there was not any organi-
zation which did not expire within the year that witnessed its
inception. The council was then, as the house of assembly is
now, annually elected, and, as there was not any one to pass

upon elections, returns and qualifications, as there was not any continuing council, it was entirely competent for the legislature to say who should have a seat at the "organization."

The act was induced by the fact that there was not any authority given to the council or assembly to pass upon the returns of their members. Section 5 of the first state constitution provides "that the assembly, *when met*, shall have power to choose a speaker and other officers, to be judges of the qualifications and elections of their own members," &c. Section 6 confers this power upon the council. As the members-elect of the house and council all met on an equal footing, it was proper that the evidential weight of their certificates should be decided by legislation, and a most careful statute said that the holders of credentials should be entitled to seats "in the organization" of the houses. This did not intrude upon the right of the houses "when met" to judge of the elections and qualifications of their members, and the first constitution did not make the legislature the judge of the returns of its members.

The constitution of 1846 added to the judicial power of the houses. It provides that they shall be the judges, not only of the elections and qualifications of their members, but of their returns—of the certificates of their election—and I submit that the adoption of that constitution repealed this provision of the act of 1839. Its re-enactment under the new constitution, if it was intended to serve the purpose claimed, was unconstitutional.

The argument for Mr. Rogers is: The constitution says that the senate shall be the judge of the qualifications, &c., of its own members, and that the senate shall be composed of one senator from each county; therefore, it is necessarily a senate composed of twenty-one members that is to do the judging, and that the rights of a claimant cannot be the subject of senatorial scrutiny until he has been inducted.

The contrary is the constitutional proposition. He must be elected and the judgment of the senate given upon his election; he must be qualified and the judgment of the senate

must be given on his qualifications. Constitutional provision is made for the election of a successor in case of the death or resignation of a senator. Take the case then presented. A special election is held, a candidate returned. Can he walk into the senate, present his credentials and oath of office, and thereupon successfully demand that his name be placed upon the roll?

If there was a senate in existence on the 9th of January, the orderly, only way to obtain admission was to apply for and receive its adjudication. It is a trifling answer to say that the admission would be refused, because that answer cannot be considered in this court.

At the sessions of 1845, 1846, 1847 and 1848, Mr. Dodd took it upon himself, as secretary, to make up the roll showing senators and senators-elect in their seats, and he testifies that he considered senators-elect entitled to vote on the temporary organization. This was merely Mr. Dodd's notion— simply his way of making up the minutes.

His successor changed the method of making up the roll and recorded only the inducted senators as present at the opening of the session. The fact of the change shows that it was the result of consideration. (Compare minutes of 1848 with those of 1849.) From 1848 to 1894, the record shows that only inducted senators participated in the temporary organization of the senate.

It would be a waste of time to discuss the proposition that any man can act as a state senator before he takes the oath of office. Article 4, section 8, provides that members of the legislature shall take an oath before " entering upon the duties of their respective offices." A construction which limits the power of the senate to an examination of the title of inducted members would be insufferable. Every body that is a judge of its own membership has the right to determine whom it will admit. The argument in favor of this construction, as I understand it, is, *first*, the constitution says that the senate shall be composed of one senator from each county ; *second*,

each house is judge of the elections, returns and qualifications of its own members.

Therefore, there must be a senator from each county to make the house which is to pass upon such elections, returns and qualifications. Carried to its proper conclusion, this reasoning would require that each senator be present when the elections, returns and qualifications are passed upon.

And one who seeks to sustain the proposition is met with the difficulty that each house is given power, by the same section of the constitution, to direct writs of election for supplying vacancies occasioned by death, resignation or otherwise. Those who attack the title of Mr. Adrain contend that the constitution requires the presence of eleven senators to organize the senate. But there is not such a constitutional requirement. Suppose that two senators-elect decline to take the oath of office, and nineteen are inducted. It becomes the duty of those nineteen to direct writs of election for supplying vacancies. By whom is this direction made? Surely by the senate, composed of nineteen members. How many votes would it require?

The constitution says that "a majority of each house shall constitute a quorum." Now, if the nineteen members were a house, capable of directing writs of election, a majority of that house would be a quorum, and five of ten senators could direct that the writs should issue, for the constitution expresses that "a majority of each [house] shall constitute a quorum to do business," and it is an accepted rule that a majority of a quorum may, in the absence of prohibition, do all that the quorum can do.

When the enactment of a law is considered, the conditions change. Here the constitution requires that "no bill or joint resolution shall pass unless there be a majority of all the members of each body present and voting for it." Here it may be argued with great pressure that the constitution requiring that the senate shall be composed of twenty-one senators, the words "a majority of all the members" means at

least eleven members, that it means a majority of all the members provided for by the constitution.

But there is a wide difference between the wording of sections 2 and 6. If it takes twenty-one members to constitute a senate, how can a senate issue writs to fill vacancies? The constitution desires a senate of twenty-one members, and the duty to fill vacancies is imperative. In vacation the governor may issue a writ of election to fill a vacancy. During its session the senate must issue such writs. But the senate does not go out of existence pending the return to such writs. In the case stated the senate would continue. The "house" of nineteen continues its existence, and a majority of it constitutes "a quorum to do business." Put in this way, two members have resigned, nineteen remain—these are the house commanded to issue writs of election. How many votes will it require to issue the writs if all the members are present when the matter is decided? Surely not more than ten. Why can ten issue the writ? Because they are a majority of the house. Now, if this is true here, it is true as to all other transactions of legislative business, with the possible exception of the passage of bills and joint resolutions.

This view is supported by the provisions of the constitution of 1776. At the time of the adoption of that instrument there were twelve counties, and the first council consisted of twelve members. Between 1776 and 1844, the number of counties was increased to eighteen, so that the council of 1844 consisted of eighteen members. Section 111 of the constitution of 1776 made seven of these a "quorum for doing business," but provided that no law should pass "unless there be a majority of all the representatives of each body personally present and agreeing thereto."

The constitution of 1844 changed the "seven" to a "majority of each house." It does not say a majority of all the members, each county being represented, but simply that a majority of the house shall constitute a quorum, so that if there was, on the 9th of January, a senate composed of thirteen members, a majority of that senate constituted a quorum.

If the four Republicans had remained with the nine Democrats to this day, would the thirteen have constituted a senate? And if so, what would be a quorum of that senate? Could not the thirteen hold-over members meet this day and legislate? And if they did, would they not be the senate? And if they are the senate, or were the senate on the 9th of January, are not nine a quorum of that senate. *Cadmus* v. *Farr*, 18 *Vroom* 208; *Mueller* v. *Egg Harbor City*, 26 *Id.* 247.

The senate, at three o'clock on the 9th of January, being composed of thirteen members, a majority of that body was competent to elect a president. A majority of the house, as it existed at the time of forming the temporary organization, was sufficient to proceed to business. One-third of the membership of the senate expires each year. Is not the remainder the senate? If not, under what right have thirteen or fourteen senators assumed every year for nearly fifty years to form a temporary organization and induct newly-elected senators?

I submit that there were thirteen inducted senators on the 9th of January; that they constituted the senate; that they were in office by adjudication upon their elections, returns and qualifications. Why, then, could not nine—over two-thirds—of this body form a temporary organization? The absence or presence of the four Republican senators could not be a determining factor.

If the nine members could not form a temporary organization, it must be because the senate was composed of twenty-one members; because of the fact that the gentlemen who swore before each other at the hotel thereby became members of the senate.

This would make the constitution read, "The senate shall be the judge of the elections, returns and qualifications of its own members; *provided,* that anyone shall become a member of that body if he takes oath before any senator-elect." Having taken the oath, he can throw his credentials away. He has not further need for them. He is a senator, entitled to the powers and privileges of the office. And yet his elec-

tion, return and qualifications·have been passed upon only by ·one who is not himself a member of the senate.

To what record shall we look for the induction of Mr. Rogers? What tribunal passed upon his election, return and ·qualifications and those of his newly-elected associates? He .answers, "We approved ourselves. We said we were elected, we passed upon our returns and we adjudged that we were ·qualified." An examination of the minutes of the Rogers body shows what they did.

They start with the proposition that the main room being ·occupied, the senators were prevented from organizing in the customary manner. Then they formed a temporary organization and approved the certificates of election, each approving ·of himself.

Now, the object of a temporary organization of the state senate of New Jersey is the induction of new members, upon .ascertainment that they have been properly elected, returned and are qualified.

At the first meeting of the senators, in 1845, there was not ·any temporary. organization. The members having been sworn, a president for the session was elected. At the next ·session, in 1846, a president *pro tempore* was elected, and the senators-elect.were inducted, and the senate proceeded to per- ·manent organization.

Prior to the temporary organization, it will be found that in each year "the senate was called to order" by the secretary of the previous session. What senate? The minutes answer —the senate composed of hold-over members. To this senate senators-elect have always submitted their credentials.

In 1868 the seat of John Torrey, senator-elect from Ocean ·county, was contested, and his credentials and the petition of contest were referred to the committee on elections before he was admitted to the senate. The minute of his admission shows that a special motion was adopted. In other cases,·the ·credentials were "read and approved." In the case of Mr. Torrey, his credentials were not approved, but, upon motion, .he was "allowed to take the oath prescribed by law."

So, in 1890, the credentials of Edward F. McDonald, as senator-elect from Hudson county, were read, but not approved. Then a protest against his election was received and "referred to the committee on elections, when appointed." He was then allowed to take the oath.

So, in 1891, the credentials of William J. Keys, senator-elect from Somerset county, being presented, they were read, but not approved, and a protest was received and referred to the committee on elections before the oath was administered to Mr. Keys.

The body which elects a president *pro tempore*, which receives, examines and approves, or rejects, applicants for membership, is the senate. It is the senate before a newly-elected senator is inducted. The unbroken record shows that the oath having been administered, the person thus qualifying "took his seat in the senate."

If the four Republicans had joined the nine Democrats in electing Mr. Adrain, the thirteen thus formed would have constituted the house of the senate, and all of that house until the body had opened for the admission of new members. If this is correct, if the senate consisted of thirteen members on the 9th of January, a majority of that number could elect a president, and they did it. Here the inquiry of the court, I respectfully submit, ceases.

A majority of the members of the senate constituted a quorum. They organized, and, about twenty minutes later, the four Republican senators appeared in the chamber. It is immaterial whether they answered the roll-call. They were present. They found that two-thirds of the body of which they were members had effected a temporary organization. Mr. Stokes rose to a question of privilege. Privilege in what office? He was entitled to rise to a question of privilege only as a member of the body. Senator Skirm had the floor of the senate.

Why did the eleven senators leave? Because the senate refused to say that all senators-elect would, without further action than is involved in the presentation and reception of

credentials and oaths of office, be admitted to membership. They were not entitled to any such assurance. The body in which they claimed seats could receive them or reject them, in the first instance, or receive them and reject them afterwards.

The argument that induction is a condition precedent to the exercise of the judicial powers of the senate is absurd. It amounts to saying that the senate can put the holder of a certificate of election out, but cannot prevent him from getting in. The time for judgment upon the qualifications of a senator-elect is when he presents his credentials, for the constitution expressly declares that " no person shall be a member of the senate " who has not certain qualifications.

If a senator-elect is admitted and it is afterwards discovered that he is not qualified, what is the judgment of the senate?

In 1793, Albert Gallatin was admitted to the United States senate from Pennsylvania. A petition was presented denying his eligibility. It was found true, and, by a vote of fourteen to twelve, it was "*Resolved*, That the election of Albert Gallatin to be a senator of the United States was void, he not having been a citizen of the United States the term of years required as a qualification to be a senator of the United States." *Bent. Abr.* 452. At that time there were fifteen states, the United States senate was composed of thirty-one members, including the vice president, but a less number than a majority of the whole declared that Mr. Gallatin's election was void and ordered a certified copy of the finding sent to the governor of Pennsylvania. *Id.* 441, 453.

On the 24th of March, 1794, Kensey Johns presented his credentials as a senator, appointed by the governor of Delaware, which were read. It was moved that they " be referred to the consideration of the committee of elections before the said Kensey Johns should be permitted to qualify, who are directed to report thereon." The resolution was adopted by a vote of thirteen to twelve. Less than one-half of the membership of the senate refused Mr. Johns' admission, and three days later it was declared that the appointment of the governor of Delaware was void. *Id.* 453.

### THE SENATE IS A CONTINUOUS BODY.

In 1841, the United States senate being, during a recess of congress, in executive session, considered the question of the removal of the public printers. In the course of an interesting debate, which will be found in pages 237 to 256 of volume IX. of the "Congressional Globe," the continuity of the senate was discussed.

Senator Allen, of Ohio, said: "There is no such thing as a new senate known to the constitution of this republic. They might as well speak of a new Supreme Court as a new senate. There was a new house of representatives, because the entire house expired at the end of the second year, and because the 4th of March terminated the life of that body. But not so the senate. The constitution replenished that body every two years, by the election of a class of senators, and thereby gives eternity to the duration of the body. There was no new nor was there any old senate."

Senator Buchanan said: "Senators had contended that one senate or one congress had no right to elect officers for their successors, and that, therefore, the joint resolution violated the constitution because it gave the election of a printer for the next senate to that which had expired on the 3d of March. This was as strange a position as any which had been assumed throughout the argument. An old senate and a new senate? There could be no new senate. This was the very same body, constitutionally and in point of law, which had assembled on its first day of meeting, in 1789. It had existed without intermission from that day until the present moment, and would continue to exist as long as the government should endure. It was emphatically a permanent body. Its rules were permanent and were not adopted from congress to congress, like those of the house of representatives. For many years after the commencement of the government its secretary was a permanent officer, though our rules now require that he should be elected at stated intervals. The

senate always had a president and there were always two-thirds of its actual members in existence, and generally a much greater number. It would be useless to labor this question. Every writer, without exception, who had treated on the subject had declared the senate to be a permanent body. It never dies, and it was the sheet-anchor of the constitution on account of its permanency."

Senator Bayard said : " The senator from Pennsylvania had made an addition in relation to the character of this body, which seemed to him to go the whole length of the subject—that this was a permanent body, the same which came into existence on the 4th of March, 1789, and had continued from that day to this, and must continue in all time, as long as the government endured, and the respective state legislatures shall perform their duty. Now, this senate, being so deemed a perpetual body, was vested with certain inherent rights. What were they ? They were either absolute or relative, and, whether the one or the other, they belonged to the body at all times and were to be exercised when proper circumstances presented themselves. There was no such artificial classification as the senator supposed, of legislative, executive and judicial functions. It was a body vested with rights which, though they might sometimes be dormant, always existed and were to be exercised as soon as a proper case was presented. Now, as a part of the absolute rights of this body was the right to judge of the elections, returns and qualifications of its members. There was no question that this body could do this whenever it was properly assembled, and the only question to arise was whether the body was properly assembled in the proper place and under the proper authority. Another absolute right was, by a majority of its own number, to decide on any ordinary question. Another was to make rules and regulations for its own government. Another was to expel any member by a vote of two-thirds of the body, and another was to elect its own officers. All these rights had no relation whatever to any other department of government; they were inherent and absolute rights, which might be exercised when

the senate was properly convened. They could not voluntarily assemble in the city of Philadelphia; they could not, by common consent, assemble at any time they thought proper, to do this act, but when they were assembled these were absolute and inherent rights, to be exercised beyond all controversy and beyond all dispute."

## SECTION 85 OF THE ELECTION LAW IS VOID.

I stand upon the ground, unreservedly and unqualifiedly, that the legislature cannot pass any statute making a return evidence of anything whatever; that each house has the absolute and unqualified right to receive or to reject a return; that the right to judge the elections, returns and qualifications of those who apply for admission to the senate cannot be controlled, interfered with or legislated upon by any action of the house of assembly, whether that action is in the shape of a statute or a resolution. Let us examine it. The returns shall be *prima facie* evidence of the right to a seat, and, following the contention for Mr. Rogers, that *prima facie* evidence includes the right to induction. The right to a seat in the senate is the right to exercise the office of senator—to fill one of the seats in the class whose seats have been vacated. Who gives the return this force? The governor and the legislature. Where does the house of assembly, where does the governor, obtain this right to say what force shall be given to a return, and that return made in a particular way? What is meant by *prima facie* evidence?

*Prima facie* evidence of a fact (in this case of the right to a seat in the senate) is such evidence in judgment of law as is sufficient to establish the fact, and remains sufficient for that purpose if not rebutted. The jury are bound to consider it in that light, and the court will set aside their verdict and grant a new trial if, without any rebutting evidence, they disregard it. In a legal sense, such *prima facie* evidence, in the absence of all controlling evidence or discrediting circumstances, becomes conclusive; in other words, it should operate

in the minds of the jury as decisive to found their verdict as to fact. *Rice Ev.*, § 61, and authorities cited.

If the legislature had the right to enact this law and the governor to approve it, why could they not have added " and the Supreme Court shall give legal effect to the *prima facie* evidence thus provided for?" If this statute is sound the *onus probandi* is shifted and the duty is imposed upon the senate of proving, before they can deny an applicant admission, that he was not elected. If it is *prima facie* evidence it is conclusive until disproved.

The legislature cannot say what the senate shall do in investigating the right to membership. It cannot limit the evidence or prescribe its weight, or give to any circumstance or paper any probative force whatever. In this matter the senate is supreme, uncontrolled and uncontrollable. There are not any "ifs" or "buts" allowable. The power is beyond the province of the legislature; it cannot be interfered with by the governor and this court cannot construe the power reposed except to declare it absolute. It is beyond legislation.; it is higher than the reach of adjudication. The law that seeks to affect it is absolutely void.

Mr. Grey quoted from the decision of Judge Horton to the effect that every person returned is a member whether eligible or not. Our constitution says that no person shall be a member unless he is, as prescribed, eligible.

Mr. Parker could find no instance in the history of the United States senate when credentials were not held equivalent to title. I have cited one from the first senate. I will refer the court to others, so that we may have the views of the senate at three periods—*first*, at the time when many of the signers of the constitution were members of the senate; *second*, at the close of the civil war; *third,* now. The first will be found in my printed brief. On the 7th of March, 1865, the credentials of Mr. Snow, senator-elect from Arkansas, were presented. The right of Mr. Snow was questioned, it being alleged that his state was yet in rebellion. The credentials were referred to the judiciary committee, and on the

9th of March, Senator Trumbull, as chairman, made the following report:

"In the year 1861 the constituted authorities of the State of Arkansas undertook to withdraw that state from the Union, and so far succeeded in the attempt as, by force of arms, to expel from the state, for a time, the authorities of the United States and set up a government in hostility thereto, and in pursuance of an act of congress, the inhabitants of said state have since been declared to be in a state of insurrection against the United States. The committee therefore recommend that the question of the admission of Mr. Snow to his seat be postponed until the next session of congress and until congress shall take action in regard to the recognition of the alleged existing state government in Arkansas." The same action was taken with the credentials of Mr. Underwood, senator-elect from Virginia. *Cong. Globe,* 1864, 1865, *pp.* 1427, 1434.

On the 5th of March, 1893, the credentials of Lee Mantle, as senator from Montana, were received and referred to a committee.

On the 29th of August, 1893, the senate adopted, by a vote of thirty-one to twenty-eight, the following resolution:

"*Resolved,* That Hon. Lee Mantle is not entitled to a seat in this body as a senator from the State of Montana."

On the same day, by a vote of thirty-two to twenty-nine, it was

"*Resolved,* That John B. Allen is not entitled to be admitted to a seat as a senator from the State of Washington." *25 Cong. Rec., pp.* 5, 996, 997.

### QUORUM RULE OF THE UNITED STATES SENATE.

If there is any one proposition in this case that has met the scorn of the counsel for Mr. Rogers, it is that less than eleven senators can make a quorum of the state senate. I have shown that the constitutional provisions providing for three classes of senators, for an ever-continuing body, were

taken from the federal constitution. I continue the parallel. The provisions in the constitution of 1844, found in article 4, section 4, placitum 2, are a reproduction of the provisions of article 1, section 5, of the federal instrument. There is not a letter changed. If I find that the construction which I contend for has been, and is, the construction given by the United States senate to the words of this section, I trust that I will have removed at least the element of hilarity from the proposition that seven of the thirteen state senators constituted a quorum on the 9th of last January, with power to organize. The rule I contend for is the rule adopted in the United States senate. There are now forty-four states in our Union. Each is entitled to a representation of two members in the United States senate. If the contention that it requires eleven members to organize the state senate is correct, then it would require forty-five members to do business in the United States senate. But this is not true. There are now three vacant seats in that body, reducing the membership to eighty-one. Forty-one members of that senate constitute a quorum. For thirty years the rules of the United States senate have contained this provision: "A quorum shall consist of a majority of the senators duly chosen and sworn." It is the second section of the third standing rule of the senate.

The rule means exactly what the ordinary sense of its words import. On the 12th of last September there were three vacancies in the senate of this Union of forty-four states. The repeal of the Silver law was under discussion, when the point was made that there was not a quorum present. The following are the reported proceedings (25 *Cong. Rec.*, p. 1341):

"The presiding officer—'The absence of the quorum being suggested, the secretary will call the roll.'

"The secretary called the roll and forty-three senators answered.

"The presiding officer—'From the roll-call it appears that forty-three senators are present, which being a quorum, the senator from Colorado will proceed.'"

Where can we go for better authority than to a construction by the body after which our state senate was modeled, and to whose proceedings the first senate under the constitution of 1844 went for their resolutions to divide the classes? If the section means what is contended for Mr. Rogers, the rule of the United States senate is unconstitutional, for it embodies a construction of the disputed section which gave shape to our own. The business which a quorum of the United States senate may do includes the passage of laws. There is not any provision corresponding to that of our state constitution, that a majority of all the members must vote for a measure to enact it. It is undisputed that if the thirteen hold-over members had met and enacted a law in the absence of the senators-elect, that law would have been good, and that its enacting clause would be true. How could this be if there was not a senate? And if those thirteen are a senate—if they are a house—what is a majority of that house?

### THIRTEEN SENATORS PARTICIPATED.

There was a quorum present, however, even if it is held that eleven members were necessary to constitute that quorum. The senate journal shows this, and the question of whether they answered to their names or not is wholly immaterial. It was the duty of the thirteen members to attend the first meeting of the session at the usual time and place of such meeting. One moment they are here protesting that they were not present, and the next moment counsel charges that they were prevented from reaching the chamber. They say, "We were present, but did not answer the roll-call." But the roll is called only to find out who is present, not who is ready to proceed to business. Can the four hold-over Republicans present themselves at every meeting, and prevent business by refusing to answer to their names? In the meetings of 1845, 1846, 1847 and 1848, upon which so much valuable time has been used, it is not recorded that the senators-elect or the senators answered to their names. It is recorded only that

they appeared in their seats. And this is so of the twenty years from 1845 to 1865. . In 1865 the journal states, for the first time, that the roll was called to ascertain who was present to vote for president *pro tempore*. The thirteen members were present or they were absent. If they were present in fact, they were present in law. Thirteen were present. They say so. Four did not answer. Did that make them any the less present? If Mr. Stokes was not present in his own proper person, how could he rise to a question of privilege? And if Mr. Hoffman was not present, how did he see what he testifies to? And if Mr. Smith was not present, where was he? And if Mr. Skirm was not there, who was it that held the credentials and oaths which he testifies he exhibited? This idea of being present as individuals, but not as legislators, is what is called filibustering. As they explain their attitude, they were present if the senate would, without inquiry into the returns, elections and qualifications of the senators-elect, admit those gentlemen to membership. They were present if the *prima facie* case, which they say is made by the election board, was not a subject of attack. Otherwise, they were somewhere else, the location of which is not clearly defined. If the nine would join in admitting the seven, then business could be proceeded with. And these are the gentlemen whom it is alleged the nine tried to keep out of the senate chamber. If they could have their way, well and good. Otherwise, in the words of Senator-elect Voorhees, revolution was in order. It would have been just as supportable for Mr. Stokes to have produced a bundle of proposed enactments and declared that the four were present if the bills could be insured of passage. In *Rushville Gas Co.* v. *Rushville*, 6 L. A. R. 315, the common council of a town in Indiana consisted of six members, who were present, with the mayor, who presided *ex officio*, with the power to give a casting vote in case of a tie, awarded a contract. The six councilmen were present; three voted for the resolution and three remained silent. The mayor declared the resolution carried, and his course was sustained by the court. A few lines of

the opinion cover the question. " It would not," says the court, " benefit the appellant if we should hold that the councilmen present and not voting did, in effect, oppose the resolution, and certainly the utmost that can, with the faintest tinge of plausibility, be claimed, is that their votes must be counted against the resolution. It is inconceivable that their silence should be allotted greater force than their active opposition would have been entitled to have assigned it had it been manifested."

The thirteen members of the senate were present, and they continued present until the senate adjourned. There is not any better established rule of parliamentary law than that if a quorum is once shown to be present, a quorum is thereafter presumably present, and parliamentary proceedings have a provision for those who desire to assail this presumption. The evidence in this case has not been read, but the court must read it to learn the situation as it existed. There is not a disputed question. It is shown that the four Republican senators went into one of the lobbies. The testimony of Mr. Voorhees shows this. They were, in law, present with the Democratic nine.

"A quorum, having once been present, is presumed to continue, although not of the same individuals, until the contrary appears in the manner already stated (*i. e.*, by a count, upon suggestion that there is not a quorum present), and hence, if business is proceeded in after the number of members present is in fact reduced below a quorum, the validity of votes agreed to before notice is taken, and the assembly counted, cannot be questioned." *Cush. Par. L.*, § 369.

Now, after the thirteen senators were present, and while they continued present in legal contemplation, as well as in fact, the resolution numbered four was passed. If there was any defect in the title of Mr. Adrain to the office of president, the adoption of that resolution cured the defect. It has been suggested by counsel that the resolutions, numbered from one to six, inclusive, show a purpose to exclude certain members-elect. They do not show anything of the sort. If their

purpose had been this, it would have been as easy to have formed a permanent organization.   Their purpose was, and is, to have an investigation of the manner in which certain elections were held, and the nine Democrats propose, if they have the right, to hold the court in which that investigation is conducted.   It is quite supposable that a court composed of partisans of one color will be as fair as if their hue was changed.   This is not the forum for a display of partisan sky-rockets.   In behalf of Mr. Adrain, I submit that the nine hold-over senators did nothing that they were not entitled to do by the law of the land.   If they have the right of investi-gation, it is their duty to use it.   If they have the power to examine the elections, returns and qualifications of those who claim admission to the senate of 1894, they are bound to exercise that power.

For Maurice A. Rogers, *Samuel H. Grey.*

This is the first time in the judicial history of this state that any tribunal of this character has been called upon to participate in or control the election of a legislative officer. The proposition that this court may, in a proceeding of this sort, make inquiry by *quo warranto* into the actual title— that is, the fact of election—of the president of the senate is an absolutely novel one.   Apparently, the judicial mind so regarded it, and therefore the court very properly, I think, directed a rule to show cause in order that an opportunity might be presented, before the court was committed to a line of judicial policy by the issuing of this writ, for an investigation of the facts, upon the exhibition of which the learned attorney-general predicated his demand for this high prerogative writ.

There are two questions involved in this application, one of which lies at the very threshold.   It is this: Can this court take jurisdiction over this matter without inquiring into the election, qualification and returns of the members of the senate?   The other is: Will this court, upon the pre-sentation of the case as it is shown in the testimony taken

under the rule, go further in the investigation than the inspection of certificates which are *prima facie* evidence of the election of members of the senate? And if, confining itself to that inquiry, it shall discover that a majority of the lawfully-certificated members of the senate united in the election of Rogers, will not this court, for that reason and upon that ground, refuse to let the writ go? In the argument of this case, so far as its discussion has fallen upon me, I shall deal with it upon these two grounds. And first, let us look into the question of the jurisdiction of the court over the matter of the election, qualification and return of members of the legislature.

I. The object of the proposed inquiry is to ascertain by what title Rogers holds his office as president. The writ is asked for because he is in possession as officer *de facto*, for the purpose of determining whether he is entitled to that possession as an officer *de jure*. *Shortt Inf.* 122.

Hence, the inquisition can only be made by a tribunal having power to investigate and determine the title challenged. That tribunal is not this court. It is another one which alone can decide. It is one whose jurisdiction is exclusive. It is fixed by the constitution. It is the senate of New Jersey when organized as a "house."

It is obvious that, as the office in possession of Mr. Rogers, the title to which is challenged, is that of the president of the senate, we cannot determine who holds title as president of the senate without determining who have been lawfully "elected" as members of the senate possessing the necessary "qualifications" and exhibiting the proper "returns," because as there can be no president of the senate who is not himself a member, and as such chosen by the majority of its "members" so "elected, qualified and returned." The initial inquiry into the question of title involves the investigation of the "election, qualifications and returns" of those claiming to be members of the senate. Into this field of investigation this court cannot enter. Upon this voyage of discovery this tribunal cannot embark. The constitution expressly confers

upon "each house" the sole power "to judge of the elections, qualifications and returns of its members." As this is a power which admits of no division, and in the exercise of which there can be no concurrence of authority, it is necessarily exclusive, and so it has always been regarded. While it is eminently wise that the organic law of the state should put into the hands of the direct representatives of the people, when organized into a "house," of which they had been elected "members," the sole power to "judge" of the fact of the "election" of persons "qualified" to discharge faithfully the trust conferred by the possession of the great office of a legislator, and to determine whether that election had been sufficiently evidenced by the "returns," the wisdom or folly of that constitutional provision is not here in question. It is the law of the land—*lex scripta est.* And in my judgment this great power is best placed in the hands of those who, as the direct representatives of the people, the source of all governmental authority, are immediately responsible to them for its rightful exercise or for its inexcusable abuse.

Nor can this court make inquisition for the purpose of deciding whether the senate which, in organizing itself into a constitutional "house," elected Mr. Rogers as its president, was or was not composed of a majority of the members of that body unless it accepts the certificate of election as *prima facie* evidence of right to a seat for organization purposes.

In the case of *People* v. *Mahaney*, 13 *Mich.* 481, Judge Cooley, one of the highest authorities upon constitutional law now living, said: "While the constitution has conferred the general judicial power of the state upon the courts and officers specified, there are certain powers of a judicial nature which, by the same instrument, are expressly conferred upon other bodies, and among them is the power to judge of the election, qualification and returns of members of the legislature. The terms employed clearly show that each house, in deciding, acts in a general capacity, and there is no clause in the constitution which empowers this or any other court to review their action."

To the same effect is *Dalton, Clerk,* v. *State,* 43 *Ohio* 652, 680; *Robertson* v. *State,* 109 *Ind.* 79; *Clough* v. *Curtis,* 134 *U. S.* 361.

So, Judge Story, in his commentaries upon the *Constitution,* section 374, uses this language: "In measures exclusively of a political, legislative or executive character, it is plain that, as the *supreme authority* as to *these questions* belongs to the legislative and · executive departments, they cannot be re-examined elsewhere."

To the same effect is Chancellor Kent's view. 1 *Kent Com.* 221, 235, and *Cooley Const. Lim* 50, 51.

The principle which controls, and which the authorities quoted recognize, was declared in the Supreme Court of New Jersey by Chief Justice Green, in the case of *State, Gledhill, pros.,* v. *Governor,* 1 *Dutcher* 331, 351.

And again, in *Pangborn* v. *Young,* 3 *Vroom* 29, Chief Justice Beasley said, when speaking of the authentication of a law and the question as to whether the court should regard the entries in the journal as evidential, and if so, as superior in value to the formal authentication by the officers of the legislature: "It will be at once perceived that this is a topic of much delicacy and of great moment, for it relates to the *right* of the judiciary to institute its own methods of inquiry *into the action of the legislative department,* as well as to exercise its authority, based upon an inquiry, to restrain such department within constitutional limits."

So well settled is the rule that there is no judicial supervision over the legislative department in the discharge of its duty, that Throop, in his work on *Officers,* section 793, lays it down thus: "A very obvious principle of public policy exempts members of the state and national legislature from judicial supervision in the performance of their legislative duty." And again, the same author (in section 814) says: "A *mandamus* will not lie against a member of the legislature to compel his action with respect to a matter pertaining to his legislative duty. Thus it cannot be granted against the speaker of the assembly, upon the application of a mem-

ber, to compel him to send to the senate a bill, which the relator insists has duly passed the house, and which the speaker insists has not duly passed." See, also, *Ex parte Echols*, 39 *Ala.* 698.

II. Is the office of "president of the senate" an office of the State of New Jersey as an organized government, one of the "civil offices" spoken of in the constitution, or is it an office of the legislature only, one of the co-ordinate branches of the state government? If the latter, can this court, under any circumstances, by *quo warranto* or otherwise, inquire into the *title* by which it is held, or, indeed, into the fact that it is in possession of anyone, whether by usurpation or lawful induction?

By article 4 of the constitution the legislative power is vested in a senate and general assembly, and provision is made for the election to these legislative bodies of such persons as possess the requisite qualifications, which are age, the right of suffrage, citizenship and inhabitancy. The two legislative "houses" have each the power "to choose its own officers, determine the rules of its proceedings," and punish or expel its members. Art. 4, § 4, ¶ 3. And every "officer of the legislature" is required to take an oath, the form of which is prescribed in the constitution, "before he enters upon his duties." Art. 4, § 8, ¶ 2. The "president of the senate" is an officer described in the constitution (art. 4, § 4, ¶ 7), and in virtue of that office receives an additional compensation equal to one-third of *his* allowance as a *member*.

By article 7, section 2, provisions are made for the appointment or election of all "civil officers" who are to be "commissioned by the governor." Section 10. Their "terms of office * * * shall commence on the day of the date of their respective commissions; but no commission shall * * * bear date prior to the expiration of the term of the incumbent of said office."

That the members of the legislature should be absolutely incapable of holding any other state or federal office is expressly provided by article 4, section 5.

We have, then, under the provisions of the fundamental law, an office created by the constitution for the express purpose of making the legislative power effective, whose incumbent must possess, as his sole qualification, the character of a legislator, whose title rests entirely upon that of his fellow-members, who is chosen from and exercises his official function wholly among them, whose compensation is based upon theirs, whose official oath defines his functions and duties as those appertaining to the exercise of legislative power, and whose term is limited by that of the legislature of which he is a member. Can it be said that such an officer holds an office of the State of New Jersey as an organized government? He is but the "mouth of the house" which elects him. *May Hist. Parl.* 195. His duties are all associated with and inseparable from that house. See them defined in *Cush. Par. L.*, § 291.

The speaker is the *servant* of the house—so when Carolus I. came into the house and took the speaker's chair (March 9th, 1620), and asked Speaker Lenthal "whether any of the five members that he came to apprehend are in the house. Whether he saw any of them, where they were"—to which Lenthal replied: "May it please your majesty, I have neither eyes to see, nor tongue to speak, in this place, but as the house is pleased to direct me, whose servant I am here, and I humbly beg your majesty's pardon that I cannot give any other answer than this to what your majesty is pleased to demand of me."

And Sergeant Glanville, when presented as speaker to the king, April 15th, 1640, said: "The house of commons have met together and chosen a speaker, one of themselves, to be the mouth, indeed the servant, of all the rest; to steer watchfully and prudently in all their weighty consultations and debates; to collect faithfully and readily the vote and genuine sense of a numerous assembly; to propound the same seasonably, and in apt questions, of their final resolutions; and to represent them and their conclusions, their deliberations and petitions, upon all urgent occasions, with truth, with right,

with life, with lustre, and with full advantage, to your most excellent majesty."

The president of the senate holds his office by the warrant, not of the state government, but of the people who organized that government. They expressed in the constitution, which they made, their purpose to confer upon one branch only of the three co-ordinate governmental agencies the power to make laws. They separated that branch wholly from the other two. They invested it with the only creative power, as all legislative action essentially is, which they were willing to delegate to their agents, and they in terms excluded this the highest field of sovereign power from the possibility of interference from, or invasion by, any persons belonging to or constituting either of the other departments, and by the same article preserved the executive and judicial departments, in the exercise of their proper functions, from invasion by the legislature.

Says Judge Cooley, in his work on *Constitutional Limitations, p.* 133 : " There are certain matters which each house determines for *itself*, and in respect to which its decision *is conclusive*. It *chooses its own officers* except where, by the constitution or statute, it is otherwise provided ; it determines its own rules of proceeding, it decides upon the election and qualifications of its own members." Here it will be seen that the *choice of officers* is put upon the same plane with the unquestionable legislative powers possessed and used *exclusively* by the legislature of judging of the " *title* " of members and adopting " rules."

How then can it be said that such an office as this is an office the title to which may be inquired into as if it were one of the " civil offices " of the organized state government ?

The fact that the president of the senate is *ex officio* a member of various state boards is insignificant—*first*, because the *quo warranto* is not sought to challenge his title as a member of any board, but as president of the senate ; *second*, because there is no evidence that Mr. Rogers has assumed to act as a member of any state board or that he has entered into posses-

sion of any state office in the exercise of his official character as president of the senate.

Nor does the constitutional provision that the president of the senate shall assume the executive functions (art. 5, ¶¶ 12, 13, 14) indicate that his office as president is other than a purely legislative one. These provisions against the inability of the governor to act are simply means of transmitting *eo instanti* the executive function, not the "office," of governor, when the contingency guarded against occurs, to a person designated by the description of the legislative office he holds. In the event of his temporary assumption of executive duty, he is not described as the *governor*, but he is described as the "person administering the government." Art. 5, ¶¶ 8, 9, 10. If it were designed that he should fill the executive office, the functions of which he assumes by virtue of his title to the legislative office which he held, there could be no occasion for the provision to fill the executive office by an election, as there is, but the president of the senate would be governor for the unexpired term. The provision, however, is that he administers the government until "another governor shall be elected and qualified" (art. 5, ¶ 12), thus clearly drawing the distinction between the occupancy of an office and the temporary assumption of its duties.

But if the president of the senate were to be regarded as a governor filling that office, instead of merely administering the government by the exercise for a time of its functions, could his title as governor be here questioned? The provisions of article 5, paragraph 2, would seem to exclude this court from such an inquiry, because "contested elections for the office of governor shall be determined in such manner as the legislature shall direct by law." This is an indication of an intent to exclude purely judicial inquiry into the title to the executive office emanating directly from the people as an independent branch of the government, and to give exclusive control over the method of determining that question to another branch of the government, also directly emanating

from the people, *i. e.*, the legislature. That power the legislature has exercised by statute. *Rev., p.* 353, §§ 88 *et seq.*

It cannot be claimed that the power of investigating the king's title to his crown ever vested in the King's Bench, or that it was there when this state declared its independence of Great Britain, and so this power is not derivative by our Supreme Court from any claim of unlimited potentiality in that court.

Another evidence that the presidency of the senate is a purely legislative office, and not an office under the organized government of the state, described in the constitution as a "civil office," is found in the fact that no commission from the governor is necessary to its full investiture, as is the case with "all officers elected or appointed pursuant to the provisions of the constitution." Art. 7, § 2, ¶¶ 10, 11. No commission ever issues to the presiding officers of either house, nor to the governor himself, and for the same obvious reason they draw their titles directly from the people as independent agents in the triunity of state government.

III. Another reason why this court cannot take jurisdiction over this matter by a writ of *quo warranto* is that the question presented is a purely political one, and not in any sense judicial. The president of the senate is a member and presiding officer of a political body. The whole function of legislation is political, essentially. No higher field of political action can be entered upon in the whole range of human experience than that of making laws for the government of organized society. Every law involves in its enactment considerations drawn from political experience, from social conditions, from moral considerations, from views of expediency. Such considerations as these rise to the very highest plane of political action.

The judicial function is in no sense that of a law-giver; the legislative function is essentially so. The judge discovers and expounds, he construes and interprets, but he does not make the law. His function is never creative, it is never original; it is always constructive or expositive. It necessarily rests

upon the existence of a rule of law, the significance, the scope and the operation of which is a subject for judicial inquiry and exposition. This cursory presentation of the principles which distinguish legislative from judicial action seems to me to indicate that within the field of legislation, law-making, in the exercise of all the functions of a legislator as a law-giver, in the organization of a legislative body, in the selection of a legislative officer, in the action of the officer in his relation to the house whose servant he is, of which he is a member, for which he speaks and by which he is controlled, are all purely political and none in any sense judicial.

The cases which, in various ways, illustrate to my mind the soundness of this proposition are some of them the following, all of which show the recognition by the judiciary of the ex-clusiveness of legislative and executive control over purely political questions, whether affecting the intercourse between nations, the national boundaries, the laws which are to control the citizen, or the organization of legislative assemblies. Again, referring to the cases before cited, I direct the court's attention to these additional authorities:

*Penn* v. *Lord Baltimore,* 1 *Ves. Sr.* 444, where Lord Hard-wicke, Chancellor, declared that the Court of Chancery had no original jurisdiction on the direct question of the original right of boundaries of political provinces in the American colonies, declaring that the power to establish the boundaries was in the king and council, but in this case he took jurisdiction of the subject-matter of controversy because it grew out of a valid contract made in England, over which contract, and the private rights created by and flowing from it, he had jurisdiction.

In the case of *Nabob of Karnatic* v. *East India Co.,* 1 *Ves. Jr.* 370, 2 *Id.* 56, it was held that the question presented was political and involved no private rights. The court refused to take jurisdiction, upon the objection to its jurisdiction being raised.

The same doctrine was recognized by the Supreme Court of the United States in the opinion of Chief Justice Marshall,

in the case of *Foster* v. *Neilson*, 2 *Pet.* 306, who said: " The judiciary is not that department of the government to which the assertion of its interests against foreign powers is confided. Its duty, commonly, is to decide upon individual rights according to those principles which the political departments of the government have established."

The same principle is declared in the following cases : *Williams* v. *Lawrence*, 13 *Pet.* 420 (McLean, J.) ; *Kendall* v. *United States*, 12 *Id.* 524 ; *Georgia* v. *Stanton*, 6 *Wall.* 350 ; *Gelston* v. *Hoyt*, 3 *Wheat.* 246, 324 ; *United States* v. *Palmer*, 3 *Id.* 610 ; *The Divina Pastora*, 4 *Id.* 52 ; *Garcia* v. *Lee*, 12 *Pet.* 511, 520 ; *Williams* v. *Insurance Co.*, 13 *Id.* 415 ; *United States* v. *Yorba*, 1 *Wall.* 412, 423 ; *United States* v. *Lynde*, 11 *Id.* 632, 638 ; and in the very recent case growing out of the disputes touching the jurisdiction over Behring sea, which is reported as *In re Cooper*, 143 *U. S.* 472, 503.

IV. But, assuming that the court desires to have the views of counsel upon the situation, deplorable as it is, which the facts present, our claim is that Mr. Rogers is the president of the senate, lawfully elected by its duly-qualified, elected and returned members.

The senate of New Jersey is one of the houses into which the legislature is divided. It is not a continuous, perpetual entity, but a body of limited vitality. Its constitution changes yearly, and oftentimes its political character ; indeed, it is because of this latter feature that we find the *raison d'etre* of the present condition of things.

Under the charter of July 2d, 1776 ( *Wils. L., P. L., art.* 7), it was provided that the governor, who was elected for one year, shall be constant president of the council and have a casting vote in their proceedings ; and the council themselves shall choose a vice president, who shall act as such in the absence of the governor." The power to " convene " the council was in the governor or vice president, but it " must be convened at all times when the assembly sits." Art. 6. The speaker of the house of assembly had power to convene that house, if the assembly had empowered the speaker so to

do, " whenever any extraordinary occurrence shall render it necessary." Art. 5. These powers of convention were not indicative of the continuity of either house as an organized body, because they were both elected " yearly and every year." Art. 3. Nor was the fact that the governor (who was elective by the council and assembly for one year) was the " constant president of the council," with a casting vote, any evidence of a continuity of character in the council. As neither the council nor the governor had any official character beyond one year, there could not be the same body continuing from year to year. What there was, was a body which, during the official life of its members, was continuously *organized,* because the charter provided for it " a constant president." Hence there was always a council perpetually clothed with power to act and ready for action whenever convened by its " constant president " or its own " vice president."

There were reasons for this condition of things at that time. The functions of the council were both legislative and judicial. It, with the governor, was then the court of " last resort in all causes of law." But when the constitution of 1844 came to be made a marked difference is apparent. There is no provision for continuous *organization* of either legislative house. The governor is no longer a " constant president " of the upper house, with a casting vote. Neither does the senate exercise the ultimate judicial power as a " court of last resort in all causes." On the contrary, the legislative year is defined (art. 4, § 1) as beginning on the second Tuesday of January next after the general election, when " the two houses shall meet separately, * * * at which time of meeting the legislative year shall commence." Here we have an express declaration of the " time of meeting," coupled with a statement that at this " time of meeting the legislative year shall commence." While this language is not substantially different from that of the old charter, which is that " on the second Tuesday next after the day of election the council and assembly shall separately meet " (art. 3), the omission in the new constitution of any provi-

sions for a continuous *organization* of the upper house or senate is to me conclusive that a new organization should be annually made, and that no power existed in the *body* which was transmitted from one year to another of any sort. There could be no power in the senate as a legislative house until it had, by its *organization,* become a house, as distinguished from a collection of "members" qualified to act in effecting an organization of themselves into a "house." Hence, until there was an organization there was no "house," which alone was empowered to "judge of the elections, returns and qualifications" of its "members." Art. 5, § 4. And consequently, as all stood upon a plane as to the source of their title as "members," all were equally qualified to act in accomplishing an organization.

This is true of the house of commons, for, upon the assembling of a new parliament, each member participates in the organization by reason of his election only. The evidence of that election is the "return-book," in which the clerk of the house records the names of those gentlemen which are returned to the clerk of the crown in chancery and by him transmitted to the clerk of the house, who holds office for life under royal appointment. These members all vote in selecting a speaker *before any of them are sworn.* *Hurdle* v. *Waring, L. R. C. P.* 435; *S. C.,* 43 *L. J.* (*N. S.*) *C. P.* 209, 212, 213.

It has been the rule for the government of the highest legislative body in the country, and found, perhaps, its last express recognition in the report of the majority and minority committees of the senate of the fifty-first congress, first session, in the matter of the election of the senator from Montana, where Judge Hoar, reporting for the majority of the committee, said : "The majority of the committee are of the opinion that if this body of persons [speaking of the Montana legislature] had lawful and constitutional certificates of their election, that title is a good title against all the world, governing their associates in that body, governing the senate, governing everybody who has a lawful duty to determine

who are lawful, elected representatives, until there can be an adjudication *by the house itself* to the contrary, and nobody can be heard to say, and no authority can be permitted to inquire into or determine *the actual facts* of the election against that title." Senator Gray, of Delaware, of the minority of the committee, made a report fully concurring in Senator Hoar's proposition as to the conclusive effect of credentials, using this language : " We do not differ at all  *  *  *  from him in the position that we should seek here, in the first place, to discover the lawful body clothed with legislative power which has chosen a senator, and that to determine whether it be such lawful body, we shall be bound, *in the first instance*, by the fact that such body is composed of members who hold credentials from an officer or board clothed with authority in the premises to make such credentials." 21 *Cong. Rec., pt. 3, pp.* 2906, 2910 ; *In re Gunn*, 50 *Kan.* 155, 175.

V. Mr. Rogers, as the proofs show, was elected as president by the majority of all the members of the senate certified and sworn, and so is entitled to his office. This fact appearing incontrovertibly, there is no occasion for the writ, for as the senators, in organizing themselves into a house, could not look beyond the "statement of the determination" of election to ascertain who were entitled, for purposes of "organization," to seats in the senate to which it had been "determined" they were elected, and as Mr. Rogers' title to his office rests upon his election by the members of a body composed of those whose *prima facie* right to vote is not challenged, the judgment of the court must necessarily be that, looking at the evidence which those who elected Mr. Rogers were bound to consider and be controlled by, and which on this rule controls this action of this court, he was lawfully elected to the legislative office which he fills.

Nor can the practice of the senate heretofore affect the question if that practice is inconsistent with the statute, for the statute is the law of the legislature and not of the senate only. It cannot be disregarded by either house, for such a

disregard would be tantamount to a repeal by one house of an act of both which the governor had approved. This is true in England, where it is said by Hatsell, in his *Precedents of Proceedings of Parliament,* " that a rule laid down by the house of commons as a regulation of themselves cannot supersede the directions of an act of parliament." 2 *Hats. Prec. Par.* 167.

VI. Inasmuch as the writ is sought against Mr. Adrain as well as Mr. Rogers, it may be well to examine into the question whether there is such a position as that of temporary president, which Mr. Adrain claims to be an " office."

In England there is no such thing as a speaker *pro tempore* occupying the speaker's place for purposes of organization, nor was there, until a recent period (1853), any provision for a temporary speaker after the house had been organized. *Cush. Par. L.,* § 313 and note. Now, when the speaker has been elected and the house thus organized, if he be unavoidably absent, his place is supplied by the chairman of the ways and means committee of the *whole house.*

Hatsell notes that in March, 1606, the journal of the house for several days began "*Absente prolocutore*," but that very little business was done except appointing a committee to consider such precedents as could be found for the proceedings of the house in the absence of the speaker. The committee made no report and the speaker returned the next day. 1 *Hats. Prec. Par.* 185.

The action of the minority of the members of the senate here under inspection was to select a president *pro tempore* in the *process of organization.* This selection was made before a majority of senators, old or new, had arrived. It was made by nine men, none of whom were members-elect. All had been elected one or two years before, and who, collectively, were two less than a quorum of the whole body. They completed a temporary organization, if there can be such a thing as a temporary condition of a thing which is essentially permanent in its character, which I deny. Having thus sought to create themselves into a body, if they had suc-

ceeded they would not have organized "the house," to which the constitution gives the power to judge of election, returns and qualifications of its members.    It is impossible for a house to organize until it has enough members present to give it the character and potentiality of a house.    It must have a "majority" to make a constitutional "quorum to do business," and certainly the creation of itself by organization into a house capable of doing business could not be effected by any number less than that which, upon the completion of the organizing process and the consequent creation of the house, were alone empowered to do business.    Hence, as the action criticised was not that of a quorum, it was absolutely, ineffective to make the position of temporary. president or to fill it if made.

A president, temporary or permanent, must have a body to preside over.    If the body be one which is created by a law which defines its composition, its character and its duties, as the constitution does, then the elements which are constitutionally necessary to give vitality to the body, *i. e.,* a majority of its members who make a quorum, must be present participating, affirmatively or negatively, in the action of the body. Here there were none such, and therefore there was no body capable of even temporary organization.    This being so, Mr. Adrain never occupied any official relation even to the minority of the members of the senate.    They were utterly incapable of clothing him with any *official* character, and as there is no such thing as a temporary president of the senate, selected as Mr. Adrain was, he has no office the title to which can be inquired into or the intrusion into which can be investigated, and the result is that, Mr. Rogers holding the only office which is recognized by law as that of president of. the senate, and the statutory evidences of his title being unquestioned by anyone, there is no occasion for a writ.    The cause shown exhibits the futility of its issue.

VII. Mr. Adrain, and those gentlemen who share with him the merit or the fault of this most extraordinary proceeding, do not regard him, although claiming to be a temporary

president, as a constitutional officer of the senate, else they would have required, and he would have desired, that he should take the oath which the constitution prescribes. He did not do so. Hence, from his standpoint and that of his colleagues and legal advisers, he was not such an officer as, under the constitution, was obliged to take the oath as an officer of the legislature. And if the senate be a continuous body, why was any organization, temporary or otherwise, at all necessary? If there was a continuity in the body, then the presidential office was filled by Mr. Adrain's preceding election in a former session. If there be anything in the theory of continuity, he carried his title to that office from year to year; he took it very much as the bishop takes his, by a sort of apostolic succession, if reference may with propriety be made in such a case as this to such a standard of comparison. Still, so little confidence did these gentlemen place in the continuity of organization of the senate that they were solemnly endeavoring, by the selection of Adrain, to again elect the elected, to again choose the chosen, to again anoint the anointed. This course of conduct, aside from all other considerations in the case, seems to my mind absolutely conclusive that whether, as an abstract question, the senate is a continuously-organized and perpetually-existing, never-dying and eternal body or not, these members of the senate who, from the contention made in this case, are claimed to be the only persons possessing senatorial power and legislative functions, did not at this time, nor until after this action, entertain the idea, nor were they governed by the theory, that there was a continuity of organization and legislative existence in the senate as one of the legislative bodies of the state.

VIII. Again, it is important to observe that the constitution confers no power whatever upon a minority of the members of the senate. The power given in section 4, article 4, paragraph 2, to a " smaller number " than a quorum, is to " adjourn from day to day." The power of the house, exercisable after organization, by a minority of its members, to compel attendance of absentees, is not a power of the minority exercisable

at their discretion. The language, as well as the manifest purpose of this provision, clearly shows this. " Each house shall be the judge of the elections, returns and qualifications of its own members, and a majority of each shall constitute a quorum to do business ; but a smaller number may adjourn from day to day, and *may be authorized* to compel the attendance of absent members in such *manner* and under *such penalties* as *each house* may provide." The purpose is to enable a minority to compel a majority to act by enforcing the rules which the *house* had previously made for that purpose, and the power to adjourn given by the constitution is so given in order that the continuity of the existence of the house, after its organization, may be preserved until a majority appears for the transaction of business. But it is not the power of the minority as such which is operative—it is the power of the majority, *i. e.*, of " the house," which, by the operation and enforcement of its rules, the minority " *may be authorized* " to use. This provision of the constitution, which thus enables the house to confer upon a minority of its members a power to drive majorities, enables them only to use the power and " penalties " necessary to compel attendance of a quorum which exists under the rules of the house, and which the house may have authorized the minority to use.

Here there was no house and there could be no minority of a house. The nine members of the legislature sitting alone were nothing but an impudent and arrogant absurdity. Until they had united with enough members to make a majority of the senate, they were as impotent for all constitutional purposes as if they had remained by their own firesides in the enjoyment of that domestic felicity for which the inquietude of their legislative experiences doubtless creates in their hearts an unsatisfied and highly-commendable yearning.

There are no rules of the house of which the nine members can avail themselves. They are not the house, and can neither make new rules nor adopt any old one which would be obligatory. If they felt that they were a continuous body, they might assume the powers of that body and attempt to compel

the majority to meet with them, but they do not feel that they are anything but a *dis*-continuous body, and so for nine weeks the only function they have exercised is that of adjournment. This fact, coupled with the fact that these nine gentlemen have tried to create into a perpetuity a temporary presidency, and to fill permanently that temporary office, is strongly indicative, to say the least, of their want of faith in the theory of continuity.

I can well understand how the learned attorney-general, relying as he did upon the truthfulness of the so-called senate journal, reached the conclusion upon which he, in part, predicated his opinion that a majority of the whole constitutional senate was present on the first day. This view seems to have been shared by his excellency the governor. But the evidence shows that there was no such journal as would have any evidential value whatever, because the written history of the proceedings of the nine was not a journal. There could be no journal except that of an organized house.

Again, the testimony shows that while Thompson was willing, when he had no official responsibility while acting as secretary of an irresponsible minority, to write down whatever seemed to be advantageous to the views of his associates, yet when he appears as a witness, and under the solemnity of an oath is asked to tell the story of what occurred that day, he equivocates and says he is not certain whether the senators whom he recorded as present and answering to their names— the four Republican senators—were in fact so present and answering. So we are relieved from any embarrassment growing out of the so-called journal. It was not a journal, and if it is to be so regarded it is confessedly untrue.

IX. No argument can be drawn in support of Mr. Adrain's position from the fact of the presence in the senate chamber of a majority of the senators. They went there to organize. They found an apparent organization. They denounced it as an usurpation, and, to avoid a breach of the peace, withdrew to another part of the senate chamber, inviting the nine gentlemen to join them, and there organized the senate by the

election of Mr. Rogers as president, Mr. Mott as secretary, and the other necessary officers. It would, indeed, be a new feature of legislative law, more arbitrary than any known ruling, if a dignified protest against an outrageous usurpation could be construed into a participation and acquiescence in the wrong upon the people of this state committed by this flagrant defiance of their lawfully-expressed will. The history of this transaction, as exhibited by the proofs in this case, shows a most remarkable and, in the history of the state, entirely unparalleled method of dealing with the representatives of the people who, in the discharge of their official duty and in the assertion of their constitutional right, assemble and meet together at the capital of the state for the purpose of organizing, in solemn form and in ancient fashion, one of the legislative bodies.

What the future may have in store for the gentlemen who devised and attempted to execute this scheme to rob the people of this state of their just political rights; what measure of punishment may be meted out by the people of New Jersey to those who have spurned and defied their will, clearly, lawfully and constitutionally expressed, I know not. It is enough to say that the people of this state, those of good repute, without regard to political association, without regard to partisan preferences, without regard to past or present party ties, those who cherish its good name, those who esteem its character as a state distinguished for a government conformed and conformable to law, those who desire to uphold and maintain the dignity of its legislative assemblies, all await in trembling hope the action of this court in this cause. That the situation is unique, scandalous, disgraceful, outrageous and dangerous to the public tranquility is too obvious for discussion. But it would be infinitely and indescribably worse when, after the true history of this matter has been thoroughly elicited, set out and exhibited in detail before this, the highest court to which the learned attorney-general could by possibility appeal, and here carefully, elaborately and earnestly discussed by counsel, if such a tribunal as this should, by its deliver-

-ance in this cause, hold up to the people of this state for their instruction in years to come the conduct of these men as a pattern to be imitated rather than as an example to deter.

God grant that the people of New Jersey be saved from the consequences of an issue of these proceedings such as that would be.

For the relator, *Frederic W. Stevens.*

In these proceedings we contend that neither Mr. Adrain nor Mr. Rogers has been elected to the constitutional office of president of the senate.

We say that Mr. Rogers has not—*first,* because the senate of New Jersey is a continuous body, and that it is to that body that the senators-elect must come and present their credentials; they cannot, with a minority of hold-over senators, leave the body and go off and organize by themselves; *second,* because, whether the senate is or is not a continuous body, the hold-over senators remain as an organized nucleus, which receives, and which alone is competent to receive, the new members, who must come and attach themselves to it.

We say, on the other hand, that Mr. Adrain has not been so elected, because a minority of the whole number of members is without power to elect a president of the senate. The constitution provides that the senate shall be composed of one senator from each county in the state (art. 4, § 2), and that a majority of the senate—*i. e.,* a majority of the senate so composed—shall constitute a quorum to do business. Art. 4, § 4. In the case in hand, four hold-over senators left the lawful body, then consisting of thirteen, before it was permanently organized. The part that remained was, therefore, without power to pass the resolution which declared that the president *pro tempore* should hold the office of president until the election of his successor.

We are met at the outset with an objection to the jurisdiction of the court. It is said that, as the senate is a branch of one of the co-ordinate departments of the government, this court has no right to interfere with or control it, more par-

ticularly as it has the exclusive right to judge of the elections, returns and qualifications of its own members.

The fallacy of this argument is easily demonstrable.

The *Quo Warranto* act, which was in force long before the constitution was adopted, provides " that in case any person or persons shall usurp, intrude into or unlawfully hold or execute any office or franchise within this state, it shall and may be lawful to and for the attorney-general, with the leave of the Supreme Court, to exhibit one or more information or informations in the nature of a *quo warranto*, at the relation of any person or persons disiring to sue or prosecute the same against such person or persons for usurping," &c.; and the statute goes on to provide that if it shall appear to the court that the several rights of diverse persons to the same office may properly be determined on one information, the court may give leave to exhibit one information against several persons in order to try their respective rights to such office.

The language of the statute is general. It extends *in terms* to every office. If it does not *in fact* extend to the office of president of the senate, this can only be because that office has, by the terms of the constitution, been expressly or by implication excluded from the operation of the act.

I will consider—*first*, the nature and purpose of the *Quo Warranto* act; *second*, the provisions of the constitution bearing upon the office of president of the senate.

I. At common law, says Blackstone, a writ of *quo warranto* was "in the nature of a writ of right for the king against him who claims or usurps any office, franchise or liberty, to inquire by what authority he supports his claim, in order to determine the right." The remedy was purely a civil one, but it was attended with delays and fell into disuse perhaps as early as 10 *Edw. III.*, an information in nature of a *quo warranto* having taken its place. *Shortt Inf.* \*110.

Informations criminal in their nature (being exhibited for every species of common law offence except treason and felony) were of great antiquity, being coeval with the origin of the common law, as was shown by the elaborate argument in 1

*Show.* 106. They were filed by the attorney-general *ex officio* or by the master of the crown office on the relation of some private individual. They were a substitute for an indictment by a grand jury. In the one case *the grand jury* informed the king that a crime had been committed, in the other *his chief law officers.*

By analogy to this criminal information, when it was found that the proceedings under the old writ of *quo warranto* were too dilatory, the attorney-general, as the attorney of the king, began to exhibit *informations* in the nature of a *quo warranto*, with the object of enabling the king to seize the forfeited office or franchise into his own hands, or if from its nature it could not be seized, then to oust the incumbent. As soon as the proceeding had assumed this form it was deemed to partake of both a civil and a criminal nature—criminal because a proceeding by information was always deemed criminal; civil because the old writ afforded a civil remedy. Its principal character was that of a civil remedy for the king of the same nature as the more ancient writ. 14 *Petersd. Abr., tit.* "*Quo Warranto,*" 97.

The ancient writ and its substitute, the *quo warranto* information, lay for all franchises, both those that might be seized into the king's hands, as waifs, estrays, goods of felons, fines, wrecks, and those that might not, as for a court baron, court leet, fair, market, ferry, for claiming to be a corporation, for in this latter class there might still be judgment of ouster. 7 *Com. Dig.* 190.

And both the writ and its substitute lay for all kinds of offices—as against the steward of a court (*Anon.*, 11 *Mod.* 383); against a person for acting as trustee under an act of parliament without appointment (*Rex* v. *Nicholson, Str.* 299); for setting up a new office (*Rex* v. *Bayles, Id.* 836); for the office of constable (*Rex* v. *Goodyear, Id.* 1213); for the office of bailiff to a borough and manor, he having a material and important function to perform in the administration of justice (*Rex* v. *Bingham*, 2 *East* 308); against a portreeve of a borough and manor, he being, as portreeve, the

returning officer of the borough (*Rex* v. *Mein*, 3 *T. R.* 596); against the defendants as common councilmen of York, to show by what authority they claimed to be such (*Rex* v. *Brown*, 3 *Id.* 574, *note*); against a person claiming to be sheriff of Coventry (*Rex* v. *Whitwell*, 5 *Id.* 85); against the mayor of Axbridge (*Rex* v. *Symmons*, 4 *Id.* 223); against the judge of a county court (*Queen* v. *Parkham*, 13 *Q. B.* 858).

It was long a matter of doubt whether an information lay against one who held an office constituted by act of parliament, the objection being that such an office did not proceed from the crown, but in *Darley* v. *Queen*, 12 *Cl. & F.* *529, it was resolved by the house of lords that it did.

One of the principal grounds for applications for *quo warranto* information was the usurpation of offices and franchises in corporations. By the common law, says Petersdorff, such usurpations could only be punished by a prosecution at the king's suit, though the dispute was really between party and party. To remedy this inconvenience it was enacted by 9 *Anne, c.* 20, that in case any person should usurp, intrude into or unlawfully hold and execute any of the said offices and franchises, the proper officer of the court might, with leave of the court, exhibit an information, in the nature of *quo warranto*, at the relation of any person desiring to prosecute the same, who should be mentioned as relator.

Thus the statute of Anne extended only to individuals usurping offices in corporations. When, in the year 1795, Judge Paterson drew our *Quo Warranto* act, he probably had in mind the fact that it was, at that time, doubtful whether *quo warranto* would lie in the case of offices not proceeding from the crown. In 1791, in the case of *King* v. *Shepherd*, 4 *T. R.* 381, where an information was moved for calling on defendants to show by what authority they claimed the office of church wardens, Lord Kenyon had said that had it not been for the case cited, he would not have been disposed to grant a rule even to show cause, for that this was not an usurpation on the rights or prerogatives of the crown, for which

only writ of *quo warranto* lay, and that an information in the nature of a *quo warranto* could only be granted in such cases, and the rule was refused.   The same point had been ruled before in *Rex* v. *Dawbenny*, 2 *Str.* 1196.   In *King* v. *Hanley*, 3 *Ad. & E.* 462, *note*, it was held that a *quo warranto* information did not lie for the office of trustees under a public local act, and in *Rex* v. *Ramsden*, 3 *Ad. & E.* 456, it was held that it did not lie for the office of governor and director elected annually by the rated inhabitants under a local poor act.   *Darley* v. *Queen*, *supra*, authoritatively establishing the contrary principle, was not decided until 1845.

While, therefore, our act is in most other respects a copy of the statute of Anne, it differs from it altogether in respect of the extent of its application.   The statute of Anne extends only to corporate offices.   Our act extends to *all* offices.   The course of decision is uniform on this point.   *State* v. *Parkhurst*, 4 *Halst.* 437; *State* v. *Utter*, 2 *Gr.* 84; *State* v. *Crowell*, 4 *Halst.* 390; *State* v. *Paterson Turnpike Co.*, 1 *Zab.* 10; *State* v. *Gummersall*, 4 *Id.* 529; *State* v. *Tolan*, 4 *Vroom* 198; *Bownes* v. *Meehan*, 16 *Id.* 196.

In *State* v. *Paterson Turnpike Co.*, Judge Carpenter says : "The language of our statute is more extensive than the statute of Anne, and applies to the intrusion into or unlawful holding of any office or franchise within this state," and Chief Justice Beasley, in *Bownes* v. *Meehan*, *supra*, says : "Instead of giving the remedy in a limited class of cases, our act in this respect is entirely unrestricted."

There can then be no doubt that the statute in terms covers the case of all offices.

It certainly cannot be denied that the president of the senate is an officer.   He is not only an officer, but a constitutional officer.   Subsection 7 of section 4 of article 4 of the constitution provides that the president of the senate shall, *in virtue of his office*, receive an additional compensation, and section 13 of article 5 provides that in case of the impeachment of the governor, his absence from the state or inability to discharge *the duties of his office*, the powers, duties and

emoluments of the office shall devolve upon the president of the senate. Besides this, he is by law made *ex officio* a member of the board of education and of the trustees for the support of public schools. It is, moreover (*Rev. Stat., p.* 748), provided that the powers, privileges, duties and remunerations granted to or imposed upon the vice president of the council by law, at and immediately before the time when the present constitution of the state took effect, shall hereafter be exercised by the president of the senate, so far as the same are not inconsistent with the present constitution. What these powers were appears from the constitution of 1776, and from the instruction of Lord Cornbury. *Leam. & Spi.* 619. Section 8 of the constitution of 1776 provides that the governor, or, in his absence, the vice president of the council (the governor being called by the preceding section *constant* president of the council), shall have the supreme executive power, be chancellor of the colony and act as captain-general and commander-in-chief of all the militia. In colonial times the vice president of the council, on several occasions, acted as governor.

Each of the defendants not only claims but has entered upon the performance of the duties of the office. Mr. Rogers has taken the oath of office prescribed by the constitution (art. 4, § 8), and such oath without user is a sufficient foundation for the information. *Rex* v. *Tate,* 4 *East* 337 ; *High Extr. Rem.,* § 627.

II. Do the constitutional provisions, relating to the senate or the president of the senate, deprive the court of its jurisdiction to try the title to that office? As the president of the senate holds an office, and as the *Quo Warranto* act applies in terms to all offices, this court must have jurisdiction, unless some constitutional provision takes it away, or unless the court declines to take jurisdiction on some ground of political expediency.

It must be borne in mind that the court is not asked, in this case, to interfere with the action of the senate of New Jersey.

There are two persons before the court, each of whom claims to be president of the senate, and each of whom has been elected by a body claiming to be the senate, but it is plain that there cannot be two senates and two presidents of the senate in existence at the same moment. One, at least, of the bodies cannot be the senate, and one, at least, of the presidents must be an usurper. Can these usurpers, not existing in conformity with the constitution, claim for themselves the privileges and immunities guaranteed by the constitution? What constitutional privileges or immunities do they possess?

The moment the court concludes that either of these bodies is the true senate, the investigation comes to an end, for my only contention here is that the bodies that elected Mr. Rogers and Mr. Adrain are *not* the senate. If either of these bodies is found to be the senate, their president is beyond all question the president of the senate mentioned in the constitution.

In the first place, I assert that there is no express provision of the constitution which debars the court from considering the question.

There are only two provisions which have any bearing upon it. The first is that which provides that each house shall be the judge of the elections, returns and qualifications of its own members. This provision obviously relates to the title of members to sit in the senate as senators, not to officers of the senate. We do not attack the title of any senator. There is not the slightest pretence of an effort to interfere with the seating of *any* senator in *any* body. All we assert is that one group of senators have attempted to elect Mr. Rogers to the presidency of the senate, and another group of senators have attempted to elect Mr. Adrain to the same office, and that both groups have failed because neither is in fact the senate.

The same result is reached when we view the matter historically. The provision in question is copied substantially from the bill of rights promulgated upon the revolution of 1688. The evil to be remedied was that, in former times,

the king and the house of lords had assumed the jurisdiction of passing upon the elections, returns and qualifications of members, and had constantly exercised it up to the year 1604, after which time the commons had claimed the jurisdiction for themselves, generally with success. But the commons' choice of their speaker had always been, and is to this day, in form approved by the king. The clause in the bill of rights had not the slightest reference to this officer. The lords never chose their speaker, the Chancellor, who was sometimes a commoner, and therefore not a member of their house, having always presided. See 1 *Ans. Eng. Const., tit.* *"Parliament."*

The second provision relied upon is that which declares that "each house shall choose its own officers," but certainly this provision does not, *in terms,* take from the courts the power to pass upon the title of president of the senate. As well might it be said that when the constitution provides that clerks and surrogates of counties shall be elected by the people of their respective counties, it delegates to the people the right to pass upon the validity of the election.

There is, then, to be found in the constitution nothing which, in terms, deprives the court of its right to inquire into the title to this office. But it is said that the dignity and independence of this co-ordinate branch of the government requires that it should be exempt from judicial control in the choice of all its officers. Suppose we concede this. Evidently the concession applies to such persons as are officers of the senate and nothing more, and only to the case of the real senate. How is it possible for a body not the senate to claim for itself any such high prerogative or immunity? But the acts and proceedings of a real house are free from judicial control only within narrow bounds. If the president of the true senate had no duty to perform other than that of presiding over its deliberations, it might be urged with force that the court ought not to look into or interfere with its internal organization. In the language of Mr. Justice Stephen, in the *Bradlaugh Case,* 12 *Q. B. Div.* 283, it might well be held

that the body really the senate should have the exclusive power *of regulating its own proceedings within its own walls.* But, as we have seen, the president of the senate is vested, both by law and by the constitution, with other and more extended powers; powers which carry him beyond the senate walls and make him an officer of the state as well as an officer of the senate. Nothing is better settled than that when the legislative body, or an officer of that body, goes beyond its own walls, the ordinary jurisdiction of the law courts attaches. Beyond those walls its adjudication of its powers or prerogatives binds no one.

This is well illustrated by the following leading cases: *Ashby* v. *White, Sm. Lead. Cas.* 281; *Stockdale* v. *Hansard,* 9 *Ad. & E.* 283; *Bradlaugh* v. *Gossett,* 12 *Q. B. Div.* 283; *Kilbourn* v. *Thompson,* 103 *U. S.* 168; *United States* v. *Ballin,* 144 *Id.* 1.

The principle is further illustrated by the case of *Pangborn* v. *Young,* 3 *Vroom* 29. It was there decided that when the presiding officer of either house had certified to the passage of a bill by that house, the court would not go behind the certificate even for the purpose of ascertaining whether the forms prescribed by the constitution had been observed in its passage. This was manifestly a proceeding within its own walls relating to a subject-matter over which it had exclusive jurisdiction, and the courts would not, for that reason, interfere with or question it. The principle of United States v. Ballin is the same.

From the above cases I think we would be warranted in asserting that even if the *constitutional* senate had elected the president of the senate in an unconstitutional mode, the powers of the officer so elected would not extend beyond the senate walls. Within these walls the senate would be allowed to place its own construction upon the constitution, so far as it related to that officer or his election, and no court would interfere with it, but beyond those walls its construction would go for naught. If it attempted to impose a deputy governor

upon the people in a mode which *this court* deemed unconstitutional, the court would interpose to defeat the attempt.

But this is not the position of the case in hand. It is not the case of a constitutional senate proceeding in an unconstitutional way, but the case of a body, not the senate, attempting to usurp the functions of the senate in electing a president thereof. Certainly, such a body derives no protection in its usurpation, either from the constitution or the laws.

But it is urged with great earnestness that the question is a political and not a judicial question, the point really involved being the *status* of the two contending senates.

I admit that the court cannot pass upon a class of political questions, and if this were one of the classes, then the court could not pass upon it; but it is not. In a certain sense, all questions which relate to government, whether they arise under the federal or the state constitution, are political. Thus, questions involving the title conferred upon an officer by an election or appointment, questions concerning the legality of the acts of municipal boards or other public bodies or officers, questions concerning the constitutionality of laws, are political questions because they are concerned not so much with private right as with the constitution of the body politic, the binding force of laws and the acts or title of its officers. The court deals with questions like these every day. On the other hand, the case of *Luther* v. *Borden,* 7 *How.* 1, which involved the question of which was the true government in Rhode Island during the time of the Dorr rebellion; the case of *Georgia* v. *Stanton,* 6 *Wall.* 50, which involved the *status* of the State of Georgia under the Reconstruction acts, and the case of *Jones* v. *United States,* 137 *U. S.* 212, which involved the inquiry whether the jurisdiction of the United States extended over one of the Guano islands, are illustrations of a class of political questions which the court will not undertake to decide in opposition to the decision of the president, to whom, under the distribution of powers conferred by the federal constitution, the decision properly belongs. The rule in this class of cases is that the judiciary will follow the

lead of the executive. The rule, even here, is not that when the court finds that there is a political question involved it will have nothing to do with the controversy. On the contrary, it will decide the controversy if the conflicting legal rights of individuals are involved in it, but in deciding it will adopt that view of the political question presented which the executive has adopted. Thus, in Luther *v.* Borden, the president having recognized the charter government of Rhode Island as the true government, the act of breaking and entering the house of a rebel, done under the direction of an officer of that government, was held to be a lawful act and not a trespass. The true rule is that we must look to the constitution to find out to which department of the government it has confided the decision of the particular question. When we have ascertained this department the other departments follow its decision.

If the court declines to compel the governor, by its own writs, to proceed to do a plain duty, which he neglects or refuses to do, it refuses to interfere, not on the ground that the question is political, but on the ground that, on the theory of our constitution, the executive is one of the co-ordinate branches of the government and is supreme within its own sphere. And so, if the court refuses to compel the legislature, or either branch of the legislature, to legislate on a particular subject, or in a particular way, or according to a particular mode of procedure, or even to *proceed* merely, it is because the legislature is supreme in its own sphere and can no more be compelled to act against its will, or even against its caprice, than the courts can.

The lack of power to institute a judicial inquiry into the election of members of the legislature springs from a different cause. The question of membership is, in its essence, judicial, but the constitution following the bill of rights has committed the decision of it to the tribunals of the houses themselves.

I freely concede that if the court were asked to do nothing but to make a declaration as to which senate was the true

senate it would be obliged to decline. But it by no means follows that, because the court cannot pass directly upon the *status* of the legislature, or either of its branches, it cannot do so at all. It is the duty of the court to expound and enforce legislative acts, and in doing so it must necessarily determine whether what purport to be laws are so in fact. If two bodies, sitting at the same time, both claim to be the legislature and pass acts, the court must determine which of those bodies is the legislature, in order that it may ascertain whose acts it shall enforce. In doing so it necessarily reviews the claims of the contending bodies and decides between them, *i. e.*, decides the question which is called political.

So, if one of those bodies orders its speaker to arrest a citizen and detain him within or without its walls, if it be not the true legislature its order is void, and on a *habeas corpus* proceeding the court must inquire into the validity of the arrest and the jurisdiction of the body which ordered it, and if the arrest be invalid, discharge him from custody wherever he may be found.

So, too, if each legislature should, under our constitution, proceed to elect a comptroller and treasurer, the court would necessarily be compelled to decide which of the persons elected were really comptroller and treasurer.

In each one of the cases I have put, the primary question, right as it stands presented, would be a judicial one. It would be none the less judicial because, in deciding it, the court was incidentally obliged to look into the organization of the legislative body.

The question was presented in the Maine and Kansas cases, and in both the court assumed jurisdiction to decide. *Prince* v. *Skillen*, 71 *Me.* 367 ; *In re Gunn*, 32 *Pac. Rep.* 470 ; *Burnham* v. *Morrissey*, 14 *Gray* 226.

The cases in which the writ has gone against incumbents of the office of governor are directly in point. All the objections that could be urged against the political expediency of inquiring into the title of a person claiming to be president of the senate, but deriving his title from a body not the

senate, apply with even greater force in the governor's case. The proceeding is a direct proceeding. But the courts distinguish between a department of the government and the person assuming to exercise its duties. *Attorney-General* v. *Barstow*, 4 *Wis.* 567; *Thatcher* v. *Boyd*, *N. W. Rep.*; *S. C.*, 143 *U. S.* 135; *State* v. *Buckley*, 23 *Atl. Rep.* 186; *High. Extr. Rem.*, § 634; *McCra. El.*, § 347; *Cooley Const. Lim.* 786.

The form in which the question arises—whether it be a suit brought to test the validity of the law, a *habeas corpus* proceeding, a proceeding to determine whether a comptroller or treasurer has been elected, or a *quo warranto* proceeding—can make no difference. If it arise in the regular course of a customary proceeding, that is sufficient. In each case the title of the senate is incidentally not directly questioned.

Will anyone assert for a moment that if a *quo warranto* proceeding should be instituted against the present comptroller and treasurer to oust them from their offices on the ground that the house of assembly, in joint meeting with the Rogers senate, had elected their successors, who had duly qualified, and that, therefore, the present comptroller's and treasurer's terms had expired, it would not be competent for the court to inquire whether there had in fact been a constitutional joint meeting? This, of course, would depend upon the question whether the Rogers senate was in fact the senate of New Jersey. Its assertion that it was would, in such an inquiry, go for nothing. But if it would be competent to pass upon the question where it was claimed that the entire legislative body had acted, *a fortiori* would it be competent to pass upon it where it appeared that only one branch of the legislature had acted?

We are brought back, then, to the question whether the office of president of the senate is such an office as comes within the scope of the *Quo Warranto* act. That it is I have already demonstrated.

It has been the practice for more than fifty years to elect the president of the senate for the ensuing year, but in these

proceedings the question of the duration of the term is immaterial. *State* v. *Utter,* 2 *Gr.* 84; *Bownes* v. *Meehan,* 16 *Vroom* 196. It is doubly so in this *case,* for this is not the case of an invalid election by a body competent to elect if it pursues the legal course, but the case of bodies which cannot, as now constituted, validly elect anyone.

For Maurice A. Rogers, *Thomas N. McCarter.*

My first proposition is that this court has no power or jurisdiction to enter upon this inquiry.

By the third article of the state constitution it is provided : " The powers of the government shall be divided into three distinct departments—the legislative, executive and judicial; and no person or persons belonging to, or constituting, one of these departments shall exercise any of the powers properly belonging to either of the others, except as herein expressly provided."

Again, section 2, paragraph 1 : " The senate shall be composed of one senator from each county in the state, elected by the legal voters of the counties, respectively, for three years."

Section 4, paragraph 2 : " Each house shall be the judge of the elections, returns and qualifications of its own members, and a majority of each shall constitute a quorum to do business; but a smaller number may adjourn from day to day, and may be authorized to compel the attendance of absent members, in such manner and under such penalties as each house may provide.

" 3. Each house shall choose its own officers, determine the rules of its proceedings, punish its members for disorderly behavior, and, with the concurrence of two-thirds, may expel a member."

Section 8, paragraph 1 : " Members of the legislature shall, before they enter on the duties of their respective offices, take and subscribe the following oath or affirmation [then follows the form of the oath]. And members-elect of the senate or general assembly are hereby empowered to administer to each other the said oath or affirmation.

" 2. Every officer of the legislature shall, before he enters upon his duties, take and subscribe the following oath or affirmation [then follows the form of the oath]."

From these extracts from the constitution it is very clear that the election of president is a legislative act, to be performed in the regular and orderly course of legislative proceedings and necessary to such proceedings. It is an office recognized by the constitution by name. Art. 5, ¶ 12.

By the first paragraph of article 10 of the constitution, it is provided that " the common law and statute laws now in force, not repugnant to this constitution, shall remain in force until they expire by their own limitation, or be altered or repealed by the legislature."

By section 85 of the "Act concerning elections" (*Rev., p.* 353), it is enacted that the senate and general assembly shall convene and hold their sessions in the state-house, at Trenton, *and in the organization of each house* the certified copies of the statements of determination made under the direction of the sixty-ninth section of this act shall be deemed and taken to be *prima facie* evidence of the right of the persons therein mentioned to seats in the house respectively to which they shall have been so determined to be elected. This section was a part of a law which was in force when the constitution was adopted, and thereby became grafted into the constitution, and a part thereof, until it should be altered or repealed by the legislature, which has never been done.

It is an undisputed fact that Mr. Rogers was elected to the office of president by a majority of the members of the senate, who met at the state-house on the day fixed for the meeting of the legislature, whose certificates of election were in due form. That having been elected, he took the constitutional oath and assumed and continues to preside over the body that elected him.

This court is asked to institute a proceeding, the result of which will be that, if it decides against Mr. Rogers, it must pass judgment of ouster and remove him from his unlawful

intrusion and subject him to the costs of the prosecution, and possibly to a fine.

It is respectfully contended that it is not within the power of this court to enter upon any such inquiry or pass any such judgment. The proceedings which resulted in his election were of a purely legislative character, with which this court cannot interfere.

The following authorities establish rules and settle principles which absolutely control this part of the case: *State* v. *Governor*, 1 *Dutcher* 331; *Thompson* v. *German Valley Railroad Co.*, 7 *C. E. Gr.* 111; *Kendall* v. *Camden*, 18 *Vroom* 47; *Pangborn* v. *Young*, 3 *Id.* 40, 41, also 35, 46; *Ruh* v. *Frambach*, 18 *Id.* 85.

Followed by Judge Depue in *Kearns* v. *Edwards*, 17 *N. J. L. J.* 51; *People* v. *Hall*, 80 *N. Y.* 117; *State* v. *Marlow*, 15 *Ohio St.* 114, 134; *Hiss* v. *Bartlett*, 3 *Gray* 468; *People* v. *Bissell*, 19 *Ill.* 229; *McCra. El.*, § 593, also § 350; *State* v. *Berry*, 24 *N. E. Rep.* 266; 6 *Am. & Eng. Encycl. L.* 387, tit. "*Elections;*" *State* v. *Tomlinson*, 20 *Kans.* 692; *Sellick* v. *Norwalk*, 40 *Conn.* 359; *Kerr* v. *Trego*, 47 *Pa. St.* 295, 298, particularly ¶ 5; *Hartranft's Appeal*, 85 *Id.* 433; *State* v. *Towney*, 8 *Ga.* 360; *State* v. *Jarret*, 13 *Md.* 309; *Cooley Const. Lim.* 131; *Mos. Mand.* 80.

The next question involved in the supposed proceeding would be the legality of the organization of the body and of the election by such body of Mr. Rogers. This, also, is subject to the same rule; it is a legislative question which has been decided by the legislature itself, and from which decision there is no appeal to the Supreme Court. It appears without dispute that the house of assembly has recognized the Rogers senate, is acting with it in passing laws, is sitting with it in joint meeting electing officers, and in every other possible lawful way co-operating with it as a regular and legal senate.

In proceeding with its legislative duties it was the right and the duty of the house to decide with what body it would act in its future operations, and it could not proceed without so deciding. It was a part of its legislative power and duty,

as much as its action in passing laws, and it is respectfully urged, in addition to what has been said on that subject, that this court has no jurisdiction to entertain an appeal from that decision; if it had, the judiciary would be superior to the legislative power. The power to determine between two rival senates, so called, with which the house would co-operate, was a power which belonged to the house; it was purely legislative, and this court cannot exercise the power or challenge or reverse the action of the house that did it.

When we find a quorum of the senate meeting at the place and on the day required by the constitution and laws of the state, and perfecting an organization, and taking the oaths of office and electing their presiding officer and other officers, and the house has recognized it and acted with it, it becomes by those facts a complete legislature, requiring for its legality the recognition of no other person, and subject to review by no other department of the government. Such recognition was within the designation of legislative or political acts over which, by well-settled principles, the court can have no jurisdiction. *Luther* v. *Borden,* 7 *Pet.* 1; *Id.* 51, opinion of Woodbury, J.; *De Katur* v. *Paulding,* 14 *Id.* 515, 516; *Kendall* v. *United States,* 12 *Id.* 524; *State of Georgia* v. *Stanton,* 6 *Wall.* 50; *People* v. *Hatch,* 33 *Ill.* 9; *Commonwealth* v. *Allen,* 70 *Pa. St.* 465; *Hartranft's Appeal, supra;* *Burnham* v. *Morrison,* 14 *Gray* 226; *State* v. *Jarret, supra.*

In many of the cases above cited the question arose as to the power of courts to deal with the election or qualification of members of city councils or other municipal bodies, and wherever the courts in such cases did assume to exercise jurisdiction it was upon the distinct ground that the rule recognized by the courts which made the houses of the legislatures or congress judges of the election and qualification of their own members, and which exempted them from supervision by the courts, did not extend to municipal bodies which were the creators of the legislature, and in every instance it was recognized that in the case of the supreme legislature congress would have no power to consider the question.

It was so laid down in the famous case of Kerr *v.* Trego, above referred to; and in McCrary's treatise it is said, section 593: "In the event that a municipal or legislative body which ought to be a unit, divides into two separate bodies, each claiming to be the legitimate and legal organization, what is the remedy by which the authority of the lawful body may be maintained and the unlawful body be restrained from assuming and attempting to exercise functions which do not belong to it? In considering this question we must keep in view the fact that there are two classes of legislative bodies, to wit, *those which are supreme and those which are subordinate. To the former class belong the congress of the United States and the legislatures of the several states. These represent the supreme legislative power of the nation or of the state.* To the latter class belong the common councils of cities and towns and other similar municipal legislative bodies. These are *under law* and subordinate to the judgments and orders of the courts of justice."

I conclude, therefore, that upon either of the questions involved in the election, returns, qualification or organization of the senate, the courts are precluded by the rules settled by the authorities above mentioned from making any such inquiry. The importance of the court's refusal to entertain jurisdiction results from the inability of the court to enforce its judgment of ouster should it reach such a determination, and the futility of such an enforcement were it undertaken.

II. But, suppose the court shall be of a different opinion and shall conclude that it may, and therefore ought to entertain the jurisdiction which is invoked for it, and proceed to investigate and decide the questions involved, what will then be the result?

If Mr. Rogers is called upon to show by what warrant he claims to act as president of the senate, and the court will undertake to determine whether his claim is justified by law, it is respectfully insisted that, by well-settled principles of law applied to the facts proved in this case, the result must be to establish either one of two propositions—*first,* that he

has been legally elected president of the senate of New Jersey and now lawfully exercises the functions of his office; or *second,* that he is at least president *de facto* of the senate, acting with the house in the discharge of their ordinary legislative duties, with no other person in existence authorized or qualified to assume his place if he should be removed from it.

What is his warrant?

1. That he was duly elected senator from the county of Camden at the election held in last November.

2. That of his ten associates who elected him, seven were duly elected from their respective counties at the same election and the remaining four were members of the senate last year, or what the attorney-general calls " the existing senate."

3. That as there can only be twenty-one senators, and as eleven is a majority of twenty-one, the body which elected him constitutes a lawful quorum to do business; that these eleven members met in Trenton on the 9th day of January, being the day fixed by the constitution, and took the oaths of office prescribed by the constitution in the manner therein provided.

4. They repaired to the state-house in compliance with section 85 of the Election act, and produced the certificates of their election, which are produced here and in evidence and are in due form.

5. They filed their credentials and oaths of office with the secretary of state, and organized themselves into a body, and elected Mr. Rogers president by a unanimous vote.

6. That he took the oath of office prescribed by the constitution, and thereupon the senate proceeded to do business with him as its presiding officer.

7. That the body over which he presides has been recognized by the house of assembly; that together they have passed many acts.

8. That the senators have met with the other house in joint meeting and have elected important state officers, namely, comptroller and state treasurer, and that, by virtue of all such proceedings, he exercises the powers in question.

Upon these facts it seems clear that the court must decide, when the question comes before it, that he was lawfully elected and lawfully exercises the powers and performs the duties of the office.

What flaw is there in that statement of title?

What answer is made to this presentation?

*First.* That the senate electing Mr. Rogers was not a lawful body because seven of its members had never been admitted to participate in the proceedings of the senate by the minority of ten, who claim that these seven could not be senators until their credentials had been passed upon and approved by the minority, and that such minority had refused to accept or consider their credentials, and therefore they could not act, although they possessed every other constitutional qualification.

The claim of the prosecutors of this proceeding is that the senate of New Jersey is a continuous body and has been from its first organization; that, although one-third go out every year, the remaining members continue to be the senate, and when they meet at the constitutional time they have power to pass upon the qualification of the new senators; that the new senators do not become members until the old members have admitted them.

Of course, to reach this conclusion it must be assumed, as it was, that a quorum of the so-called existing senate was competent to act on the question, and the argument is that, inasmuch as the nine members who met and constituted a quorum of the existing senate were the constitutional judges of the election and qualification of the members, no person can become a member without the affirmative judgment of that body. The effect of the alleged presence and participation of the four hold-over senators, which will be considered hereafter, is not material to the present inquiry according to the attorney-general's view.

According to this contention, although the constitution says the senate shall be composed of one member from each county, yet every year when the senate meets it shall only be composed of one member from each county that has not

elected a new one, and whether it will ever be composed of more or not will depend not on the constitution, but on the will of the members from the fourteen counties holding over. If such choose to admit the new ones, all well; if not, their judgment is final and conclusive.

The newly-elected members may have been duly elected; may possess every constitutional qualification; may, as in this case, produce the certificates of election, which the law makes *prima facie* evidence of their right to seats in the house in the organization, and yet a majority of the hold-overs, though less than a quorum of the whole number, may finally and conclusively determine, in spite of law and the constitution, that the newly-elected men are not and cannot be members of the senate.

Pursue this logic to its legitimate conclusion. The seven hold-over senators are disfranchised. The year goes on with the senate composed of fourteen members. At the end of the year seven more go out, and others may be elected in their places, but there are seven hold-overs composing the existing senate. Four is a majority, and these four may exclude the newly-elected, as they did before, and then the existing senate, consisting of seven for another year, and then it goes out like the snuff of a candle.

The argument in support of a doctrine which may lead to such an absurd conclusion is founded on the supposed analogy between the senate of New Jersey and the senate of the United States.

Now, the practice in our state from the beginning has always been to re-elect a president at every meeting of the senate, to re-elect the other officers, to adopt new rules and to take proceedings, all of which would be unnecessary and illogical, if not illegal, if the doctrine of the attorney-general were sound.

If the senate was an existing body, the journal of the senate would be a continuous volume, having no interruptions or breaks occasioned by the adjournments. If it was a continuous body, why would not the business left unfinished

at a previous session continue to be on the calendar and business of the new session in the same condition of progress which it had at the adjournment? Yet everybody knows that unfinished business, left so at the expiration of a session, dies with the session and cannot come up in the new session in the same stage of progress which it had when the senate adjourned. Will it be pretended that after the adjournment of the senate of 1893 any of its powers continued during the recess in the legislature? Had it imprisoned a man for contempt, would its existence and continued power operate to hold him in custody during the recess, when everybody knows that the right to hold and punish for contempt ceases with the adjournment of the house in which the proceedings for contempt were taken?

In *Anderson* v. *Dunn*, 6 *Wheat.* 204, the Supreme Court of the United States, in dealing with a case of contempt, says: "Although the legislative power continues perpetual, the legislative body ceases to exist on the moment of its adjournment or periodical dissolution."

It may be said here that in the discussions which occurred in the convention in regard to the constitution of the senate and the duration of its official term, its likeness to the senate of the United States was disclaimed and contradicted. The constitution says: "The senate shall be composed of one member from each county, and that each house shall be the judge of the elections, returns and qualifications of its own members, and the majority of which shall constitute a quorum to do business." What is the constitutional house? Is it a quorum of the twenty-one, or is it a quorum of fourteen? There can be no stronger assertion of the right of these newly-elected members to participate in the organization of this senate than that found in *McCrary on Elections*, which book is quoted as an authority by the attorney-general.

In section 282 he says: "There can be no doubt but that a certificate of election, regular in form, signed by the proper authority, constitutes *prima facie* evidence of title to the office, which can only be set aside by such proceedings for contest-

ing the election as the law provides. The certificate, whether rightfully or wrongfully given, confers upon the person holding it the *prima facie* right to the office. If, however, the certificate contains upon its face a recital of facts, and these facts show affirmatively that the party holding it was not duly elected, it may be disregarded."

*Second.* There is enough in this case to justify the court in denying this writ and refusing to interfere with the title of Mr. Rogers, without exercising the jurisdiction to try his title or the election and qualifications of those who elected him, and that is, that Mr. Rogers is the president *de facto.* The position occupied by him is one which has been recognized by the house, and questioned only by the relator in this case, the governor of the state. If the court finds from the evidence that he was elected by the quorum of the senate, and that the house has acquiesced in such election and treated his legislative body as its associate in the making of laws, the court can easily find that he occupies the position of president *de facto,* without passing upon any other question or trenching upon the jurisdiction of the senate; and the ascertainment of that result would necessarily lead to a denial of leave to file this information, because there cannot be the slightest pretence that Mr. Adrain is lawful president of any senate, or ever has been of the present senate. He does not even claim to be anything more than president *pro tempore.* It is not claimed for him that, by virtue of that appointment, he can exercise the incidental and statutory functions which *ex officio* belong to the president of the senate. As before stated, he has never been elected permanent president; he has never taken the oath of the office, and has never done anything but to aid in keeping up a purely temporary organization of a minority of the senate. That minority, failing to meet with the quorum and to participate in its action, can have no legislative power whatever.

In the case of *People* v. *Hatch,* 33 *Ill.* 164, it is said: "The spontaneous meeting of all the members, except in the case stated, at a time not appointed by law and without a

previous vote for such purpose, would avail nothing. The executive, if he desired, could not recognize it as a legislative body, nor could it perform a legislative act having any binding authority. *This being so, it follows a less number than a quorum cannot meet and hold a legislative session, no matter under what convictions they may assemble or what rights they may suppose they can preserve by such meeting. It would be a proceeding not sanctioned by our constitution and laws."*

Take the definition of an officer *de facto,* as found in the attorney-general's opinion. It is plain that Mr. Rogers fills that position, and if he should be ousted there would be no other person qualified to take his place without a new election. His removal from office would not, in any sense, place Mr. Adrain in office, and the only effect of such removal would be to leave the senate without its president.

In support of this position I cite the rule of the Supreme Court of this state in *Dugan* v. *Farrier,* 13 *Vroom* 383, and contend that, under the rule as stated, the facts established that Mr. Rogers had a color of right sufficient to create him president *de facto*. Judge Dixon, in that case, said on another ground, also, he had a color of right. The power of electing a president belonged exclusively to the board of chosen freeholders, and it was for the board also to determine in what mode the power should be exercised. The acquiescence of the board in Mr. Govern's presidency and its proceeding to business with him in the chair, gave him the appearance of title sufficient to render him president *de facto.*

So, in the present case, the actual election of Mr. Rogers by a quorum of the senate. The fact that the house recognizes his senate as the existing senate, and that the two are acting together in conducting the only legislation which is being carried on for the state, or can be, gives to Mr. Rogers the position of president *de facto.* No possible harm can come to the public by permitting him to remain undisturbed in the enjoyment of that position. No other person has a right to it, and no question has been raised as to his right except on the matter of the merest form, which was entirely

under the control of the senatorial body, the giving effect to which will not only subvert the existing legislature but will nullify the verdict of the people and the large majority by which they decided that the senate of the State of New Jersey should be Republican. What good will come of it? On the contrary, the question of expediency will render it incumbent on the court to take the view last suggested, if they entertain the matter at all, and hold that Mr. Rogers, being president *de facto*, has a right to occupy the position until he is. removed by the only body authorized to challenge his seat and unseat him.

III. The court, in the exercise of its discretion, ought not to allow the filing of this information. As has been already shown, this is a discretionary power, and the case above referred to, of *Mitchell* v. *Tolan*, 4 *Vroom* 195, lays down rules. regulating the exercise of such discretion.

For the relator, *John P. Stockton, Attorney-General.*

I. The Supreme Court has jurisdiction in a case where there are two conflicting senates, each claiming a right to exercise legislative functions, to determine by which body legislative authority can be lawfully exercised.

In the case of *Prince* v. *Skillin*, 71 *Me.* 367, the Supreme Court of Maine said : " When different bodies of men, each claiming to be and to exercise the functions of the legislative department of the state, appear, each asserting their titles to be regarded as the lawgivers for the people, it is the obvious duty of the judicial department, who must inevitably, at no distant day, be called to pass upon the validity of the laws that may be enacted by the respective claimants to legislative authority, to inquire and ascertain for themselves, with or without questions presented by the claimants, which of those bodies lawfully represents the people, from whom they derive their power. There can be but one lawful legislature. The court must know for itself whose enactments it will recognize as laws of binding force, whose levies of taxes it will enforce when brought judicially before it, whose choice of a prose--

cuting officer before the court it will respect. In a thousand ways it becomes essential that the court should forthwith ascertain and take judicial cognizance of the question, which is the true legislature?"

McCrary says where there are two bodies, each claiming to be the legislature, then the courts, whose duty it is to respect and execute the acts of such legislature, must of necessity decide which is the legislature. *McCra. El.* 396.

In the case of *Attorney-General* v. *Barstow,* 4 *Wis.* 567, it was held that "the office of governor in this state is a civil office, and an unlawful intrusion into or usurpation of the same can be tried in this court, by information in the nature of *quo warranto,* and the intruder or usurper be ousted and punished. It was held that, although the court had no power to interfere with the functions of the executive department, yet it had jurisdiction of the citizens of the state to prevent them usurping the offices and franchises of the state. It has been said that there are three departments of the government. This may be true, but there are not three governments nor three parts of the government deriving power from separate sources; they all derive power from the same source. When the executive department acts, the whole government, and not part of it, operates through that department; the state, with all its sovereign power, is in motion. Just so with the legislative and judicial departments. Though the executive power is vested in the governor, it is not vested in any individual who may, by accident, mistake or fraud, obtain possession of the office."

In 1893 two houses of representatives attempted to carry on business at the capitol of Kansas. Finally, by a writ of *habeas corpus,* the Supreme Court decided which was the constitutional and valid house. The case is reported as *In re Gunn,* 50 *Kans.* 155. It was said in that case, in the opinion, among other things:

"If it is the obvious duty of the judicial department to pass upon the claims of two legislative bodies or assemblies, then it is much more the duty of the judicial department to

pass upon the legality of the two different houses, both claiming to be the house of representatives. A house is not the legislature."

It has been contended on behalf of one of the defendants that the court has not jurisdiction in this case for the following reasons:

*First.* Because the question submitted is political and not judicial, and must, therefore, be decided by the executive and not by the courts.

Let us see just what the question to be decided is. Stripped of all subsidiary considerations, it is simply this—which of these two senates is organized according to the constitution? Manifestly, they cannot both be so organized, and that one only can be which has complied with the constitutional forms and requirements. To decide this question there must be determined, first, what the constitution requires, and second, which body, if either, has conformed to such requirements. What is there in these inquiries that is not judicial? When, in the history of the world, has a question of constitutional interpretation, or compliance with constitutional requirements, been held to be other than judicial? If the governor should assume to decide it, would not he have to act judicially? In other words, would not he have to interpret the constitution and adjudicate whether or not its standards had been complied with? In doing so, what would be his action, if not judicial? In what possible sense could it be called political? Legislative bodies in constitutional governments are organized under and not above the constitution, and courts are created and exist to apply the test of the constitution to every act they perform, and to declare such acts void if not in conformity thereto.

Political questions may be raised in a state, but they can only be raised by the supreme power, not by one of its creatures. The people have the right to set up one government and pull down another, and they have the power to destroy constitutions as well as to make them. Whether or not they have done the latter in a given case is a political question, and

the courts cannot deal with it because it arises, not under the constitution, but outside and above it.

Such was the case in Rhode Island at the time of the Dorr rebellion. There were there two state governments organized by the people, each complete in all its departments. The courts could not deal with the question as to which of them was the true government, because they had no standard by which to judge them, and because they themselves existed under the one government or the other, and could not, therefore, decide between them. On application to the president of the United States, under the clause of the federal constitution which guarantees to every state a republican form of government, he recognized the one government and threatened to suppress the other by force, and so ended the contention. This was the question which the supreme court of the United States declared was political in *Luther* v. *Borden,* 7 *How.* 1, and it is the principle of this case which was applied in the various cases cited from the Supreme Court of the United States, not one of which bears the faintest resemblance to the situation in the present case.

The question as to whether or not such an issue as that raised in this case is political was as directly involved in the Kansas decision in the Gunn case as it was in the Wisconsin decision in the Barstow case. In the Kansas case it was conceded that the court had the right to inquire into the title of the speaker of the house, because his action involved the liberty of a subject; but it was contended that the recognition of the speaker's title by the governor and the senate bound the court as the decision of a political question. Upon this point Judge Allen dissented, and the opinion of the majority of the court is full and convincing. It therefore received full consideration and a direct decision.

*Second.* It has also been argued that the president of the senate is the mere servant and mouthpiece of the senate, and not, therefore, a public, substantive officer.

The argument is based upon the character of the office of

speaker of the house of commons, which bears only a slight analogy to that of president of the senate of New Jersey.

The speaker of the house of commons may be the mere servant and mouthpiece of that body, but the president of the senate has duties cast upon him by the constitution and the law which he does not perform entirely during the session of the senate and does not perform at all as its servant or agent.    It is these duties, already pointed out, directly affect-ing the public at large, that make his office a public one.

The office is substantive and independent as well as public, because it was created by the constitution, and will exist with-out the will of the senate so long as the constitution remains unaltered.

It was because the office of adjutant-general of the Essex militia and the office of jailer of the workhouse of the county of Hudson were created by statute that the former was held by Chief Justice Hornblower and the latter by Chief Justice Beasley. to be independent and substantive, although the incumbents were appointed in the one case by the commander-in-chief of the militia and in the other by the board of chosen freeholders of Hudson county, and in both cases the incumbent was liable to be removed at the will of the body or person appointing him.

*Third.* It has also been contended that, as the senate has the right to choose its own officers, it may elect anyone to the office of president of the senate whom it chooses, and the court cannot inquire into his title without interfering with the legislative department of the government.

The senate has the undoubted right to choose its own officers, but it does not follow that it has the right to elect a person to the office of president of the senate who is constitu-tionally disqualified from holding that position.    If he were a mere servant of the senate, its act in electing him, as already conceded, could not be reviewed elsewhere, but, surely, power must exist in the judicial department of the government to pass upon the constitutional qualifications of a person whom the senate puts into the chair of the executive of the state or

makes a member of the state board of education, and to oust him from such position if he be found constitutionally disqualified therefor.

But with that question we have nothing to do in this case. We are not here seeking to review the act of the senate of New Jersey in electing either of these respondents. The question here is, has either of them been elected by the true senate? Both, of course, have not been, and if either of them has been he has an unquestionable title to the office which he claims. To argue, therefore, that in adjudging as to the election of either of these respondents, the court would interfere with the legislative department of the government is to beg the question. Even if it were true that the court could not review the action of the senate in electing a president, it would not prevent the court from adjudging that the body which elected either of these men was not the senate of New Jersey, and it would be folly to claim that, in so adjudging, the court would interfere with the legislative department of the government.

In the Wisconsin case Mr. Carpenter insisted that the court could not inquire and decide whether or not the respondent was the true governor, because to do so would be to interfere with the executive department of the government. The answer of Mr. Justice Cole on this point has everywhere been regarded as conclusive. He said: "The objection to the exercise of the jurisdiction of this court to entertain a proceeding to determine the right of a person to hold and enjoy the office of governor is that it is dangerous to the independence of the executive department of the government. The executive power of the state is vested in the governor by the constitution, and hence it is said you cannot interfere with the person acting as governor without disturbing the department. Who does not see the fallacy of this reasoning and the utter confusion of ideas in the very statement of the proposition? It assumes, in the first place, the very point in controversy, to wit, the right of the person acting as governor to the office. This inquiry proceeds upon the hypothesis that this right is

·disputed, contested; that the respondent is an usurper. But whether he is or not is a question of fact to be established by proof alone. It is certainly very illogical to commence reasoning upon a proposition by begging the question. The question here is, who is entitled to hold the office of governor of this state? The answer given is that the respondent is the governor, and there the argument ends. Concede it and there is nothing to inquire into; no right to be ascertained, no subject for judicial investigation. But whether the respondent is the governor or not is the issue."

II. In case of a division of a legislative body that ought to be a unit, that is the legal organization which has maintained the regular forms of organization according to the laws and usages of the body; or, in the absence of these, according to the laws, customs and usages of similar bodies in like cases, or in analogy to them. The new members, though they be in the majority, must meet with the old at the time and place fixed by law and proceed regularly with the organization of the body. They must join themselves to the existing body, for the members holding over, though they may be in the minority and not sufficiently numerous to constitute a quorum, are yet the body for the purpose of receiving the new members and acting as the organs of reorganizing the body.

Mr. McCrary, in his work on *Elections*, says: "It is undoubtedly true that for failure to organize a supreme legislature there is no remedy which courts of justice can administer, and this fact makes it all the more important that the rules which have been established to prevent such failure and avoid the anarchy, confusion and possible bloodshed which might ensue, should be adhered to." *McCra. El.*, § 593.

This high authority also lays down the rule thus: "In case of a division of a legislative body that ought to be a unit, it becomes important to determine which is the legal and which the illegal assembly. In such a case the true test is this: that is the legal organization which has 'maintained the regular forms of organization, according to the laws and

usages of the body, or in the absence of these, according to the laws, customs and usages of similar bodies in like cases, or in analogy to them.' This rule affords the best possible test of legitimate organization.

"In all cases where part of a legislative body remains, and where the body is to be completed by the reception of new members, the old members who hold over remain as an organized nucleus, which receives the new members, when the whole body proceeds to the exercise of all its functions. The new members, though they be in the majority, must meet with the old at the time and place fixed by law, and proceed regularly with the organization of the body, and they cannot assemble elsewhere and organize the body. They must join themselves to the existing body, for the members holding over, though they may be in the minority, and not sufficiently numerous to constitute a quorum, are yet the body for the purpose of receiving the new members and acting as the organs of reorganizing the body." *McCra. El.*, § 592.

The senate of New Jersey is a continuous body with holdover members, as is clearly demonstrated by reference to the constitution.

Article 4, section 1, provides that the legislative power shall be vested in a senate and general assembly, and in paragraph 3 of the same section it is provided that "members of the senate and general assembly shall be elected yearly and every year, and on the first Tuesday after the first Monday in November; and the two houses shall meet separately on the second Tuesday in January next after the said day of election, at which time of meeting the legislative year shall commence; but the time of holding such election may be altered by the legislature."

Section 2 provides that "the senate shall be composed of one senator from each county in the state, elected by the legal voters of the counties, respectively, for three years."

Section 4 provides that "each house shall direct writs of election for supplying vacancies occasioned by death, resignation or otherwise; but if vacancies occur during the recess of

the legislature, the writs may be issued by the governor under such regulations as may be prescribed by law."

Section 6 provides that "no bill or joint resolution shall pass unless there be a majority of all the members of each body personally present and agreeing thereto; and the yeas and nays of the members voting on such final passage shall be entered on the journal."

Clause 12 of article 5 provides that "in case of the death, resignation or removal from office of the governor, the powers, duties and emoluments of the office shall devolve upon the president of the senate, and in case of his death, resignation or removal, then upon the speaker of the house of assembly for the time being.

The provisions of the constitution of 1844, so far as they concern the creation, organization and powers of the senate, are manifestly copied from the constitution of the United States. In fact, the words are precisely the same, except in such changes as are rendered necessary by reason of the difference in the terms for which senators are chosen, and the body of electors. Both bodies are made continuous bodies and are always in existence. The seats of senators of the first class were to be vacated at the expiration of the first year; those of the second class at the expiration of the second year, and those of the third class at the expiration of the third year, so that one class may be elected every year, and if vacancies happen they are to be filled by persons elected for the unexpired term.

This provision is precisely similar to that of the constitution of the United States, creating the United States senate, except that in the latter case the senators are elected for six years and one-third retires every two years.

This creates a continuous body, and there always exists a senate capable of doing business, because there is always two-thirds of the entire senate in existence, and, moreover, there is always more than the constitutional number required to pass a bill.

If there should be some mistake in the manner or time of

election, or it should happen that no one of the class which is to be elected to fill the vacancies of any particular year should be constitutionally qualified to take his seat, the existing senate could proceed to business and direct writs of election for supplying vacancies. There can be no doubt of the constitutional duty of the senate to assemble at the time named by the constitution and to proceed to do all those acts which the number of members present make it competent for it to perform.

Mr. Cushing, in his treatise on *Law and Practice of Legislative Assemblies*, § 272, thus describes the *status* and continuancy of the senate of the United States: "The senate of the United States, though it constitutes a branch of each succeeding congress, and its sessions are held periodically, and correspond with those of the house of representatives, is a continuous and permanent body, was organized under the constitution when that instrument first went into operation, in 1789, and has continued its organization ever since. Each state is entitled to be represented at all times by two senators in the senate of the United States, and elects them by the legislature of each for the term of six years, whenever vacancies occur by lapse of time. Occasional and unforeseen vacancies occurring by reason of death, resignation, acceptance of a disqualifying office or otherwise, are filled for the residue of the unexpired term, either by the legislature, if then in session, or by appointment of the executive. Members, when elected or appointed, if the senate is then sitting, or as soon afterwards as it sits, present their credentials and immediately take the oath of office and their seats. The senate, on its first organization under the constitution, was divided by lot into three classes, one of which expires with each congress, and the same arrangement being repeated on the accession of new states, as to the members therefrom, one-third of the members of the senate go out of office every two years. Hence, at the commencement of each congress two-thirds of the senate, at least, which is more than a quorum, are then in office, duly qualified and ready to proceed to business. The presiding

officer of the senate being the vice president of the United States by virtue of his office, and in his absence one of the senators, chosen temporarily, and the former retiring from the senate towards the end of each congress, in order that his place may be supplied by the choice of a temporary president, the consequence is that, at the commencement of each congress, there is a presiding officer of the senate already in office, ready to proceed at once with his duties as such and without any further authority from the senate. The secretary and other officers of this branch remain in office until their successors are chosen. There is no necessity, therefore, at the commencement of each congress, for an organization of the senate of the United States in the ordinary sense of that term. In these points the senate of the United States bears a close analogy to the house of lords."

It will be observed that, while Mr. Cushing is positive in his conclusion that the senate of the United States is a continuous body by reason of its membership and the provision for supplying vacancies and the division into classes, that he connects with this declaration the custom adopted, as he says, as a matter of precaution, of selecting a senator as president *pro tempore* to preside over the senate at the opening of the next session. This juxtaposition has been made the basis of an argument which has been presented to this court, that the absence of a similar system in New Jersey argues against the permanency and continuity of the New Jersey senate as secured by the constitutional provision similar to that which has been held to secure the permanency of the United States senate.

The continuity of both the senate of the United States and the senate of New Jersey is created by the mode of election and term of the members, and not by the manner of providing for a temporary presiding officer. This condition as to membership has its origin in the constitutional provision, and is neither strengthened nor weakened by the subsequent action of the senate itself in providing a precautionary method for the selection of a presiding officer. The senate of the

United States could not make itself a continuing body, nor could it diminish the constitutional provision which made it a continuing body. The senate of New Jersey, formed under the same constitutional theory and formula, was a continuing body by reason of that constitutional provision, and was not made less so by the absence of any provision by its own membership as to a presiding officer, temporary or otherwise.

But the State of New Jersey has endeavored to provide a permanent and continuing presiding officer for the senate. .

The New Jersey law and practice has been to provide for a presiding officer of the senate during the entire existence of the senate, not as in the case of the United States senate, in advance, but contemporaneously and with ample power to meet any contingency as it may arise. Under the constitution of 1776 the legislative council was invested with the power of choosing a vice president of council. The governor of the state was the *constant president* of the council, and in his absence the vice president acted in his place. To this vice president was given other powers, among which were those which belonged to the governor, in case of the absence of the governor. In other words, the vice president of the council stood in the same relation to the council that a president *pro tempore* does to the senate. In the United States senate the vice president of the United States is the president of the senate; the temporary president takes his place in his absence. In the New Jersey senate the governor was the constant president of the senate; in his absence the vice president of the council took his place as constant president of the council. This was the position of affairs in this regard at the time that the constitution of 1844 was considered and adopted. That constitution provided for an officer to be known as the president of the senate, who was to preside over the senate and to take the place of the governor in his absence or inability. This officer was not to be a mere presiding officer over the senate while it was in session. He was the continuing officer of the senate, whether that senate was in regular or special session or in recess; he is by law *ex officio* member of various

state boards, which he attends when the senats is not in session; he signs deeds and conveys land as president of the senate, and is *ex officio* one of the trustees of the school fund. While the constitution of 1844 did not say so, the legislature of 1845 took care to supply the omission by providing that "the powers, privileges, duties and remunerations granted to or imposed upon the vice president by law at and immediately before the time when the present constitution of the state took effect, shall hereafter be exercised, enjoyed and performed by the president of .the senate so far as the same are not inconsistent with the present constitution; and all such powers or duties heretofore exercised or performed by the president of the senate are hereby ratified and confirmed, and shall have the same force and effect as if exercised and performed after the passage of this act."

This provision of a permanent officer, with great general and continuing powers, seems to be as ample a provision for the proper and timely organization of the senate as does that of the federal constitution and custom.

This provision has been further fortified by a custom of fifty years' existence that each session of the senate shall be called to order by the secretary of the preceding session, which custom in origin, duration and efficacy has all the force and effect possessed by the custom of the United States senate in providing for a president *pro tempore* to call the senate to order in the absence of the vice president.

The constitution, in settling the succession, recognizes the president of the senate as always existing. It distinguishes between his existence and that of the speaker of the house. The expression is, the president of the senate and the speaker of the house for the time being.

The senate of the United States itself, by its action and by the voice of its ablest members from the earliest time, repudiated the notion that there could be an old senate and a new senate. It has always been insisted that it was the very same body constitutionally and in point of law which had assembled on the first day of its meeting in 1789; that it existed

without intermission from that day until the present, and would continue to exist as long as the government should endure.

In the debate which took place in the senate of the United States, twenty-sixth congress, to be found in the " Congressional Globe," volume 9, pages 236 *et seq.*, Senator William Allen, of Ohio, said : " There was no such thing as a new senate known to the constitution of this republic. They might as well speak of a new Supreme Court as of a new senate. There was a new house of representatives, because the entire house expired at the expiration of the second year, and because the fourth of March terminated the life of that body. But not so the senate."

Senator Silas Wright, of New York, said : " He had never heard it pretended that the rules of the senate are not perpetual from congress to congress, unless they were changed by the body."

Senator Henry Clay, of Kentucky, said : " It was contended on one side that the senate was a continuous, neverdying body, and on the other side it was said there was no house of representatives. But in the true contemplation of the constitution, the senate, and the house, too, were supposed to be in existence ; for if the states had discharged their duties by the election of members, they were ready to form a house. The senate and house were, in the contemplation of the constitution, continuous bodies ; they were not identical in the members that composed them, but he hoped that, though theoretically always in existence, the acts and measures of the senate would depend on the component members that constitute the body."

Senator James Buchanan, of Pennsylvania, said : " Senators contended that one senate or one congress had no right to elect officers for their successor ; and that, therefore, the joint resolution violated the constitution, because it gave the election of a printer for the next senate to that which had expired on the third of March. This was as strange a position as any which had been assumed throughout the argument.

An old senate and a new senate? There could be no new senate. This was the very same body constitutionally, and in point of law, which had assembled on its first day of meeting, in 1789. It had existed without intermission from that day until the present moment, and would continue to exist as long as the government should endure. It was emphatically a permanent body. Its rules were permanent, and were not adopted from congress to congress, like those of the house of representatives. For many years after the commencement of the government its secretary was a permanent officer, though our rules now required that he should be elected at stated intervals. The senate always had a president, and there were always two-thirds of its actual members in existence, and generally a much greater number. It would be useless to labor this question. Every writer, without exception, who had treated on the subject, had declared the senate to be a permanent body. It never dies, and it was the sheet anchor of the constitution on account of its permanency."

The continuity of the senate of New Jersey and of the senate of the United States does not depend upon the opinions of anyone, or even upon the intentions of those who framed them, but it depends upon the words of the constitution which actually created a body, two-thirds of whom are always in existence and capable of any action which may be required; but that this was the intention of the framers is stated in the debates of both conventions. The same words are used in creating the bodies, and the same arguments are used and reasons given for doing so. The fact that the senate is a part of the appointing power is stated by Mr. Ten Eyck in the New Jersey convention as his reason for making it a permanent body. The same reason is given by Luther Martin in the national convention.

Let us compare for a moment the debates in the constitutional conventions.

*Notes from "Debates on the Federal Constitution," by Elliot, vol.* I.:

Luther Martin's letter on the federal constitution of 1787

and the general information delivered to the legislature of the State of Maryland, relative to the proceedings of the general convention, held at Philadelphia in 1787, by Luther Martin, Esq., attorney-general of Maryland and one of the delegates in the said convention, page 361, commencing on line 21 :

" The senate, sir, is so constituted that they are not only to compose one branch of the legislature, but by the second section of the second article they are to compose a privy council for the president. Hence it will be necessary that they should be, in a great measure, a permanent body, constantly residing at the seat of government." * * *

*Yates' Minutes of the Secret Debates of the Federal Convention of* 1787 :

Debate on motion " That the national legislature shall have the power of negativing all laws to be passed by the state legislature, which they may judge improper."

Mr. Madison—" I confess it is not without its difficulties in many accounts. * * * May not this power be useless in the senatorial branch ? They will probably be always sitting." *Yates' Minutes, p.* 450.

Debate of motion by Mr. Read—" That the term of ' nine years' be inserted in triennial rotation."

Mr. Madison—" The senate therefore ought to be this body, and, to answer these purposes, there ought to be permanency and stability." * * *

Mr. Sherman—" The two objects of this body are permanency and safety to those who are to be governed." * * *

Mr. Wilson—" The motion is now for nine years, and a triennial rotation. Every nation attends to its foreign intercourse; to support its commerce; to prevent foreign contempt and to make war or peace. Our senate will be possessed of these powers, and therefore ought to be dignified and permanent."

The " Newark Daily Advertiser " of June 22d, 1844, contains the following report of the discussion which ensued on

the adoption of the report on legislative power from the committee of the New Jersey constitutional convention :

"Mr. Dickerson hoped the motion would prevail, as he saw no good reason for the change from the then practice at all. There was no necessity of making the term of one house different from the other. He was not in favor of giving more importance to one branch of the legislature than to the other.

"Mr. Ten Eyck said he would vote against the section, inasmuch as the appointing power was now vested in the senate. He had voted for this section in the committee of the whole, but as the appointing power had not been .changed to the joint meeting, as he had hoped, he would now vote against it.

"Mr. Pickel was in favor of the amendment, and insisted that if the popular voice could be heard it would be decidedly in favor of annual election.

"Mr. Vroom thought it was strange that there should now be this difficulty. Who are the justices of the Supreme Court, the governor, the justices of the Common Pleas? And why not as well have them elected annually? The object of this section was to acquire some stability in the legislative power, and it would be incorrect in principle and theory to have no check on this power.

"Mr. Ewing was in favor of having the representatives responsible to the people at short intervals. If these senators should perform their duty as to appointments unfaithfully,. and .they should remain in office in spite of the people, it would bring about a state of feeling and discontent never before witnessed. It was a very different case with the judiciary. They ought to have a longer tenure of office, to render them free and independent of any local contingencies. This was a feature drawn from aristocratic times, one which the people, he was sure, were not prepared to approve. If these great powers of appointment had not been assigned .to them, we might have felt different, but as it was he hoped the amendment would prevail.

" Mr. Parker said it was a wrong idea that the people would only elect their senators every three years. It was not so, but one-third of the senate was to be elected annually, and the people at all times could correct any abuse by changing the third of the senate, as it was not likely they would be unanimous on any one subject. It was very desirable to have stability in the legislation, and this plan of modeling the senate would have it.

" The amendment was rejected—yeas, 22 ; nays, 30—as follows :

" Yeas—Cassady, Dickerson, Edsall, Ewing, Fort, Hibbler, Holmes, Jacques, P. B. Kennedy, Laird, Lambert, Marsh, Naar, Neighbour, Pickel, Pitney, Swain, Ten Eyck, Van Arsdale, Westervelt, Wills, Wood. 22.

" Nays—Bell, Brown, Childs, Clark, Condit, Connelly, Elmer, Field, Gilchrist, Green, Haight, Halstead, Hornblower, R. S. Kennedy, Mickel, Ogden, Parker, Parsons, Randolph, Ryerson, Schenck, Sickler, Stites, J. R. Thomson, R. P. Thompson, Vroom, Williamson (President), Wurts (Vice President), Zabriskie. 30."

The practice in the United States senate is to present the credentials of new senators as soon as they are elected, and this is usually done at the session before they take their seats, although a new congress may come in on the 4th of March.

The " Congressional Globe" of 1869 shows that Mr. Stockton's credentials, when he was elected the second time to take his seat from the 4th of March, were presented in the middle of February by his predecessor, Mr. Frelinghuysen, and all the new members, whose credentials had been presented, were upon the 4th of March called upon by the president of the senate to come forward and take the requisite oath.

It is therefore a question that does not admit of dispute, that the senate of the United States is a continuous body with organized hold-over members, and that that was a construction of the constitutional clause creating the senate before the constitution of New Jersey was framed ; that this was well

known to the learned lawyers who were engaged in framing that constitution, and that the arguments used in the state convention were the same as used in the national convention.

The Supreme Court of this state, in the case of *Fritts* v. *Kuhl*, 22 *Vroom* 191, in construing another clause of our state constitution, which was adopted from a similar provision in the federal constitution, said:

"That the body which framed the constitution of 1844 was ignorant of the interpretations of this language, which had uniformly prevailed in the practice of the federal government, at least since the term of the elder Adams, cannot be conceded, when we remember that among the members present in that convention, and actively participating in its work, were Joseph C. Hornblower, Henry W. Green, Peter D. Vroom, Alexander Wurts, Abraham Browning and other eminent jurists of our state.

"Mahlon Dickerson, James Parker, Ferdinand S. Schenck, Joseph F. Randolph and Charles C. Stratton were also members of the convention of 1844.

"Mr. Dickerson was a member of the United States senate from 1817 to 1833, and, it seems, must have been conversant with the fact that, in 1823, Mr. Attorney-General Wirt gave to President Monroe, and, in 1832, Mr. Attorney-General Taney gave to President Jackson the opinions to which reference has been made.

"Mr. Parker, Mr. Schenck, Mr. Randolph, Mr. Stratton and Mr. Vroom were members of the federal house of representatives between 1833 and 1843, and must have been familiar with events so important in the political history of the period of their public service; that, in a convention in which these distinguished men exercised a controlling influence, a clause should have been incorporated in our state constitution with the intention that it should receive an interpretation different from that which we may reasonably assume they knew had been applied to it in the unvarying practice of the federal government for nearly half a century, is scarcely conceivable.

"The question, therefore, which confronts us is far different from that submitted to Attorney-General Wirt and that passed upon by Judge Cadwalader.

"The rule is well settled that where a statute or a constitutional provision of doubtful import has been adopted in one state from the statutes or constitution of another state, after a practical construction has been given to the language by judicial decision, it will be presumed that the interpretation adopted in the state from which it is taken has been accepted as well as the words. *Lessee of Gray* v. *Askew*, 3 *Ohio* 466; *Langdon* v. *Applegate*, 5 *Ind.* 327; *Rigg* v. *Wilton*, 13 *Ill.* 15; *Adams* v. *Field*, 21 *Vt.* 256; *Rutland* v. *Mendon*, 1 *Pick.* 154."

The debates that took place in the convention that formed the constitution of the United States, and in the conventions of the states to which it was submitted for approval; the declarations of the United States senate by its ablest constitutional lawyers; the debates in the convention which framed the constitution of New Jersey, all support the rule as laid down by the commentators too firmly to be shaken by the opinions of partisans, promulgated in a time of popular excitement.

The statute law of the state also recognizes the constitutional right of the senate to be the judge of the returns presented by members-elect, for it provides that the credentials shall be *prima facie* evidence. Evidence for what purpose? Before what tribunal? The tribunal is fixed by the constitution; its jurisdiction is made exclusive, and the statute law provides that the presentation of the credentials shall be *prima facie* evidence before that court. This, so far from attempting to take away any of the constitutional power of the tribunal, simply reasserts it. No legislative act could interfere with the constitutional power granted to each house. It is not a question committed to legislative action, because each house is given control over its own membership.

By the ninety-sixth section of "An act to regulate elections," approved April 16th, 1846, it was provided "That

the senate and general assembly shall convene and hold their sessions in the state-house at Trenton; and in the organization of each house the certified copies of the statements of determination, made under the direction of the seventy-ninth section of this act, shall be deemed and taken to be *prima facie* evidence of the right of the persons therein mentioned to seats in the houses respectively to which they shall have been so determined to be elected."

It will be observed that it is not provided that a member shall be entitled to take his seat on the presentation of the certified copy of the statement of determination. The act could not do this, because the constitution provided that *each* body should be the judge of the returns of the members. So the act simply confines itself to making this certificate *prima facie* evidence; evidence to be submitted to the tribunal which, by the constitution, could alone make the determination; evidence which, if uncontradicted, is sufficient to establish the right to the seat. The act, in connection with the constitutional provision, is an absolute recognition of the right of the senate to adjudge the question of membership.

An act was passed on the 11th day of March, 1880, which provided "That whenever any candidate, at any election in this state for member of the senate or member of the assembly, shall have reason to believe that an error has been made in any board of election or of canvassers, in counting the vote or declaring the result of such election, whereby the result of such election has been changed, such candidate may apply to any justice of the Supreme Court, who is authorized to order and cause a recount of the votes, and if it shall appear, upon such recount of the ballots cast, that an error has been made sufficient to change the result of such election as declared by the board of canvassers, then such justice of the Supreme Court shall be empowered to revoke the certificate of election already issued, and order to be issued in its place another certificate to the person who shall be found by such recount to have received a majority of the votes cast."

The courts have held, without dissent, that it was beyond

the power of the legislature to make a justice of the Supreme Court a judge of the election of a member of either house, because that power was committed by the constitution to each house, and not to the legislature; that the power given was simply to recount for the purpose of correcting a mistake and changing the position of the parties by revoking the certificate and granting another, which action would prevent the certificate of the canvassers from being *prima facie* evidence, as provided by the former statute, and make the certificate of the justice *prima facie* evidence.

The provision of both statutes, the ruling of the courts and the custom of the body, all recognize the power of each body to render judgment on the presentation of the evidence.

The constitution provides that the members of the legislature shall, before they enter on the duties of their respective offices, take and subscribe a specified oath or affirmation, and then adds that members-elect of the senate or general assembly are hereby empowered to administer to each other the said oath or affirmation.

It will be remembered that in section 2 it is provided that as soon as the senate shall meet after the first election to be held in pursuance of this constitution, they shall be divided as equally as may be into three classes, &c.

It is manifest that the provision permitting the members-elect to take the oath before one another was a necessity in the first organization of the senate. It was a necessity, if they took an oath at all, that some person should be designated to administer that oath. It might have been the Chief Justice; it might have been a justice of the Supreme Court; it might have been a justice of the peace. It could not be the president of the senate, because there was no president. The body had to organize. In reference to the house, which was not made a continuous body, whose speaker is spoken of in the constitution as speaker for the time being, it is always a convenient method of organizing. In the senate it was only necessary for the purposes of the first organization, and therefore it appears that, from the time the senate was organized

as a continuous body to the present time, the members-elect have been sworn in by the president *pro. tempore* of the senate in the presence of the senate.    But even if this were not so, how absurd it is to claim that the power to take an oath, given in one clause of the constitution to a member, constitutes that member the judge of the returns of a claimant, which power, by express provision, is vested solely and exclusively in the organized body and is necessary to its independent existence.    If the power to administer the oath had been in the Chief Justice, would it have been insisted that he thereby became the judge of the returns of claimants to seats? And yet this proposition is not more unreasonable than it is to insist that, because one member may administer the oath to another, the senate is deprived of its power to judge of the returns of its own members.

It is claimed that, under the clauses which provided that " members of the legislature shall, before they enter upon the duties of their respective offices, take and subscribe the following oath or affirmation:    *    *    *    and members-elect of the senate or general assembly are hereby empowered to administer to each other the said oath or affirmation," senators-elect could take such an oath or affirmation in private, then appear with an attested certificate and insist upon taking their seats without permitting the existing senate, even if they were all present, to pass upon their returns.    Such a proposition can find no support either from principle or authority, and is inconsistent with the free exercise by the senate of its power as judges of the returns of its members. If such a course could be pursued the senate could be destroyed by usurpers, and on their presentation a majority might immediately exist in the senate, which would have power to decide on their own elections and control legislation ; and the testimony shows that this was the purpose of the insistment that the senate should bind itself to seat the members-elect, as a condition precedent to their presentation.

Is is unnecessary to consider the question whether the oath of office may be taken in private or at some other time and

place, or before some other person or body than the senate. This has nothing whatever to do with the question. When it is determined to admit a senator to his seat because his credentials are regular, he is then admitted to take the oath of office, but he does not become a member of the body by virtue of the oath of office, but by virtue of the judgment of the senators upon his credentials and their determination that he is entitled to admission. While the official oath may be a necessary part of his induction into office, it does not make him a member of the body until his credentials have been approved by the body, who are the constitutional judges.

The constitution provides that "each house shall be the judge of the elections, returns and qualifications of its own members," and the question has been raised as to when this judgment shall be exercised—shall it be before or after the admission of the members upon these returns?

An examination of the records discloses the fact that, as a common practice, the method has been to admit the applicant upon the returns and then to afterward examine into the manner. But in every instance it is apparent that the body claimed and retained to itself the power to act when and how it pleased. It is difficult to see how it could be otherwise. The power of a legislative body to judge of the election of its own members is an absolute power, controlled by no other tribunal. In this country it was adopted from the English system, and it was embodied in the unwritten constitution of Great Britain as the result of one of the earliest of the conflicts between the house of commons on the one hand and the sovereign or the lords, or both, on the other, and has ever since been admitted to belong exclusively to the house itself as "its ancient, natural and undoubted privilege."

It is a power held to be essential to the free election and independent existence of a legislative assembly, and it has been guaranteed to the legislative bodies of New Jersey by express constitutional provisions, which have been fully supported and protected by our courts and our executives.

It is a power which has always been exercised by every

legislative body in this state and country, at its own will, as to *time or manner*, without the possibility of successful opposition or review save that of an appeal to the people.

There is no necessity to prove this by a multiplication of illustrations. It has become an axiom of parliamentary law, and perhaps is as well demonstrated by the formula in which members are admitted to their seats as by a statement of particular cases.

It has been presented in evidence by the counsel for Mr. Rogers that, by the memory of Mr. Daniel Dodd, who was secretary of the senate in 1845, 1846 and 1847, the senators all appeared in their seats at the opening of those sessions, no distinction being made between the senators-elect and hold-over senators, and that all participated in the organization of the senate, or in the selection of a president *pro tempore*, for that is all that was done before the admission of the new senators. The memory of this witness of events nearly fifty years ago is that a person being named as president *pro tempore*, the motion was submitted without contest to the members present; that the vote was taken *viva voce*, and always without a negative, and that he could not distinguish between the voices of the senators *in esse* and the senators *in posse*. This vague and inconclusive memory can hardly prevail against the contemporaneous record explicitly made in every instance, by the same person, that every member-elect was admitted to his seat only after presentation and judgment on his credentials and his taking of the oath of office.

An examination of the journals of the senates of 1845, 1846, 1847 and 1848 shows these indisputable facts:

The senate of 1845 was made up of nineteen senators, who, in obedience to the constitutional provision to that end, divided themselves into three classes, so that one class would go out at the end of that legislative year, the other at the end of the next legislative year, and the third at the end of the third legislative year. In the first class, which was to expire with the then current year, were Ihrie, of Warren; Dodd, of Essex; Brown, of Somerset; Combs, of Monmouth; Small-

wood, of Gloucester; Howell, of Camden, and Shinn, of Salem.

In 1846, when the senate met in session, there were present and in office the senators of the preceding session, as follows: Garrison, of Passaic; Wurts, of Hunterdon; Crowell, of Middlesex; Hulme, of Burlington; Hamilton, of Sussex; Willets, of Cape May; Outwater, of Hudson; Johnes, of Morris; Paulison, of Bergen; Olden, of Mercer; Adams, of Atlantic, and Moore, of Cumberland. The senators-elect who presented themselves were Grover, of Essex; Leupp, of Somerset; Fort, of Monmouth; Smallwood, of Gloucester; Stafford, of Camden, and Acton, of Salem. Mr. Mackey, of Warren, had been elected, but did not present himself. The journal states that all of the senators and senators-elect "appeared in their seats," and verbal testimony has been introduced to show that the senators-elect participated in the proceeding of electing a president *pro tempore* and in passing upon the credentials. The journal is silent as to any part which the senators-elect took in the selection of a president *pro tempore*, as that act was performed without opposition, *viva voce*, except that Hulme, one of the hold-over senators, moved that Wurts, another of the hold-over senators, be appointed president *pro tempore*. In the presentation of the credentials, Hulme, a hold-over member, presented the credentials of Grover, a member-elect; Crowell, a hold-over senator, presented the credentials of Leupp, a member-elect; Paulison, a hold-over member, presented the credentials of Fort, a member-elect; Adams, a hold-over member, presented the credentials of Stafford, a member-elect; Willets, a hold-over member, presented the credentials of Smallwood, a member-elect; Moore, a hold-over member, presented the credentials of Acton, a member-elect, and then the minutes state: "The members of the senate having been all sworn or affirmed, proceeded to the election of a president for the present session."

In 1847 the members-elect were Ryerson, of Passaic; Farlee, of Hunterdon; Lee, of Middlesex; Richards, of Bur-

lington; Nathan Smith, of Sussex, and James L. Smith, of Cape May. The journal states that these senators "appeared in their seats" with the existing hold-over members of the senate, but they show that Grover, a hold-over senator, moved that Paulison, a hold-over senator, be appointed president *pro tempore,* and that that motion was unanimously agreed to, *viva voce.* The president *pro tempore* having taken the chair, Olden, a hold-over member, presented the credentials of Lee, senator-elect; Leupp, a hold-over member, presented the credentials of Farlee, a senator-elect; Grover, a hold-over senator, presented the credentials of Garrison, a senator-elect; Smallwood, a hold-over senator, presented the credentials of Richards, a senator-elect; Fort, a hold-over senator, presented the credentials of Mackey, who then presented his credentials for adjudication and approval, although elected for the previous year; Acton, a hold-over member, presented the credentials of James L. Smith, a member-elect; Adams, a hold-over member, presented the credentials of Nathan Smith, a member-elect; Outwater, a hold-over member, presented the credentials of Ryerson, a member-elect. These credentials were separately read and separately approved, and the member admitted to his seat in turn, and "the members of the senate having been all sworn, proceeded to the election of a president of the senate for the present session."

In 1848 the members-elect were Tonnele, of Hudson; Marsh, of Morris; Haring, of Bergen; Olden, of Mercer; Walker, of Atlantic, and Garrison, of Cumberland. As before, the journal states that these members, in common with the existing senators, "appeared in their seats," and that Richards, a hold-over senator, moved that Fort, a hold-over senator, be appointed president *pro tempore,* which being done, that Lee, a hold-over senator, presented the credentials of Olden, a member-elect; Richards, a hold-over senator, presented the credentials of Tonnele, a senator-elect; J. L. Smith, a hold-over senator, presented the credentials of Garrison, a senator-elect; Acton, a hold-over senator, presented the credentials of Marsh, a senator-elect; Nathan Smith, a

hold-over senator, presented the credentials of Haring, a senator-elect; Stafford, a hold-over senator, presented the credentials of Walker, a senator-elect. These credentials were separately read and separately approved, and the oath was administered to each in turn, and as each qualified himself by his oath in the presence of the senate, after having presented his credentials and having them approved, took his seat, and that "the members of the senate present having been all sworn, proceeded to the election of a president of the senate for the present session."

It is a notable fact that of all the senators-elect who are recorded as "appearing in their seats" before they were admitted to their seats, not one was ever selected for president *pro tempore,* nor ever nominated a senator for the temporary presidency, nor ever presented the credentials of a senator-elect, nor ever performed any recordable act in the organization. The grouping of the senators-elect with the existing senators was evidently a blunder by the secretary, committed through the then seeming unimportance of the form of the record, which he has since endeavored to fortify by vague recollections, and which is exposed by the fact that in 1849, when Mr. Dodd had ceased to be the secretary of the senate, and his place had been taken by Philip J. Grey, of Camden, the journal ceased showing that the senators-elect "appeared in their seats," and were subsequently "admitted to their seats" after the important intermediary processes of the presentation of their credentials, the judgment and approval of the senate upon them and the taking of their official oath.

The precedent set by Mr. Grey in 1849, in recording the participation in the formation of the senate of only those who did in fact participate, has been followed to the present day.

It is urged that the rule which requires the judgment of the existing body on the returns of its members is unreasonable; that members-elect may be deprived of their seats and of taking proper part in the organization by the unjust action of those whom the constitution has made the judges. This

is an argument from inconvenience, which goes a very little distance in the consideration of a constitutional question. The very existence of the government depends upon the theory that those in high official position will perform the duty enjoined by the constitution, and to the performance of which they are obligated. Mr. Madison advised the members of the convention which formed the constitution of the United States not to carry with them to their homes the objections and inconveniences which it had been alleged might arise in practice from clauses of the constitution adopted, because, he said, if this were done the constitution would never be ratified. There is an argument from inconvenience against almost every provision of the constitution. By way of example, who can compel the states to elect United States senators? And yet the failure would stop the wheels of the federal government. Who can compel the executive of a state to deliver up fugitives from justice? And yet it is especially required by the United States constitution. Who can compel a legislature to go into joint meeting to elect state officers? The senate in this state has often refused to go into joint meeting for the election of important officials. Who can compel the Supreme Court to action other than that which accords with its own judgment? There is usually an inconvenience on both sides of these propositions, and in this case the constitution has adopted the provision which was considered the least objectionable. Suppose they had selected some other plan and made no provision for judgment on the returns. Suppose they had adopted the plan suggested by the counsel and the theory on which this case has been argued. Suppose they had provided that the action of the election officers in taking the votes, in estimating them hastily, late at night—the action of the county canvassers (often men without the slightest responsibility for the proper performance of their duties, and yet the men who make up these credentials which these members bear to the senate) should be final. Suppose the senate of New Jersey and the house of assembly were bound conclusively by this action, which

would constitute the greater inconvenience? Were not the framers of our constitution wise when, recognizing the possibility of these errors by minor officials; when, realizing that neither the election officers nor the canvassing officers had the slightest power or right to inquire into the qualification of the members or the conduct of the elections, they said that when that member, with the certificate of the county canvassers, came to the senate, the senate should have the power then or at any other time, at their convenience and in their own way, to examine fully, not only into the returns which had been brought to them, but into the qualifications of the man who had brought them and the election by which he had been sent there, and should be unrestricted in that power? Has not the history of this state shown that the aid of our highest judicial officers has been summoned to revise and perfect these returns and credentials, because they were found to be so defective as to be unworthy of presentation to the house itself? Is this not the reason why the certificates of election, which, after all, are but the returns of the board of county canvassers, were not made conclusive, but by subsequent legislative action were declared to be only *prima facie* evidence before the body which was wisely empowered to render judgment upon them?

If the constitution had provided that, without the examination of any certificates or the judgment of the body, one claiming to have been elected a member of the body could take his seat and act with the body, the legislature, with all its great inherent powers, would be destroyed by intruders. The inconvenience that would then follow would be that the scenes that have occurred this year would occur after each succeeding election. And if it be true, as insisted, that newly-elected members need not show their credentials or unite themselves to an organized existing body, and that the courts have no jurisdiction in the premises, the result would be anarchy and civil war instead of regulated constitutional liberty and civil government.

It is also insisted that eleven is a majority of the senate,

and a larger number than ten, and for this reason that the Rogers senate should be recognized as the legal senate.

This proposition is founded on the theory that it is the action of individuals which makes laws and elects United States senators and other prominent state officers.

It is not a matter of any importance whatever, so far as the question of organization is concerned, how many members joined the Rogers senate. Unless organized according to law and constitutional provisions, if every member of both bodies were assembled they would be nothing but a mob and incapable of making laws or electing United States senators or state officers.

It was doubted for a long time whether a joint meeting could elect a United States senator. This mode of election was established by custom, contrary to the opinion of the commentators and the best constitutional lawyers. It was insisted that the joint meeting was not the legislature. In the convention which formed the constitution of New Jersey, one of its ablest members amended the report of the committee, changing the expression "joint meeting" to "the legislature in joint meeting." On page 150 of the journal of the convention, Mr. Ewing amended the report of the committee by striking out "legislature" and inserting "joint meeting." On page 151 Mr. Hornblower had the vote reconsidered and moved to amend by inserting before "joint meeting" the words "legislature in," which was agreed to."

It is impossible to overestimate the importance of observing the distinction between the members of the body individually and the body itself as an organized political body. All the members of any body may be assembled together, but if they are not properly organized they can do no legislative act. This is not a matter of form, but it is a matter of substance, because it is a matter of constitutional law. The constitution of the state prescribes what the legislature shall be, and unless it is organized as directed by the constitution it is powerless.

The importance of this principle is not only dwelt upon by

all the commentators on the constitution, but is illustrated in the debates in the senate of the United States in considering the validity of the election of members to that body. One of the most valuable of these cases is Harlan's case, because it was debated by the ablest constitutional lawyers at that time in the senate and because it involved no party question. The legislature of Iowa was in session, and it was stated in the debate that if Mr. Harlan were unseated he would be immediately returned, both of which circumstances subsequently occurred.

Mr. Crittenden, of Kentucky, chairman of the committee on the judiciary, made an elaborate report of all the facts, with a resolution that Harlan was not entitled to his seat. The case turned entirely on the question whether the senate, as an organized body, was present in the joint meeting. The joint meeting had been regularly organized by a resolution of each body and had adjourned from time to time. On the day to which the last adjournment had been made, a committee of the house was sent to the senate to inform them that they were ready to go into joint meeting, but they reported that the senate was not there; it had already adjourned. Members of the senate sufficient to make a large majority in the joint meeting attended and took part in the proceedings; but the committee's report is based on the fact that the senate, as an organized body, was not present, and that the legislature was composed of two bodies, and, although they might act in joint session, they must be in session at the time of the election.

There is really but one question in this case. It is simply a construction of those provisions of the constitution which created the senate of New Jersey.

The court cannot alter or amend these provisions.

It cannot reject the plain import of the words, because the result may seem to this court at this time, in the light of experience, to be inconvenient. Such questions were debated and considered by the framers of the constitution before they were adopted and ratified by the people. It is the people

who made this constitution, and it is the sworn duty of every officer connected with this government, whether with the judicial, the legislative or the executive department, to support the constitution of the state and the United States, and that includes such a construction of the language employed as it plainly imports.

If a construction not inconsistent with the language used has been given to these provisions from the time of their adoption to the present time without contradiction; has been adopted by all the commentators; has been announced by the ablest constitutional lawyers in the senate of the United States, and, with the knowledge of that construction, has been incorporated into our own constitution by its framers; and if the custom in New Jersey from that date to the present day has been in accordance with such construction, it becomes the simple duty of this court to declare that the words can bear no other meaning.

Constitutions are made in periods of tranquillity and public order, that they may guide and control in times of popular excitement and disorder. To construe them to suit popular clamor, contrary to their plain and settled import, is to destroy the constitution by construction, and is as great a crime and almost as bad in its results as to destroy it by open rebellion. The arguments presented by some of the counsel who oppose the granting of the writ applied for go to the extent of urging the court, from motives of expediency, to commit this offence.

The opinion of the court was delivered by

BEASLEY, CHIEF JUSTICE. This case has been placed before the court on a rule to show cause why an information in the nature of a *quo warranto* should not be issued against these respondents, each of whom claims, and to some extent has exercised, the office of president of the senate of New Jersey. Under this procedure evidence has been taken, and it thus appears that the twenty-one senators of the state have divided themselves into two bodies, that is to say, nine of the

old members, who were styled in the argument "hold-over members," constituting one of such bodies, and four hold-over members with seven newly-chosen senators constituting the other body.  Subsequently a newly-chosen senator joined himself to the body made up of hold-over senators, making that body to consist of ten senators, the other consisting, as just shown, of eleven.  The former of these bodies will be referred to, in order to avoid periphrase, as the Adrain senate, the latter as the Rogers senate.  Mr. Adrain's so-called senate has been recognized officially by the governor and remains in session.  The Rogers so-called senate is recognized officially by the house of assembly, but has been refused official recognition by the executive; it has passed various laws and, with the co-operation of the lower house, has appointed a treasurer and comptroller of the state.

The above is a description of the general aspect of the case, and it will be sufficient for immediate purposes.

The object of the present course of law is to establish by a judicial judgment which of these contestants is the genuine and which the spurious state senate, for they cannot both be genuine.  But before proceeding to dispose of that important question, the counsel of Mr. Rogers have interposed a preliminary one, which is whether this court can take cognizance of such a litigation.

It is confessed that the argument on this subject denying the existence of the judicial power in question has not been impressive.  In my judgment it is founded, in all its parts, on a sheer *petitio principii*, or on a denial of a legal principle so entirely established as not to be debatable, for it proceeds on the assumption that the senate it advocates is a constitutional senate, or that the judgment of a majority of the senators elected with respect to the question whether or not they have organized in conformity to or in violation of the constitution of the state is conclusive and final.  It will be observed that the contention of the applicants for the writ is that the Rogers senate has no legal existence, inasmuch as it was organized in a manner contrary to the fundamental law; and the proposi-

NEW JERSEY SUPREME COURT.

tion, therefore, would seem very evident that, as no power is vested by the constitution in the majority of senators to construe such law in this respect, the power to expound and enforce it is lodged in the ordinary legal tribunals.   Referring to this judicial prerogative, Mr. Cooley, in his work on *Constitutional Limitation, p.* 46, says : " The right and power of the courts to do this are so plain and the duty is so generally, we may almost say universally, conceded that we should not be justified in wearying the patience of the reader in quoting from the very numerous authorities on the subject." It was certainly, therefore, the unexpected that happened when learned counsel, in reply to the contention that the senatorial organization in question was inconsistent with constitutional prescriptions, assumed the position that this court could not entertain jurisdiction in the case, as the interpretation of the constitution was a matter, in the language of the brief before us, " of a purely legislative character."   It is believed that no decision has been made for a century past that does not antagonize such a proposition.

It will be understood that in this vindication of what is esteemed to be the undeniable prerogative of this court, there is not the slightest suggestion of the existence of a judicial capacity to control the legislative authority when exercised within its appropriate sphere.   If the question here presented had been whether this senatorial body had been organized in the accustomed mode, or in open violation of its own practices and rules, a totally different subject of inquiry would have been *sub judice,* and it may well be that the decision of such senatorial body itself would have been received as conclusive and entirely beyond the power of this tribunal to review.   This court does not claim the slightest legal faculty to supervise or interfere with such transactions.   All that is asserted is that when the inquiry is whether the legislature or any other body or officer has violated the regulations of the constitution, it is entirely plain that the decision of that subject must rest exclusively with the judicial department of the government.   Nor can we for a moment forget that, in en-

tering upon the inquiry that is now imposed upon us as a duty, we have to do with a subject of great importance and delicacy, and that before the restraining power of. this court can be exerted to interfere with the action of a co-ordinate branch of the state government, we must be as certain as care and diligence can make us that the foundation on which we place ourselves is sure and stable.

That this court has the legal right to entertain jurisdiction in the case displayed by this record, we have no doubt, and we are further of opinion that it is scarcely possible to conceive of any crisis in public affairs that would more imperatively than the present one call for the intervention of such judicial authority.

With respect to the further contention that the presidency of the senate does not belong to that class of officers whose legality can be put to the test by force of a proceeding in the nature of a *quo warranto*, our conclusion is that such contention cannot prevail. The statute of this state, being broader than its English prototype, describes in terms of the utmost generality the scope of this remedy, for it declares that it shall be applicable to every case in which "any person or persons shall usurp, intrude into or unlawfully hold or execute any office or franchise within this state." Consequently it does not seem deniable that all offices, as well those derived from the legislature as those derived from other sources, are comprehended by this definition, and the consequence must be, therefore, that the statutory provision just cited justifies the present proceeding, unless it can be shown that such action would be inconsistent with the constitution or privileges of the senate as an independent department of the government, and, indeed, this was one of the positions of counsel in the argument before us, but we think it is obvious that whatever seeming force such an argument has is derived from the *petitio principii* before alluded to, for it assumes as its basis that the court is taking proceedings against the officer of a genuine senate. But the assumption is unfounded, as the process that we are now asked to order is to be directed

against the appointee of a senate that it is alleged is spurious. It seems to be plain that such action cannot be an infringement of the prerogatives of the real senate of the state. And in disposing of this part of the case no stress is laid on the fact that each of these respondents, if legally in power, is entitled to hold, *ex officio,* certain high offices by virtue of the constitution and laws of this state, for it seems to be well to place the right of the court to authorize the use of the present procedure on the distinct ground that it is the appropriate and legal remedy whenever it shall be made to appear that any person is holding himself out as a public officer by senatorial appointment, when, in point of fact, such appointing body has no existence, in view of constitutional provisions and regulations. As at present advised, I do not perceive how in any case there can be any judicial interference with the actions, appointments or proceedings of a true senate of the state, unless the same shall be shown to be out of harmony with the constitution itself. We wish it to be understood that we do not intend to, and do not decide anything further than the case now before us. When by judicial action it becomes necessary to demark the constitutional lines which separate the jurisdiction and powers of the several independent departments of government, each from the others, we are deeply conscious that in such momentous matters we should be always on our guard, and that our judgment with respect to them should be invariably in the concrete, for experience has demonstrated that theorizing and speculation on such occasions are dangerous in the extreme, and are inventions that have generally returned " to plague the inventor."

Having thus briefly disposed of the preliminary question in favor of the jurisdiction of this court, it becomes necessary to proceed to an examination of the legal aspect of the case as presented in the issue upon the record.

That issue has been framed in this wise, in order to expedite the determination of the case : The counsel of these litigants agreed that if cognizance should be taken by the court of this controversy, it should be assumed that an information

had been filed and that each of the contending parties had interposed his answer stating the facts which appear in the evidence and which are not in dispute, by force of which he seeks to vindicate his title and that reciprocal demurrers should then be put in, thus exhibiting to the court the litigated points to be determined.

The facts contained in the answers alluded to are somewhat voluminous, and will be found contained in the statement which prefaces this proceeding.

Upon looking into the presentation of the facts thus indicated, it will be at once apparent that the central ground of controversy between these rival organizations, is with respect to the right of the Adrain senate, or what is called the holdover senate, to dominate on the occasion of the introduction of newly-elected members into the senate.

In the very able and carefully-considered briefs of the attorney-general and his associates, this dominance is claimed to exist on the ground that, by the proper construction of the constitution of the state, the state senate is a continuous body—that is, that it has perpetual life, and that consequently a member elected to one of its seats cannot enter it until his title has been passed upon by the ever-existing body. It has not and cannot be pretended that this doctrine has its root in the actual expressions of the constitution, and it therefore is admittedly the creature of construction.

The only provisions of the constitution pertinent to this subject are the following : Article 4, section 1, provides that the legislative power shall be vested in a senate and general assembly, and in paragraph 3 of the same section, it is provided that " Members of the senate and general assembly shall be elected yearly and every year, and on the first Tuesday after the first Monday in November ; and the two houses shall meet separately on the second Tuesday of January next after the said day of election, at which time of meeting the legislative year shall commence," &c.

Section 2 provides that the senate shall be composed of one

senator from each county in the state, elected by the legal voters of the counties respectively for three years.

By the second paragraph of section 2, article 4, it is provided "that as soon as the senate shall meet after the first election to be held in pursuance of this constitution, they shall be divided as equally as may be into three classes." The seats of the senators of the first class shall be vacated at the expiration of the first year, of the second class at the expiration of the second year, and of the third class at the expiration of the third year, so that one class may be elected every year, &c. It is apparent that these recitals fully justify the remark just made that the constitution does not attempt to define the life of the senate, yet, notwithstanding such silence, the attorney-general and the counsel of President Adrain raise the contention that the state senate, like the senate of the United States, has a continuous existence; that there can be no such thing as an old senate and a new senate, and that there has been an unbroken continuity of existence of this body from its birth to this hour. And as a corollary of this doctrine, it is further insisted that this self-sustaining body is the sole judge of the right of newly-elected senators when they apply for admission to its seats, and that it can, on such occasions, receive or reject them at its will.

In the application of this theory to this case it was claimed that the body presided over by Mr. Adrain had the right to require that the credentials of senators-elect should be placed before it to be retained and to be adjudicated upon at such time and in such mode as itself might deem proper.

If the state senate has the inherent vitality thus asserted, it seems to be undeniable that it had the power to act as it did on the occasion that has given rise to this litigation, for, by the plain language of the constitution itself, it is declared that "each house shall be the judge of the elections, returns and qualifications of its own members."

It will be perceived, therefore, that the question now to be considered and decided by this court is, has the senate of the state the perpetuity thus claimed?

The first and most elaborate argument pressed with such force and earnestness upon the attention of the court by the learned attorney-general and his able associate, Mr. McDermott, was grounded almost entirely upon the fact that the clause in the constitution of the state that gives to the membership of the senate a continuity of life by a succession of members in such a way that provides for the continued presence of a quorum of the body, was a transcript of a similar provision in the federal constitution, and it was thereupon further insisted that the language of the regulation so adopted had, before its adoption, a settled meaning, denoting the permanent existence of the body regulated by it.

If we were to assume the truth of the foregoing statement in all its parts, no one could doubt that the reasoning founded upon it would be entitled to great weight. It cannot be denied that the section is, in substance, a copy of a clause of the same import in the constitution of the United States, and if the clause so imported had antecedently received an authoritative interpretation, it would be but reasonable to infer that the framers of our organic law, many of whom were jurists of great learning and experience, understood the provision in the sense thus impressed upon it. Under such circumstances, no other conclusion would be at all rational. The " rule is well settled," says this court in the case of *Fritts* v. *Kuhl,* 22 *Vroom* 191, " that where a statute or a constitutional provision of a doubtful import has been adopted in one state from the statutes or constitution of another state, after a practical construction has been given to the language by judicial decision, it will be presumed that the interpretation adopted in the state from which it is taken has been adopted as well as its words."

If, therefore, counsel on this occasion are justified in predicating that the clause under criticism had acquired, in the manner indicated, a settled signification at the time in question, it must be admitted that this would be the sense in which it should be now read and understood.

But, upon careful examination of the subject, I am satisfied that the assumption in question is wholly without basis. So far as I have ascertained, no person, whether text-writer, jurist or statesman, has ever asserted that the clause under discussion bears the force and meaning now for the first time imputed to it. And it would have been singular indeed if any critic had ventured to express such an opinion, for the constitutional provision obviously would refuse to bear such treatment. The expressions employed do not in any degree import the continuance of the senate itself, but simply provide for the succession and length of the terms of the members of that body. It is true that, by providing an always-existent membership, the clause imparts to the body the potentiality of a permanent existence, but it does not impart to the body such continuous vitality. I think it is safe to say that never, on any occasion, has it been suggested that the clause has any further reach than this. The senate of the United States has been declared to be a permanent body, and when the subject was under discussion it was on all sides assumed that the section in the federal constitution from which, as has been stated, our own has been copied gave to the senate an aptitude for a continuous existence, but it was never alleged that it was possessed of any further effect. The vivifying force that was infused into the body thus made capable of receiving it was looked for and discovered in other constitutional adjustments, and especially in the provision that gave to the senate an always-existing presiding officer. This is a factor mentioned and relied on by every one who has written upon the subject, and, similarly, it has been the principal argument in all debates relating to the longevity of the senate. It was deemed that permanency of the presiding officer constituted the permanency of the body itself, as, by such a constitution, there was no necessity for periodical reorganizations.

It is obvious, therefore, that the construction put upon the national constitution can have but little effect in an effort to construe our own. The problems are differently conditioned,

so that the solution of one of them will afford but slender assistance in the solution of the other. We must construe our own constitution exclusively by its own lights.

Adopting this method, I will now turn to the several provisions of the constitution of the state that appear to me in any degree to elucidate the question under consideration.

Upon opening this instrument, the first feature of it that, in connection with the subject in hand, strikes our attention is the declaration that " the senate shall be composed of one senator from each county in the state, elected by the legal voters of the counties," &c.

In looking at this constitutional mandate, the inquiry at once arises, does it mean that at *all times,* within the range of human possibility, such shall be the composition of the body in question, or that it shall have such composition only sometimes? Does it mean that, on some occasions, the senate shall be composed of one senator from each county, and on other occasions, in the orderly working of the system established, it shall be composed of only two-thirds of such members? It is difficult to see how it can be plausibly argued that the clause cited is not designed to establish, as far as possible, a permanent composition of the senate.

And this view, it must be admitted, is much strengthened when we look at the purpose of this provision. That purpose, obviously, is to provide that each county shall be perpetually represented and have a voice in this body on every measure that comes before it, whatever its nature may be. To deprive a county of such a prerogative is plainly unjust, and therefore it is clear that any construction that tends to the production of such a wrong should be viewed with distrust and should not be sanctioned unless upon considerations that amount to a demonstration of its correctness. And, adopting this as the guiding principle, it becomes at once manifest that it is scarcely possible to maintain, successfully, the proposition that it is not the entire body of senators, but only a class of them, who are to take part in the organization of the senatorial body. The importance of that function

strongly repels such a theory.    Organization involves the composition of the body organized, and consequently it involves the right of the counties to participate in the decision of the all-important question, which of them shall be represented in the body and which of them shall be unrepresented? It seems to me that the mandate of the constitution, that the senate shall be composed of one senator from each county, cannot be reasonably enforced except by the adoption of the hypothesis that each senator shall have a voice in all the proceedings that result in the composition of the body itself. When, therefore, on the occasion that gave rise to the present controversy, it was asserted that one-third of all the counties of the state should be excluded from all participation in a transaction so vital to their rights and affecting so intimately the interests of the entire commonwealth, a doctrine was asserted that must be considered as devoid of all reasonable foundation, unless it can be made plainly manifest from the provisions of the primary law of our state.    The principle that two-thirds, or even a lesser number, of the senators chosen by the counties shall have absolute ascendency in the organization of the senate is, it should be noticed in passing, not only antagonistic to the language and spirit of the constitutional clause just cited, but is, likewise, in conspicuous violation of that great and fundamental law underlying all our institutions, that it is the will of the majority of the people that is supreme.    He who asserts that this axiom, which may be called national in its character, does not prevail on any occasion, must prove his proposition, and must prove it conclusively, for every legal intendment will, *a priori*, be against its truth.    It is not too much to say that, with regard to the transaction before us, this cannot be done except by putting a finger on the very section or sections of the constitution in which the alleged heterodoxy is to be found unambiguously written.

That this was not done by the counsel arguing before us in favor of the doctrine that in the all-important affair of organizing the state senate it is the minority and not the majority

that shall rule, is conspicuously manifest from the fact that the only constitutional clause that was relied upon was the one that distributes senators into classes, but as it has appeared that such clause is just as applicable to the supposition of an annual senate as it is to that of a perpetual senate, it is manifest that a reference to that section is altogether futile.

But while this was the only citation relied on for the purpose of proving the existence in this state of an ever-living senate, my examination has led me to the discovery that others exist that cannot, in my opinion, be reconciled with the doctrine contended for.

The first provisions of the class indicated are those clauses of the constitution which to all appearance provide for a yearly organization of both the senate and the house of assembly. In this respect the two bodies are placed upon the same footing and subjected to the same regulations. No express power to organize is conferred upon either of them, but by necessary implication it belongs similarly to both. The assemblymen and senators are required to meet yearly at an appointed day. With respect to the former class, each of the class has the undoubted right to take part in the organization, and it would certainly seem to follow that each senator is vested with a similar prerogative. When the power to organize is merely a legal intendment, the power consists in a right to organize in the customary manner, and it therefore excludes the notion of a minority ruling in the transaction. In the case of the assembly, it is admitted that the organization must be effected in accordance with usual modes; in that affair it is not pretended that there can be any dominance of a minority. It does not appear, therefore, how it can be reasonably maintained that the senate, in exercising this important function, shall be subjected to an abnormal condition, and that in its case there shall be a dominance of the minority. The organizing power of the senate being derived in its totality by legal implication, it appears to be plain that the law will not imply a regulation that would be both unusual and unjust.

The next provision to which reference will be made appears to be of paramount importance. It is to be found in paragraph 3 of section 1, in article 4. It is thus expressed: "Members of the senate and general assembly shall be elected yearly and every year on the first Tuesday in November, and the two houses shall meet separately on the second Tuesday in January next after the said day of election, at which time of meeting the legislative year shall commence."

This clause is significant, with respect to the subject we are considering, in all its parts, its first observable feature being that it appoints a day for the organization of both legislative houses. The purpose for the meeting on the day specified cannot be doubted, indeed it never has been doubted; it has always been so understood and acted upon. It therefore is plain that it is a direction for the senate to organize, for the expression is, "the two houses shall meet separately." Both houses here are placed upon the same basis for the same purpose, and most assuredly they are thus similarly treated as though an organization were equally essential to the legal existence of each body. The assembly is of course a body that needs a yearly reorganization, and the senate is here required, to all appearances, to do precisely what the assembly is directed to do. Beyond all question we here find that a duty is imposed on both the assembly and the senate to convene at an appointed time and to effect a yearly organization. Such a regulation is appropriate to a body that expires yearly, but it is most inappropriate and unprecedented in its application to a body that is possessed of a permanent life. In the practice of the United States senate, which we have stated is an ever-living body, there is no fixed day for the admission of members-elect. The certificates of incoming senators are presented from time to time on convenient occasions, and are thus severally passed upon.

From the regulation in question it appears to be, if not the necessary at least the reasonable inference, that the senate of this state is no more a continuous body than is the assembly.

The two remaining regulations of the section cited lead strongly, as it is deemed, to the same result. The first of these is the direction, in the language of the statute, "that the two houses shall meet separately on," &c. Now it is obvious that the expression "houses" must of necessity be construed to denote the members of such houses; it can mean nothing else, for it is obvious that at the time specified there is no house of assembly in existence. Ascribing, then, this necessary signification to this expression, we have a constitutional direction that the members of the senate shall assemble at the time specified in order to organize. It does not seem that it can be denied that such a regulation in a very perspicuous form repudiates the notion of a continuous senate.

Also, in the next place, the designation of a legislative year—that is, when such year shall begin and when it shall end—tends in the same direction. What has a perpetual body to do with prescribed periods of time? The legislative year thus established obviously accords with the official life of the assembly, and it appears to be reasonable to suppose that it was meant to accord with a senatorial life of equal extent.

In fine, after a very careful study of the constitution of the state, my conclusion is that its intimations are all to this effect, that the claim advanced for the first time on this occasion, that the senate is a permanent, continuous body, is without any solid foundation.

Nor has there been found any more substantial basis for the doctrine just discarded in the past practice of the senate in respect to its yearly organization.

The practice may be thus generally described: In the first instance the senate, under the new constitution, was organized as the house of assembly now is, by the action of all its members; then for some years afterwards upon the senators convening, a roll containing the names of all the senators was called, but in subsequent years the practice was to call the names only of the senators holding over. This was not an unnatural course, as those senators had theretofore taken the oath of office and their credentials had already been inspected.

In this condition of things the custom obtained for the incoming members to present their credentials to the body of senators holding over, and upon their approval they were sworn in. The office thus performed by the old senators was, in substance, purely formal, as much so as though they had been a committee appointed by the body of senators to inspect and to report upon the credentials of the new senators. On no occasion did they exercise any other power, nor did they ever pretend to be possessed of any other power. There is not an instance in which they undertook to adjudicate on the right of a senator-elect to his seat, nor did they ever hold such right in suspense.

If this body has the absolute power now asserted for the first time and after a lapse of half a century, it certainly would be a most strange circumstance that, during this long period, the existence of such power was never manifested by a single word or a single act. The claim of such an imperial authority made at this late day is an entire novelty, and, like most novelties in legal matters, is not well founded. It is likewise in this connection important to note that during this long time the senatorial action was regulated by the eighty-fifth section of the act relating to elections (*Rev.*, *p.* 353), which is in the following terms: "That the senate and assembly shall convene and hold their sessions in the state-house in Trenton ; and in the organization of each house the certified copies of the statements of determination made under the direction of the sixty-ninth section of this act, shall be deemed and taken to be *prima facie* evidence of the right of the persons therein mentioned to the seats in the houses respectively to which they shall have been so determined to be elected."

No one can look at this act and fail to perceive that it is absolutely irreconcilable with the theory of an ever-existent senate. This is so entirely the case that the very astute counsel of President Adrain insisted that it was void, as it attempted to prescribe to an existing senate a rule controlling its action in a matter committed to its exclusive jurisdiction

by the constitution. On the premises postulated by counsel that the senate is ever living, his argument was invincible, but the existence of the statute and a submission to it for such a cycle of years, exhibit, in a very impressive form, the fact that the contemporaneous construction of the constitution in the particular in question was adverse to the present claim which I have designated as a novelty. This statute is not to be misunderstood in this respect, that it provides for the introduction of senators by the process of organization, and it rejects altogether the idea of an admission of senators into a body already formed and continually existing. When we add to the fact that the ancient and continued practice has been in pursuance of and in obedience to this law, the further circumstance that the senate as a matter of fact has been and must of necessity be yearly organized, and that in the performance of the ultimate act in such process—that is, in the choice of its permanent president—all the senators elected have invariably co-operated, the pretense of a continuous senate must be declared to be an utter fallacy. The construction that would convert this customary method of senatorial procedure into a practice to admit members into a body always existing, and therefore always organized, seems to me an afterthought; and the fact that such a theory is a novelty undreamed of for half a century is, of itself, enough to explode it. In legal affairs it is the practical and common-sense view that in general is the true view, as neither the affairs of men nor of states can be regulated by logical refinement; where subtilty begins the law ends. When I accept, therefore, the understanding that plainly appears to have prevailed for so long a time, I feel great confidence that I have not fallen into error. The doctrine in question stands, I think, condemned, both by the intimations of the constitution itself as well as by a long-continued and practical exposition.

There is still another consideration that should not be overlooked. It is this: that if it be true, as claimed, that the senate of the state be a continuous body, into which no member can enter except by its own action, it inevitably

follows that the constitutional government of this common-wealth must come to an end whenever and at the moment that it shall occur that four of the members of such continuous body shall, before the introduction of new members, be permanently absent, by reason of death, resignation or from the exercise of an unbridled will. Annually there are fourteen senators continuing in office. Of these, eleven are necessary to form a quorum, and, in the absence of such quorum, the constitution itself declares that all that a smaller number can do is "to adjourn from day to day." No person will claim, therefore, that a senate destitute of a quorum could admit as one of its members a newly-elected senator. The consequence is that if, in any year, the senate should lose four of its members from any cause whatever, the state government would be, *ipso facto*, destroyed. In such a crisis the state would be without a legislature, and it could not rehabilitate itself in that respect by any method inherent in the constitution. Such an anarchic condition could not be remedied by a constitutional amendment, as such a device could not be effected without the assent of a legal senate, which, in the case supposed, would be non-existent. In fact, no resort would be available but an appeal to the people of the state to construct a new government in the exercise of their right of ultimate sovereignty. For it will be observed that to fill up the mutilated senate by an election would be of no avail, as such new members could not be inducted into a senate that was devoid of a quorum. It is believed that no one will maintain that the distinguished jurists and statesmen, who constructed our government with so much skill and wisdom, intended to stake its very existence on the happening of an event that might occur within a few months after its establishment. And it is equally certain that no citizen of this state has ever, until the present occasion, entertained the belief that the entire government was, like a house of cards built by a child, likely to fall to pieces at any moment at the touch of an accident. It seems irresistibly to follow that a theory

necessitating such a result as this cannot be well founded—it calls for no refutation—*res ipsa loquitur*.

It will not be unobserved that the foregoing consideration appears to repel altogether the hypothesis that there is any real similitude between the state of things to which our own constitution applies and that which is the subject of the constitution of the United States. In point of fact, no differentiation could be more marked, for if we adopt the discarded theory, the constitution of this state, as has appeared, must, from an inherent defect, come, in its normal operation, to a casual and violent death, while that of the Union, as applied to its subject, is not liable to any defeasance by reason of any intrinsic imperfection. It appears to the court, therefore, in the light of such conditions as these, that it is unreasonable in the extreme to contend that the latter constitution has been, with respect to its general structure and purpose, the prototype of the former merely because, in certain of the clauses of the two instruments, there is found to be an identity of expression and purpose.

The result of the inquiry before us is that we have concluded that the senate of New Jersey is not a continuous body, but that it expires annually, in the same sense that the assembly does.

Therefore, our conclusion is that Mr. Adrain has no title to the office that he ostensibly holds, and that the appropriate judgment must be entered against him.

With respect to the title of the opposite claimant, Mr. Rogers, we hold that his title must be regarded as constitutional and valid. Our resolution in this regard is founded entirely on the ground that, touching the act of reorganizing its own body, the majority of senators are the absolute masters of the occasion. Such action is taken by a body co-ordinate with ourselves, and whose proceedings, when not violative of the constitution of the state, we have no capacity to supervise or control. In our opinion, when a majority of senators organized the senate and elected Mr. Rogers its president,

such action was and is conclusive upon this court as well as upon all departments of the government.

Let a judgment be entered accordingly.

Justices DEPUE, VAN SYCKEL, DIXON, REED, GARRISON and LIPPINCOTT concurred.

ABBETT, J. (dissenting).    The senate of New Jersey came into existence under the constitution of 1844.    It was created to take the place of the legislative council provided by the constitution of 1776.    The council was an annual body, its members being all elected for one year only.    The senate at its first meeting, in 1845, consisted of nineteen members, one from each of the then counties of the state.    It was divided as equally as possible into three classes.    The seats of the senators of the first class were vacated at the expiration of the first year, of the second class at the expiration of the second year, and of the third class at the expiration of the third year, so that, in accordance with the constitution, one class may be elected every year; and if vacancies happen by resignation or otherwise, the persons elected to supply such vacancies shall be elected for the unexpired terms only.    The term of office of senators is three years.    Two new counties have been created since 1844, and the full senate now consists of twenty-one senators, of whom eleven are a quorum to do business.

At the election held in November, 1893, eight senators were elected to take the places of the senators whose terms of office would expire January 8th, 1894.    On January 9th there were existent thirteen hold-over senators and eight senators-elect.    Nine of the hold-over senators met in the senate chamber and elected one of their number, Robert Adrain, their presiding officer, and thereafter claimed to have elected him " president of the senate," upon the insistment that the four other hold-over senators were actually or constructively present at the time of his election.    The four, however, insisted upon certain assurances from the nine as to their

future action, and these being refused they withdrew and associated themselves with seven of the senators-elect, and these eleven organized themselves into a second body, which they insist is the true senate of New Jersey, because, as they contend, the quorum of the senate provided for by the constitution was present at this organization. This body elected Maurice A. Rogers as president of the senate. The thirteen hold-over senators, constituting the two classes of the senate whose terms of office had not expired, did not voluntarily act together as one body, but divided themselves as I have stated. Under the constitution, the senate elects its own president. If either of the bodies described was the true senate of New Jersey at the time it acted, then the person chosen by that body is president of the senate.

The questions in this case are: *First,* whether this court has jurisdiction to try the issues raised by the record ; *second,* jurisdiction being found, is either of the respondents president of the senate of New Jersey ? It is clear that, to elect a president of the senate, the body exercising such power must be the senate. There can be only one senate in existence, and the decision of the rights of the respondents therefore depends upon the answer to the question, was either of these bodies the senate of New Jersey ?

I have reached the conclusion, for the reasons hereinafter stated, that neither of said bodies, at the time it acted, was the true senate of New Jersey ; that the senate is a continuous body, and at that time consisted of the thirteen senators composing the two classes whose terms of office had not then expired.

The jurisdiction of the court to try this controversy is, in my judgment, clear. The object of the litigation is not to interfere with the functions of the legislative department of the state, or either of the houses, which together constitute that department; it is to ascertain whether either of the two bodies claiming to be the senate is really the senate of New Jersey. That such an inquiry is a judicial one seems to be established on principle and authority. *McCra. El.*

396; *Prince* v. *Skillin,* 71 *Me.* 367; *In re Gunn,* 50 *Kans.* 155. This jurisdiction has also been upheld where it relates to the executive department, and the question was which of two contestants was lieutenant-governor of a state. *Attorney-General* v. *Barstow,* 4 *Wis.* 567. The reasons for upholding the jurisdiction of this court, stated in the opinion of the learned Chief Justice, are conclusive. It is true that our constitution declares that "The legislative power shall be vested in a senate and general assembly," but when two bodies claim to be the senate, a judicial question is presented.

This court, in *Pangborn et al.* v. *Young,* 3 *Vroom* 29, 32, says that "a legislative bill which wanted the approval of either the assembly or the senate, or that of the governor, would be so plainly defective on constitutional grounds, that this court could not hesitate, in the exercise of its clearly legitimate power, in declaring it absolutely void." In the same case it treats the certificate signed by the president of the senate and the speaker of the house as "conclusive" evidence of the passage of a bill through the two houses. The court may therefore inquire into the question of title when two persons claim to be president of the senate, and to do so in this case it is necessary to decide which body, if either, is the constitutional senate.

This court having jurisdiction, the duty is imposed upon it of deciding which of the claimants, if either, has shown title to the office. This question of title involves the inquiry whether our senate expires annually in the same sense that the assembly does, or is, like the senate of the United States, a continuous, "ever-living body." There is no such body as a "new senate" known to the constitution of the United States. There is biennially a new house of representatives, because the entire membership of that body expires at the end of every second year, but not so the senate. The constitution replenishes that body every two years by the election of a class of senators, and thereby gives continuity to that body. The debates in the constitutional convention of 1787, and those in the senate, and the procedure of that body, show

that the senate of the United States is continuous, and in the case of *Robertson* v. *Smith,* 109 *Ind.* 79, the Supreme Court of Indiana, while holding that the senate of Indiana is not a continuous body, states the reason why it is not such and recognizes the feature which establishes the continuity of the United States senate. Judge Niblack, in delivering the opinion of the court, says: "I feel quite assured that the senate of this state is not, like the senate of the United States, a continuous body. In the senate of the United States a majority constitutes a quorum, and as there is always more than a quorum of qualified senators holding seats in that body, its organic existence is necessarily continuous. But in the senate of this state two-thirds of its members are necessary to make a quorum. As one-half of its members go out of office at the end of each legislative term of two years, that is to say, on the day after each general and biennial election, it becomes, at the end of each such legislative term, a disorganized body."

The reasons given by this learned judge for stating that the United States senate is necessarily continuous, apply equally to both the United States senate and to the senate of New Jersey. A majority constitutes a quorum in both bodies, and in both there is always more than a quorum of qualified senators holding seats in the body. If it is necessarily continuous in one case it must, for the same reasons, be necessarily continuous in the other.

If the rule applicable to the United States senate is to be applied to the senate of this state, the thirteen so-called hold-over senators were the senate of New Jersey on January 9th, and as such had the exclusive and absolute power to determine "the elections, returns and qualifications of its own members." Such has ever been the practice and usage in the senate of the United States. Every senator-elect must there present his credentials to the senate composed of the hold-over senators and must be inducted into office with the assent of that senate so composed. Upon the question of the admission of a senator into the senate of the United States, no

senator-elect has ever been treated as a member of that body. In every instance induction has been by the action of a majority of a quorum of the senate composed of senators theretofore inducted into office. This practice is necessarily based upon the assumption that the senate is always in existence, always composed of inducted senators, and that it has existed as an "ever-living senate" from the time of its organization to the present hour.

I feel the more confidence in stating this view thus broadly because, in the opinion of the court in this case, read by the learned Chief Justice, it is stated as an incontrovertible proposition that the United States senate "is an ever-living body."

It is insisted, however, that although it is true that the senate of the United States is a continuous body, yet the New Jersey senate is different from its great prototype. This contention is founded upon alleged differences between the constitution of the United States and the constitution of the state of New Jersey, and an alleged difference of practice prevailing in this state.

An examination of the two instruments and the practice thereunder will not support this contention. The language of our constitution is substantially identical with that part of the constitution of the United States whose provisions have been held to create a continuous senate. Let us compare the two instruments.

The constitution of the United States provides:

"Article 1, section 3.—1. The senate of the United States shall be composed of two senators from each state, chosen by the legislature thereof for six years, and each senator shall have one vote.

"2. Immediately after they shall be assembled, in consequence of the first election, they shall be divided as equally as may be into three classes. The seats of the senators of the first class shall be vacated at the expiration of the second year, of the second class at the expiration of the fourth year, and of the third class at the expiration of the sixth year, so that one-third may be chosen every second year; and

if vacancies happen, by resignation or otherwise, during the recess of the legislature of any state, the executive thereof may make temporary appointments until the next meeting of the legislature, which shall then fill such vacancies."

"Section 5.—1. Each house shall be the judge of the elections, returns and qualifications of its own members, and a majority of each shall constitute a quorum to do business; but a smaller number may adjourn from day to day and may be authorized to compel the attendance of absent members, in such manner and under such penalties as each house may provide.

"2. Each house may determine the rules of its proceedings, punish its members for disorderly behavior, and, with the concurrence of two-thirds, expel a member.

"4. Neither house, during the session of congress, shall, without the consent of the other, adjourn for more than three days, nor to any other place than that in which the two houses shall be sitting."

The constitution of New Jersey provides:

"Article 4, section 2.—1. The senate shall be composed of one senator from each county in the state, elected by the legal voters of the counties respectively for three years.

"2. As soon as the senate shall meet after the first election to be held in pursuance of this constitution, they shall be divided as equally as may be into three classes. The seats of the senators of the first class shall be vacated at the expiration of the first year, of the second class at the expiration of the second year, and of the third class at the expiration of the third year, so that one class may be elected every year; and if vacancies happen, by resignation or otherwise, the persons elected to supply such vacancies shall be elected for the unexpired terms only."

"Section 4. Each house shall be the judge of the elections, returns and qualifications of its own members, and a majority of each shall constitute a quorum to do business; but a smaller number may adjourn from day to day, and may be authorized

to compel the attendance of absent members, in such manner, and under such penalties, as each house may provide.

"3. Each house shall choose its own officers, determine the rules of its proceedings, punish its members for disorderly behavior, and, with the concurrence of two-thirds, may expel a member.

"5. Neither house, during the session of the legislature, shall, without the consent of the other, adjourn for more than three days, nor to any other place than that in which the two houses shall be sitting."

A comparison of these provisions in the two constitutions shows that they are exactly parallel, and it is apparent that the language of the New Jersey constitution of 1844 is a copy of provisions in the constitution of the United States, with only such changes as were rendered necessary by reason of the difference in the terms of office of senators in the two bodies and the constituencies they represent. The only real difference is that our senators are chosen for three years instead of six, and represent counties instead of states. But that one constitution was modeled upon the other, seems to me beyond question. The reasons given by Judge Niblack for the continuity of the United States senate, exist with reference to our senate under language similar to that used in the constitution of the United States to create a continuous senate. Not only does this clearly appear from the language itself, but the history of the adoption of the provisions of our constitution, and the arguments and debate in our constitutional convention, and the procedure thereunder, confirm this conclusion.

When the convention met in 1844, two different views were represented by the members of that body. One party was in favor of continuing the policy laid down in the constitution of 1776, and making the terms of office of the members of both houses annual, while the majority were in favor of modeling our senate upon that of the United States. The convention, after a most interesting debate upon the report of

the committee on this point, favored the latter proposition, and settled the question by a vote of thirty to twenty-two.

The reasons influencing the majority were clearly stated by Mr. Vroom, in his speech to the convention, June 7th, 1844. The composition of the senate being under consideration, he said : " The reason, the great object of fixing the terms of senators at three years, is not only because they are connected with the executive, but by this means the senate will be a more permanent body than the house of assembly.   *   *   * If the senate is elected annually, you will have a changing legislature, as we always have had."

On motion made to amend the term of senators from three years to two, Mr. Ogden, although advocating it, said : " The reasons given in favor of permanency of the senate are strong."

That the statesmen in the convention of 1844 meant to make the state senate an ever-living body, when they used in our constitution the language of the federal constitution that made the United States senate continuous, cannot be more forcibly presented than by quoting the language of the learned judge who wrote the opinion in *Fritts* v. *Kuhl*, 22 *Vroom* 199.   He says: " That, in a convention in which these distinguished men exercised a controlling influence, a clause should have been incorporated in our state constitution, with the intention that it should receive an interpretation different from that which we may reasonably assume they knew had been applied to it in the unvarying practice of the federal government for nearly half a century, is scarcely conceivable."

After the constitutional convention of 1844 had thus, for the purpose expressed, incorporated in our fundamental law the provisions of the constitution of the United States which make the United States senate " an ever-living body," we find that the state senate at its first session, in 1845, proceeded to follow the exact mode of procedure, under the constitution of 1844, that the United States senate at its first session adopted under similar provisions in the United States constitution.

State v. Rogers.     *56 N. J. L.*

The action of the senate at its first session, under the constitution of 1844, was in strict conformity to the action taken by the senate of the United States when it first met in 1789. In both bodies a special committee was appointed and reported a mode of classifying the senators, which divided them into three classes, and the term of each class was decided by lot, and each senate decided " That the classes shall vacate their seats in the senate according to the order of numbers drawn for them, beginning with number one."

Not only was the provision of our constitution, in reference to classification of senators, suggested by the provisions of the federal constitution, but the exact mode of dividing the classes used by the United States senate was adopted by the New Jersey senate. See 1 *Bent. Abr.* 14, 15, and *Senate Journal* 1845, *p.* 169.

The procedure of the first two sessions of the senate undoubtedly reflected the views of the framers of the constitution of 1844. Alexander Wurts, president of the constitutional convention of 1844, was a member of the senate of 1845. He was also president *pro tempore* of the senate of 1846.

It is important and instructive to note the difference between the steps taken to induct into office the senators-elect in 1845, and those taken to induct the senators-elect at the next legislative session in 1846.

The senate journal of January 14th, 1845, shows that " John C. Smallwood, Esq., of the county of Gloucester, produced a certificate of election as a member of the senate for the county of Gloucester, which certificate was read and approved. Whereupon he took and subscribed the affirmation prescribed by the constitution and laws of New Jersey, before the Hon. Alexander Wurts, one of the members of the senate-elect, and took his seat in the senate." And thereafter each senator-elect produced and presented his own certificate of election, and the same was read and the same action taken thereon as in the case of Mr. Smallwood, and each thereafter took and subscribed the same affirmation before Mr. Small--

wood, and thereafter took his seat in the senate, and then the record proceeds: "The members of the senate present having all been sworn or affirmed, proceeded to the election of a president of the senate."

In 1846, however, the senate did not proceed in this manner. It changed its mode of procedure, because there was then an existing senate composed of two hold-over classes—class two and class three drawn and named by the senate in 1845. In 1846, the record shows that Senator Wurts, being then a hold-over senator, was appointed president *pro tempore*, and the journal of January 13th, 1846, states: "The president *pro tempore* having taken the chair, Mr. Hulme presented the credentials of the Hon. Stephen R. Grover, elected a senator from the county of Essex, which were read and approved; and the oath prescribed by law having been administered to Mr. Grover, he took his seat in the senate."

The same procedure was had with reference to all the other senators-elect who had been chosen by the counties to succeed the senators in class one, whose terms of office had expired at the close of the legislative year of 1845. These credentials, according to the journal, were in every instance presented, read and approved, and the oath of office administered to the senators-elect before they took their seats in the senate. It will be noted that, at the first session of the senate, each senator-elect presented the certificate of his own election; the next year the credentials of each senator-elect were presented by a senator of one of the hold-over classes. The credentials thus presented were "read and approved." Can there be any doubt of the significance of this procedure? To whom were the credentials presented, if not to the senate? And if there was no difference between the first and second sessions, if each was a "new senate," why was it considered necessary, after the senate was organized in 1845, that an inducted senator should in every instance present the credentials of a senator-elect. The procedure shows that Senator Wurts and his hold-over associates (composed of the second and third classes

of the senate of 1845) entertained the belief that they were the senate, and that the bearers of credentials, the senators-elect, could not participate in the proceedings of the senate, even to the extent of presenting credentials, until they had been admitted to membership by the affirmative action of an existing and continuing senate. If there was not a senate in existence, to whom did Mr. Hulme present the credentials of Mr. Grover, as stated in the journal?

The organization of the senate in 1845 was necessarily done in the manner stated by the journal. It was necessary, because there was no senate then in existence which could judge of the credentials of senators-elect. The New Jersey senate, in this respect, followed the procedure of the organization of the senate of the United States. Each took the same action because of the necessity of organizing at the beginning of their existence, by the consent of those claiming to be senators. The procedure of induction into the state senate, thus instituted in 1846, has never been changed. No senator, with but a single exception, has ever been admitted to membership, except by the presentation of his credentials by an inducted member and by the approval of those credentials by a vote of the senate, presided over by a president *pro tempore* or permanent. The single exception is found in the journal of January 12th, 1875, which states that "Mr. Taylor moved that, in consequence of the Hon. J. Howard Willets not having his credentials present as senator-elect from the county of Cumberland, he be permitted to take the oath of office, and to file his credentials with the secretary at his earliest convenience, which was agreed to. The oath prescribed by law having been duly administered to Mr. Willets by the president *pro tempore*, he took his seat in the senate."

This exception shows that the senate composed of the hold-over senators (which, according to the journal on that day, were fourteen in number) exercised the power of admitting a senator without the presentation of his credentials. They determined his election, returns and qualifications without the presence of any certificate of the result of the election.

Continuing the history of the senate from 1847 to 1893, inclusive, the unbroken custom has been for the president of the senate, permanent or *pro tempore*, to administer the oath to those admitted to the body, and the record of each of these years shows that these oaths were administered in open session, whether there was or was not a contest as to a seat. An examination of the cases where the right of the member-elect to take a seat in the senate has been impeached, shows that no senator-elect has ever been permitted to take his seat in the senate as a matter of right, upon the mere presentation of his credentials. In every instance the senate has acted as an organized, existing senate, and the senate when thus acting has, in every instance, been composed exclusively of inducted senators, acting as an organized body. No senator-elect since 1845 has ever been inducted into office as a senator except by permission or affirmative action of the senate.

The cases of contest shown in the record are as follows: John Torrey, Jr., senator-elect from Ocean county (*Senate Journal,* January 12th, 1869); John Hopper, senator-elect from Passaic county (*Id.,* January 13th, 1874); Edward. F. McDonald, senator-elect from Hudson county (*Id.,* January 14th, 1890); William J. Keys, senator-elect from Somerset county (*Id.,* January 13th, 1891); Robert S. Hudspeth, senator-elect from Hudson county (*Id.,* January 12th, 1892). In each of these years the journal shows that the roll of senators was called by the secretary chosen at the preceding session of the senate, and that only the names of the hold-over senators were called as members of the then existing senate. In every instance a president *pro tempore* was chosen by the hold-over senators, acting as the senate, and was in the chair as presiding officer of that body, before any credentials of senators-elect were presented to the senate. These credentials were always presented by a hold-over senator, and the returns and protests were read and referred to a committee, or otherwise disposed of by the senate acting as a tribunal having absolute power over the subject-matter. In Mr. Torrey's case, in 1869, fourteen hold-over senators acted as the senate,

and as such elected a president *pro tempore.* The credentials of this senator-elect were presented to this senate by a member thereof, one of the hold-over senators, and on motion were referred to the committee on elections, with the petition accompanying them. Then, upon motion of a hold-over senator, the record states that he "was allowed" to take the oath prescribed by law. The oath was administered to him by the president *pro tempore* of the senate. After all this action of the senate, and not before, the record shows that he "took his seat in the senate." The only difference in Mr. Hopper's case, in 1874, was that the protest against his election was read and laid on the table, this senate being composed of fifteen hold-over senators, and his credentials were "read and approved" by the senate, and thereafter, on taking an oath in like manner, "he took his seat in the senate." In the contests in 1890, 1891 and 1892 similar action was taken by the senate, the protests in each case being read and referred to the committee on elections, the oath administered in open senate by its presiding officer, and then, and not until then, the senator-elect taking his seat as a senator. The existence of the power to thus receive protests and act thereon, to waive the production of credentials (as in 1875), to adopt special motions for admission without adjudication upon returns, to choose a president *pro tempore* by the hold-over senators, who presided and administered the oath to the incoming senators, can be supported only upon the theory that the senate is an ever-living body, the vitality of which is not interrupted by the expiration annually of the terms of a class of senators composing one-third of its membership.

At the commencement of the legislative year of 1887 there were fourteen hold-over senators, and they alone acted as the senate; they repeatedly by motion and by a majority vote postponed the organization of the senate from January 11th to February 1st, and, on this last date, the hold-over senators, still acting as the senate, elected a president *pro tempore,* and proceeded as a senate to induct the senators-elect into office in the same way as heretofore stated. This precedent

and the record of votes taken clearly show that it was then considered unquestioned that the hold-over senators constituted the senate, and that senators-elect had no right to participate in the action of the senate until they were inducted into office by the senate composed of hold-over senators in the mode that had been recognized as proper for nearly half a century.

From 1846, when Senator Wurts was chosen president *pro tempore* of the senate, to the present time, no one has ever been admitted to the senate until after the election by the hold-over senators of a president *pro tempore;* nor has the holder of credentials from any county ever been admitted to the senate (except in the case of Senator Willets, in 1875, hereinbefore referred to), except upon the presentation to that body of his credentials and its acceptance or approval of the same. No senator-elect has ever been admitted except upon the approval of his credentials or the waiver thereof by a senate, presided over by a president; nor is there a single instance, since 1845, where a senator has been inducted except by taking the oath of office in open senate, administered to him by the president of that body. The senate journals from 1849 to 1893, inclusive, show in every instance that the hold-over senators only were called to order as the senate by the secretary of the preceding session. The journal of the sessions of 1846, 1847 and 1848 do not show any participation, by vote or action in the senate, of any senators-elect, although it is stated by the secretary in those years that both senators and senators-elect appeared in their seats. The journals of those years do, however, show that no senator-elect was ever president or nominated any officer, or ever made any motion, voted upon any question, or participated in any way in the proceedings of the senate until after his credentials had been presented by an inducted senator and been received and approved by the senate. Only after this was done were these senators-elect sworn in by the president of the senate. After all this action by the senate, and not before, do the journals of these years state, as to each senator-elect, " he took his seat

in the senate." The journal of 1849, and every journal since,. expressly shows that the senate called to order consisted *only*. of the hold-over senators. No others are stated to have ap- peared in their seats or to have been called. This was so in, years when there were contests and in years when there was no contest.

The question in this case is not what the hold-over sena- tors should do in the performance of their constitutional duty, but whether they had the power and authority to act as a, senate under the constitution. If they had this power, this court cannot review their action for any reason whatever. "The question of power alone can be considered by this, court." *Fritts* v. *Kuhl*, 22 *Vroom* 206. This court has no, right to instruct the senate as to matters which involve its duty only and not its power. *Id.* 208.

This history of the senate of New Jersey, showing a claim of continuous existence on the part of hold-over senators for nearly fifty years, without protest, seems to me to be a com- plete answer to the insistment that the contention that the senate is an ever-living body is a novel one.

The unbroken usage .and construction of our constitution, for nearly fifty years by the senate itself, should, under the authority of Fritts *v.* Kuhl, settle the question of the con- tinuity of the senate and the right of the hold-over senators to judge of the elections, returns and qualifications of sena- tors-elect, unless the constitution of the state contains some clear and express provision which is incompatible with this result. That case cites with approval the following language. of Mr. Cooley, which is especially applicable to the question now before us : " When there has been a practical construc- tion which has been. acquiesced in for a considerable period, considerations in favor of adhering to this construction pre- sent themselves to the courts with a plausibility and force. which it is not easy to resist."

It is insisted, however, that our state constitution did not create a continuous senate, because it does not, in terms, pro- vide for an always-existing presiding officer, as does the con--

stitution of the United States when it makes the vice president the president of the senate, or as did our first state constitution, which made the governor the " constant president " of the legislative council. It is argued that the permanency of the presiding officer creates the permanency of the body itself, as under such a provision there is no necessity for periodical reorganization. It is also argued that the provision of our constitution that the senate shall be composed of one senator from each county in the state, elected by the legal voters from each county, is obviously to provide that each county shall be represented at all times by a senator, and have a voice in the senate, through him, on every measure or question that comes before it. It is further insisted that the continuity of the state senate is negatived by the constitutional provision requiring the two houses composing the legislature to meet separately, on the second Tuesday in January, after each election.

I cannot find in these provisions, or in any other clause in the constitution, anything which will annually disorganize the senate, as the house of assembly is disorganized every year by the expiration of the terms of all of its members. How is the existence of a permanent officer necessary for a continuous senate? The senate has express power under the constitution to choose its own officers, and whether it exists as a senate expiring every year, or as a continuous senate, that power can be exercised at any session. The death or resignation of the president of the senate would have no influence upon the continuity of that body. Whenever the senate meets and has no presiding officer, it can elect one and proceed with its business. Under the constitution of 1776, all the members of the legislative council were elected annually, for one year. So careful were the framers of that instrument to provide for the yearly disorganization of that body, that they required the members of the council to take a constitutional oath that they would never, by any act, word or proceeding, do anything which would change their term of office beyond the annual elections. The same constitution

provided that the governor of the state should be chosen annually by the joint meeting of the legislative council and the house of assembly, and each governor when thus chosen became "the constant" presiding officer of the council. The council was not, however, a continuous body because a "constant" presiding officer was provided for it, and the senate does not fail to be a continuous body because it has no constant president, while it has the power at all times to elect its own president. Its continuing existence gives it the continuing power to always have a president by its own action as a senate.

The claim that the senate of the United States is a continuous body does not rest upon the fact that the federal constitution provides an always-existing presiding officer. The provisions of that instrument upon this point are these:

"The vice president of the United States shall be president of the senate, but shall have no vote unless they be equally divided.

"The senate shall choose their other officers, and also a president *pro tempore* in the absence of the vice president or when he shall exercise the office of president of the United States."

It would be difficult, in these provisions, to find any support for the continuity of the United States senate. The absence of a presiding officer does not work the dissolution of a legislative body. What shall be done in the absence of the vice president is provided for by the federal constitution; what is to be done in the absence of the president of our state senate is provided, in the absence of rules adopted by the body, by ordinary parliamentary procedure. Our senate has the power to elect its presiding officer, and thus provision is made, which is equally efficacious with that contained in the constitution of the United States, to always have a president of the senate. Would anyone contend that if the vice president of the United States and the president *pro tempore* were both absent or dead, or unable to act, that the United States senate would cease to be a continuous body? It could and

would, under such circumstances, exercise the inherent power of every legislative body under universal parliamentary law, and choose a presiding officer, and proceed with its business, just the same as if nothing had happened to affect its existence or its powers.

An examination of the provisions of our constitution as to what constitutes the senate and a consideration of similar provisions in the federal constitution, will also fail to disclose any substantial difference affecting the question of the continuity of the two bodies.

The constitution of the United States provides that the senate shall be composed of two senators from each state, yet no one has ever contended that the fact that certain states were not represented in the senate deprived that body of its continued existence or affected the power of the other senators to act so long as a quorum remained to do business. This court has also said, in *Mueller* v. *Egg Harbor City*, 26 *Vroom* 247, that "it has never been supposed that the death of a member of a state legislature suspended its power to enact laws until the vacancy was filled." This is true because the quorum remains to do business. I have failed to find any text-writer, authority or precedent to uphold the proposition that the expiration of the terms of office of less than a quorum of a legislative body suspends its existence or any of the powers given to it by the constitution. If the United States senate continues to exercise its powers as such when certain states are unrepresented therein, it is difficult to perceive how the fact that all the counties of our state are not actually represented in the state senate at the commencement of the legislative session can deprive that body of its continued existence and right to act as the senate so long as a quorum is present. If all of the counties in the state having senators whose terms expired failed to elect senators, or elected those whom the constitution declared should *not* be members of the senate, would anyone doubt that the hold-over senators would still be a senate if the quorum provided for in the constitution remained? If they would be the senate in such a case, it is

difficult to conceive of any case in which they would not constitute a constitutional senate.

The case of *Mueller* v. *Egg Harbor City*, 26 *Vroom* 245, would seem to recognize the principle that a legislative body is not rendered incompetent to act by reason of a vacancy in its membership by death, resignation or otherwise, if a quorum remains. That was a case in Egg Harbor City. There were, at the time of the passage of an ordinance, two vacancies in the common council, caused by resignation, which the mayor had power to fill. He had not exercised this power, and only six of the ten members of the council convened and voted for the ordinance. The charter required the concurrence of a majority to pass ordinances. The court says: " In this instance six members convened and voted for the ordinance. A quorum was therefore present, and a majority of the whole number of members voted in the affirmative. A legislative body thus constituted is not rendered incompetent to act by the death or resignation of one or more of its members so long as there continues to be the quorum required by the statute. It has never been supposed that the death of a member of a state legislature suspended its power to enact laws until the vacancy was filled."

Accepting this decision as a correct statement of the law, and applying the principles upon which it is based to the present case, I am unable to perceive what force there is in the insistment that the senate must at all times be composed of one member from each of the twenty-one counties of the state. If neither death nor resignation disorganizes the senate, so long as a " quorum " remains to do business, it is because its continued existence does not depend upon every county having at all times a member in the senate. If this " quorum " is a senate for any purpose under the constitution, it is a senate for all purposes mentioned therein, and its existence is not interrupted or affected because there are senators-elect claiming seats in that body. The presence of these persons, and their presentation of credentials, has no effect whatever except to call upon this tribunal, the senate, to ex-

ercise its constitutional power as to these claimants, by judging of their elections, returns and qualifications. Our constitution and that of the United States are practically alike so far as their provisions affect this question. The constitution of the United States says : " The senate of the United States shall be composed of two senators from each state." Our constitution provides that " the senate shall be composed of one senator from each county in the state." The fact that at times the United States senate has not been thus composed, either by reason of civil war, failure of the state legislatures to act, or any other reason whatever, has never affected its continuity, either in the estimation of the senate itself or of any text-writer or judicial authority. Unless we are to adopt a different rule in this state, and to do so without precedent or authority, our senate, so long as it has a " quorum," will, like the senate of the United States, continue to be an everexisting body, unaffected by the fact that certain counties are temporarily for any reason unrepresented.

It is also contended that the New Jersey senate is not continuous because our constitution provides that the " houses shall meet separately on the second Tuesday in January next after the said day of election." It is argued that this provision negatives the idea of a continuous senate. So far from this being a supportable inference, this section may, without violence to its obvious intent, be held to be wholly irrelevant to the question before us. The direction to meet on a certain day or days could be as well given to a continuous body as to a novel one. Section 4, article 1, of the federal constitution provides that " the congress shall assemble at least once in every year, and such meeting shall be on the first Monday in December, unless they shall by law appoint a different day."

The congress consists of the senate and house of representatives. In that constitution each of these bodies is designated as a " house." The direction that congress shall assemble annually has never been construed to affect the continuity of the senate of the United States, nor have I found any writer who alludes to this direction for annual meetings as in any

way affecting this question of continuity.   The federal senate and the state senate may be called upon to meet at any time by invitation of the executive.   For *legislative* purposes the houses constituting the congress, and the houses constituting our legislature, are directed to meet at certain times, but it is difficult to perceive why a continuous senate could not, as well as a novel body, be the subject of this constitutional mandate to meet on a certain day.   Nor is it perceived why the words requiring "each house" to meet annually should be construed to disorganize the state senate, when a like requirement in the federal constitution does not affect the continuity of the federal senate.   The vitality of the body depends upon the existence of a "quorum" capable of doing business.   That quorum constitutes a senate.   Its action is the expression of the will of the senate, and no authority can be found which states any other conclusion.   All difficulty and confusion in constitutional construction is avoided by applying the rule laid down by Judge Niblack, that the continuity of the body depends upon the fact that in the senate a majority constitutes a quorum, and as there is always more than a quorum of qualified senators holding seats in that body, its organic existence is necessarily continuous.

Every other element, power or condition of the senate can be absent except that stated by Judge Niblack, and yet it will still be a continuous body.   The senate of the United States remains a continuous body because two-thirds of its members are always, in contemplation of the constitution, in existence.  That body is an ever-existing senate, although the vice president may be acting as president and the president *pro tempore* be absent or dead.   An examination will, I am confident, fail to find any provision in the federal constitution which can be successfully invoked, upon principle, to sustain the proposition that the senate is an ever-living, continuous body, except that one which provides for the division of the senate into three classes, two of which always hold over, and the further provision that makes a majority of the whole number of possible senators a "quorum" to do business and act as the

senate for all purposes. These provisions were, by the convention of 1844, incorporated into our state constitution, and,. under the case of Fritts *v.* Kuhl, should have the same force and effect as were theretofore given to them in the construction of the federal constitution.

In the argument of counsel for Mr. Rogers, great stress has been placed upon section 85 of the Election act, which makes the certificate of election *prima facie* evidence in the organization of the two houses.

The origin of this section is found in section 94 of "An act to regulate elections," passed March 12th, 1839 (*Pamph. L., p.* 229), which provides "that the legislative council and general assembly shall convene and hold their sessions in the state-house at Trenton, and shall commence their session on the fourth Tuesday of October next after they shall have been elected ; and in the organization of each house the certified copies of the statements of determination made under the direction of the seventy-eighth section of this act shall be deemed and taken to be *prima facie* evidence of the right of the persons therein mentioned to seats in the houses respectively" to which they shall have been elected.

In 1839 both houses—the legislative council and the general assembly—were yearly bodies, expiring annually as to their entire membership.

The constitution of 1776, then operative, vested the government "in a governor, legislative council and general assembly." Under it the counties severally chose annually, at the same election, one person to be a member of the legislative council and three members of assembly, with the right of a majority of the representatives in council and general assembly convened, to add to or diminish the number or proportion of the members of the assembly for any county. Under this instrument the assembly and council, "when met," were severally made the judges of the qualifications and elections of their own members. The constitution was silent with reference to "returns." It appears that the act of 1839 was passed in view of this omission in the constitution, and the

legislature had undoubtedly a right, in the absence of consti-
tutional provision in reference thereto, to declare that certified
copies of the statements of determination of election made by
the board of county canvassers should be *prima facie* evi-
dence of the result of the election.

When the convention framed the constitution of 1844 it
provided therein not only that the senate should be the judge
of the elections and qualifications of its members, as provided
in the constitution of 1776, but it went further and gave the
senate like power as to the "returns." The power as to all
these matters affecting senators-elect was thereafter vested in
the senate itself. The act of the legislature of 1846, passed
after the adoption of the constitution and after the second
meeting of the senate elected under that instrument, cannot,
therefore, affect or in any way abridge these powers of the
senate given to it by the constitution of 1844. This view is
recognized as "invincible" in the opinion of the court, read
by the Chief Justice, if the proposition is established that
"the senate is ever-living" If, therefore, it has been demon-
strated that the state senate, like the federal senate, is a con-
tinuous body, the act of 1846 is void in so far as it purports
to establish a rule controlling its action in a matter committed
to the exclusive jurisdiction of the senate by the constitution.

The Supreme Court has clearly stated the limitation of the
power of the legislature in this matter, in reference to the
house of assembly, and the same rule applies to the senate
under the same constitutional provision. The court says:
"The legislature have the power to determine the source from
which the certificate of election shall issue, but the house of
assembly being, by the constitution, the judge of the election
of its own members, can go behind the certificate whether
issued by a board of canvassers or by order of a justice of
the Supreme Court, and finally decide who is entitled to the
seat. *Ruh* v. *Frambach,* 18 *Vroom* 85, 88.

If it was ever the intention of the legislature to attempt
to give any force or validity to the certificates of the county
boards of canvassers, except to make them evidence, in the

first instance, of the right of the holders thereof to claim as members-elect, an examination of the record and history of the senate will show that the act has remained a dead letter since its passage. The record shows that the senate has never given to the certificates of election any force or validity not entirely subject to the will of the senate. In the unbroken history of the senate since the act was passed in 1846, no member has ever been admitted upon his credentials as a matter of right. The senate, in every instance, according to its record, has passed upon these credentials. Sometimes it has waived their presentation, at other times it has admitted the senator-elect and referred the credentials to the committee on elections for trial thereafter, but always, the record shows, without a single exception, the senate has asserted its right to decide upon the admission of the members-elect. No senator-elect has ever been inducted except with the consent of the senate as an existing body. In every instance these credentials have been presented by a hold-over senator, or, if presented after the first meeting in January, then by a member of the senate, theretofore inducted into office by the action of the senate.

With this unbroken line of precedents, it may be stated with confidence that a certificate of election entitles the holder to no right whatever as against the constitutional power of the ever-existing senate to take such action thereon as it may decide to be proper.

The consideration stated having led me irresistibly to the conclusion that the senate, at the commencement of the legislative session of 1894, was a continuous body, composed of the two classes of hold-over members, it necessarily follows that, on the 9th of January, 1894, the thirteen hold-over senators who composed the two classes of senators whose terms had not expired at that time were the senate of New Jersey, and as such had the exclusive right to decide upon the qualifications, elections and returns of the eight senators-elect. If this be established then the body composed of seven senators-elect and four hold-over senators was not, at that

time, the true senate of New Jersey, authorized to determine the elections, returns and qualifications of these senators-elect, and had no power to elect a president of the senate.

The question still remains, was the body which elected Mr. Adrain its presiding officer the senate of New Jersey ?

The constitution provides, in reference to the senate and assembly, that " a majority of each shall constitute a quorum to do business." Art. 4, § 4, ¶ 2. This paragraph should be construed in connection with article 4, section 2, which provides that " the senate shall be composed of one senator from each county in the state." These taken together would require in this state eleven senators to constitute a " quorum " to do business. There was at that time no rule of the senate in existence enabling the nine senators present to compel the attendance of absent members. The rules adopted in 1893 had been expressly limited in their application to that session of the senate, and the power to make rules necessarily carried with it the power to fix the time during which they would be operative, subject always to the power of the senate to create or change rules at any time in its discretion.

Mr. Adrain was not, on the 9th of January, 1894, president of the senate by reason of his election as such at the session of 1893, because the senate in 1893, in the exercise of its power to choose its presiding officer, had limited his term of office to that session. It is further contended on his behalf that the four hold-over senators ratified the proceedings of the nine by their acquiescence, and that if that contention cannot be sustained he is nevertheless the president of the senate, because nine senators were two more than a majority of the thirteen senators then holding office, and that consequently their action was the action of the senate.

To support this contention the court has been referred by counsel to the standing rule of the United States senate, which provides that "A quorum shall consist of a majority of the senators duly chosen *and sworn*." *Barc. Dig.*, 1868, *p.* 233.

That this is the present rule of the United States senate is unquestioned, and its application to legislation in that body

is such that the most important measures may be enacted without the assent of a number equal to a majority of all the senators to which all the states are entitled under the constitution. Within a few weeks a most important measure, affecting the coinage of silver, was passed in the United States senate by forty-four affirmative votes, there being then two or three vacancies existing in the representation of the forty-four states.

The constitution of the United States provides that a "majority of each [house] shall constitute a quorum to do business," and this provision was copied into our state constitution of 1844. If the above rule, now in force in the federal senate, had been in force at the time of the adoption of our constitution, in 1844, the contention based thereon would be controlling. The present rule, however, was not in force in 1844, and consequently its definition of a "quorum" was unknown to the able statesmen who composed the constitutional convention of that year. On the contrary, the *opposite rule* then prevailed. Prior to 1864 it was held by the senate of the United States that a "quorum" could be formed only by the presence of a majority of all the senators possible from all the states. On June 30th, 1862, Senator Sherman introduced the following resolution: "That a majority of the senators duly elected and entitled to seats in this body is a constitutional quorum," which met with such opposition that it was not until the 1st day of May, 1864, that it was finally adopted in the following form: "*Resolved,* That a quorum of the senate consists of a majority of the senators duly chosen." The rule adopted was modified in 1868 by adding the words "and sworn." This rule, changing the basis of the "quorum," had its origin in the fear that the senate of the United States, by reason of secession and other events, was in danger of being frequently without a quorum, if the rule requiring a majority of all the senators possible under the constitution was adhered to. The necessity for the adoption of Mr. Sherman's resolution has passed away, but the rule has been continued in its present shape since 1868. The

interesting debate upon this resolution during the two years that it was pending shows conclusively that, at the time of the adoption of our constitution in 1844, the unchallenged practice of the United States senate required the presence of a majority of all possible senators to constitute a quorum. *Cong. Globe,* 1861–62, 1863–64, *Index, tit. "Quorum."* This being the view held in the United States senate when our convention met in 1844, it is safe to assume that when its members adopted the language of the United States constitution as to a " quorum," they meant to use it in the sense then accepted by the senate of the United States. I therefore assume that, on the 9th of last January, the presence and participation of at least eleven senators were necessary to constitute a quorum of the senate of New Jersey. At the usual hour for commencing the annual session of the legislature there were but nine senators in the chamber, and it was not within the power of these nine to choose a president of the senate or do any other business as a senate. They had, however, the right common to every body—to choose one of their number to preside over their deliberations. The constitution confers upon a number less than a quorum the right to adjourn from day to day, and that this might be done in an orderly manner, it was proper that one of such minority should be called upon to preside. The person thus chosen to provide form for the doings of this minority would not, however, be the president of the senate, because the senate was not present at his election. It is further contended that after Mr. Adrain had, upon *motion* adopted by nine senators, taken the chair, the four other hold-over senators appeared and thus supplied the number necessary to constitute a quorum. If the four had, as a matter of fact, joined the nine in acting upon the resolution which is depended upon to secure Mr. Adrain's title, there would be good ground for the contention in this case that he was elected president by their votes. The meeting of the thirteen hold-over members would then have constituted the senate of New Jersey, and they could have proceeded to the enactment of laws, and have done all other

acts that a senate of twenty-one members may do.    The four, however, insist that they did not join the nine, that they did not act with them, and that they were present only for the purpose of demanding the induction of certain senators-elect upon the presentation of their credentials.    They further insist that their demands meeting with refusal, they withdrew from the company of the nine.    The evidence in this case clearly supports this claim, and the mere presence of the four in the senate chamber, in the attitude of protestants, and distinctly refusing to act with the nine, except upon certain conditions which were denied, cannot be held to have supplied the "quorum" necessary to do business.    Mr. Adrain was, therefore, only presiding officer of a body consisting of nine senators, and was not elected president of the senate by a "quorum" of that body.

In view of these conclusions, I am of the opinion that judgment of ouster should be entered against both respondents.